**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

NOALA FRITZ, et al.,

          Plaintiffs,

    v.

IRAN AND CHINA INVESTMENT
DEVELOPMENT GROUP, d/b/a
LUBIAN.COM,

          Defendant.

Civil Action No. 1:25-cv-07093

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION FOR *EX PARTE* ORDER OF ATTACHMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 2

    I.      Victims Secure $9.1 Billion in Judgments Against Iran for Sponsoring
Terrorism ......................................................................................... 2

    II.     Iran Evades Sanctions Through Cryptocurrency Mining ....................... 4

    III.    The Iran-China Group Collaborates with Iran to Mine Cryptocurrency ............... 6

    IV.   The Bitcoin Belonging to the Iran-China Group Are Hacked, and the
United States Later Takes Custody of Them ......................................... 10

LEGAL BACKGROUND ..................................................................................... 11

ARGUMENT ..................................................................................................... 12

    I.      The Bitcoin Are Subject to Attachment Under TRIA ......................... 12

        A.     It Is Probable That the Iran-China Group Is an Agency or
Instrumentality of Iran ................................................... 13

        B.     It is Probable that the Bitcoin Are Blocked Assets of Iran ...................... 17

    II.     The Court Should Order Attachment Under CPLR Article 62 ............................ 19

        A.     Attachment Is Authorized Under CPLR § 6205 ....................................... 19

        B.     Victims Satisfy All Remaining Requirements for Attachment ................. 21

    III.    The Court Should Issue an Order of Attachment *Ex Parte* Under CPLR
§ 6211 ........................................................................................... 25

    IV.   The Court Should Permit Alternative Service ....................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Dohan v. Kouyoumjian*,
   451 N.Y.S.2d 367 (Sup. Ct. 1982) ........................................................................27

*Bakalar v. Vavra*,
   619 F.3d 136 (2d Cir. 2010) .................................................................................18

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016) ..............................................................................................11

*Beauvais v. Allegiance Sec., Inc.*,
   942 F.2d 838 (2d Cir. 1991) .................................................................................22

*Bennett v. Islamic Republic of Iran*,
   825 F.3d 949 (9th Cir. 2016) ................................................................................23

*Brown v. United Airlines, Inc.*,
   720 F.3d 60 (1st Cir. 2013) ..................................................................................23

*City of New York v. Midmanhattan Realty Corp.*,
   464 N.Y.S.2d 938 (Sup. Ct. 1983) .......................................................................22

*Commonwealth of North Mariana Islands v. Canadian Imperial Bank of Com.*,
   990 N.E.2d 114 (N.Y. Ct. App. 2013) .................................................................22

*Counihan v. Allstate Ins. Co.*,
   25 F.3d 109 (2d Cir. 1994) ...................................................................................19

*Doe v. JPMorgan Chase Bank, N.A.*,
   899 F.3d 152 (2d Cir. 2018) .................................................................................17

*Elton Leather Corp. v. First Gen. Resources Co.*,
   138 A.D.2d 132 (N.Y. App. Div. 1988) ..............................................................25

*Est. of Botvin by Ellis v. Heideman, Nudelman & Kalik, P.C.*,
   115 F.4th 594 (D.C. Cir. 2024) .......................................................................25, 26

*Est. of Levin v. Wells Fargo Bank, N.A.*,
   156 F.4th 632 (D.C. Cir. 2025) ............................................................................22

*Exec. House Realty v. Hagen*,
   438 N.Y.S.2d 174 (Sup. Ct. 1981) .......................................................................26

*Fritz v. Islamic Republic of Iran*,
   320 F. Supp. 3d 48 (D.D.C. 2018) .........................................................................3

*Greenbaum v. Islamic Republic of Iran*,
   67 F.4th 428 (D.C. Cir. 2023) ..............................................................................24

**Page(s)**

*Grp. One Ltd. v. GTE GmbH,*
    523 F. Supp. 3d 323 (E.D.N.Y. 2021) ..................................................................27

*Havlish v. Taliban,*
    152 F.4th 339 (2d Cir. 2025) .............................................................................20

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) ...........................................................................................15

*Hosseini v. Nielsen,*
    911 F.3d 366 (6th Cir. 2018) ............................................................................15

*In re Islamic Republic of Iran Terrorism Litig.,*
    659 F. Supp. 2d 31 (D.D.C. 2009) .....................................................................24

*JDF Realty, Inc. v. Kim,*
    2010 WL 231624 (N.Y. Sup. Ct. Jan. 6, 2010) .....................................................21

*Kirschenbaum v. 650 Fifth Ave. & Related Props.,*
    830 F.3d 107 (2d Cir. 2016) ..............................................12, 13, 14, 15, 16, 17, 19

*Kirschenbaum v. 650 Fifth Ave.,*
    257 F. Supp. 3d 463 (S.D.N.Y. 2017) ................................................................14

*Levin v. Bank of N.Y. Mellon,*
    2019 WL 564341 (S.D.N.Y. Feb. 12, 2019) .........................................................17

*Levinson v. Kuwait Fin. House (Malaysia) Berhad,*
    44 F.4th 91 (2d Cir. 2022) ..................................................................11, 13, 21, 24

*In re Liquidation of Jugobanka, A.D.,*
    995 N.Y.S.2d 906 (Sup. Ct. 2014) .....................................................................26

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran
    v. Elahi,*
    556 U.S. 366 (2009) .......................................................................................22

*Mistyrise Int'l Ltd. v. Corporacion Electrica Nacional S.A.,*
    2024 WL 5184360 (N.Y. Sup. Ct. Dec. 20, 2024) .............................................19, 21

*Ned Chartering & Trading, Inc. v. Republic of Pakistan,*
    130 F. Supp. 2d 64 (D.D.C. 2001) .....................................................................20

*Nw., Inc. v. Ginsberg,*
    572 U.S. 273 (2014) .......................................................................................23

*Owens v. Republic of Sudan,*
    826 F. Supp. 2d 128 (D.D.C. 2011) .....................................................................3

*Owens v. Turkiye Halk Bankasi A.S.,*
    2021 WL 638975 (S.D.N.Y. Feb. 16, 2021) .........................................................25

*Pharo Gaia Fund Ltd. v. Bolivarian Republic of Venezuela,*
    2021 WL 2168916 (S.D.N.Y. May 27, 2021) .......................................................20

**Page(s)**

*Roth v. Islamic Republic of Iran,*
　78 F. Supp. 3d 379 (D.D.C. 2015) ............................................................................3

*Roth v. Islamic Republic of Iran,*
　No. 11-1377, Dkt. 43 (D.D.C. Jan. 27, 2015) ........................................................20

*Rubin v. Islamic Republic of Iran,*
　583 U.S. 202 (2018) .............................................................................................12, 23

*Savage Servs. Corp. v. United States,*
　25 F.4th 925 (11th Cir. 2022) ...............................................................................23

*SEC v. Coinbase, Inc.,*
　726 F. Supp. 3d 260 (S.D.N.Y. 2024) ...................................................................18

*Shamrock Farms Co. v. Veneman,*
　146 F.3d 1177 (9th Cir. 1998) ...............................................................................23

*Solomon R. Guggenheim Found. v. Lubell,*
　77 N.Y.2d 311 (Ct. App. 1991) .............................................................................18

*Spencer v. Islamic Republic of Iran,*
　71 F. Supp. 3d 23 (D.D.C. 2014) ............................................................................3

*Stansell v. Revolutionary Armed Forces of Colombia,*
　45 F.4th 1340 (11th Cir. 2022) ..............................................................................15

*TAGC Mgmt., LLC v. Lehman,*
　842 F. Supp. 2d 575 (S.D.N.Y. 2012) ...................................................................25

*United States v. 500 Delaware St.,*
　868 F. Supp. 513 (W.D.N.Y. 1994) .......................................................................19

*United States v. Harmon,*
　474 F. Supp. 3d 76 (D.D.C. 2020) .........................................................................18

*Wamai v. Indus. Bank of Korea,*
　2021 WL 3038402 (S.D.N.Y. July 14, 2021) ........................................................25

*Weinstein v. Islamic Republic of Iran,*
　609 F.3d 43 (2d Cir. 2010) .....................................................................................23

**Statutes**

28 U.S.C. § 1395 .......................................................................................................17

28 U.S.C. § 1604 .......................................................................................................11

28 U.S.C. § 1605 (1996) ...........................................................................................13

28 U.S.C. § 1605A ...............................................................................................11, 12

28 U.S.C. § 1608 ...................................................................................................3, 20

Page(s)

28 U.S.C. § 1609 ...................................................................................................11

28 U.S.C. § 1610 ............................................................................................11, 20

CPLR § 105 ...........................................................................................................22

CPLR § 308 ...........................................................................................................26

CPLR § 5225 ...........................................................................................13, 21, 24

CPLR § 5227 ..................................................................................................21, 24

CPLR § 6201 ...........................................................................................................24

CPLR § 6205 .....................................................................................2, 12, 19, 20, 24

CPLR § 6211 ........................................................................................2, 12, 25, 27

CPLR § 6212 ..............................................................................................12, 13, 21

CPLR § 6214 ...........................................................................................................26

CPLR § 6226 ...........................................................................................................26

N.Y. Est. Powers & Trusts Law § 13-A-1 ............................................................18

TRIA, Pub. L. No. 107-297, § 201, 116 Stat. 2337 (Nov. 26, 2002) ...........2, 11, 17, 23

**Regulations**

31 C.F.R. § 560.211 .................................................................................................4

31 C.F.R. § 594.201 .................................................................................................4

Exec. Order No. 13599, 77 Fed. Reg. 6659 (Feb. 5, 2012) ...............................4, 17

**Rules**

Fed. R. Civ. P. 4.1 .................................................................................................26

Fed. R. Civ. P. 64 ............................................................................................11, 19

Fed. R. Civ. P. 69 ............................................................................................11, 19

Local Civil Rule 6.1 ...............................................................................................25

**Other Authorities**

148 Cong. Rec. H8728 (Nov. 13, 2002) ...............................................................11

*Arkham Uncovers $3.5B Heist – The Largest Ever*, Arkham (Aug. 2, 2025),
    https://info.arkm.com/announcements/arkham-uncovers ...............................10

Black's Law Dictionary (10th ed. 2014)...............................................................15

**Page(s)**

Black's Law Dictionary (12th ed. 2024)......................................................................16

*Block Producer*, https://crypto.com/us/glossary/block-producer .....................................8

*Crypto Wallets*, Fidelity, https://www.fidelity.com/learning-center/trading-
    investing/crypto/crypto-wallet ...............................................................................10

David D. Siegel & Patrick M. Connors, *Siegel's New York Practice* § 316 (6th ed.
    2020) ...................................................................................................................19

Marcus George, *Iran Pledges to Counter "Malicious" Oil Embargo*, Reuters
    (July 1, 2012) .........................................................................................................4

*Mining Pool*, https://crypto.com/en/glossary/mining-pool .............................................8

Oxford English Dictionary Online .............................................................................14

Sara Bazoobandi, *Populism, Jihad, and Economic Resistance: Studying the
    Political Discourse of Iran's Supreme Leader*, 32 Dig. of Middle East Stud.
    321 (2023)..............................................................................................................4

*U.S. Sanctions Won't Change Iran Policies Says FM*, Radio Free Europe (Dec.
    15, 2018), https://tinyurl.com/5dayuvrx .....................................................................4

Webster's Third New International Dictionary (1993)....................................................15

*What Is Mining?*, Coinbase, https://www.coinbase.com/learn/crypto-basics/what-
    is-mining ................................................................................................................5

## PRELIMINARY STATEMENT

Plaintiffs are 2,282 victims of terrorism ("Victims") who hold over $9.1 billion in U.S. court judgments against the Islamic Republic of Iran ("Iran") for its role in the 2006 and 2007 kidnappings and murders of four U.S. service members in Iraq, the 2001 Hamas bombing of a restaurant in Jerusalem, Israel, the 1998 bombings of the U.S. embassies in Kenya and Tanzania, and the 1983 Hezbollah bombing of U.S. Marine barracks in Beirut, Lebanon. Their final judgments were entered years ago. Iran has full knowledge of the judgments, but it refuses to honor them. Its failure to pay means that Victims must find Iranian assets on their own to enforce against. That is what Victims seek to do in this case.

Consistent with its disregard for the rule of law, Iran goes to extreme measures to hide its assets and evade justice, all while flagrantly disregarding U.S. sanctions laws. To that end, Iran has engaged in a massive cryptocurrency-mining operation, acting here through the Iran and China Investment Development Group ("Iran-China Group"), using the name Lubian.com or LuBian, to obtain Bitcoin to avoid U.S. sanctions and judgment-enforcement efforts by Iran's creditors. As the result of a hacker breaking into LuBian's digital wallets, approximately 127,271 Bitcoin held by the Iran-China Group ("Bitcoin") are now in the United States and the subject of a forfeiture action by the U.S. government pending in this Court.

Federal and state law authorize Victims to attach the Bitcoin and the Iran-China Group's interests in them in satisfaction of Victims' judgments against Iran because the Iran-China Group is an agency or instrumentality of Iran—it provided material support and served a material function for Iran, enabling Iran to skirt sanctions by turning Iranian energy into cryptocurrency. The Terrorism Risk Insurance Act ("TRIA") authorizes attachment of blocked assets (which include assets "seized … by the United States") belonging to a terrorist party or its agency or

1

instrumentality, "[n]otwithstanding any other provision of law." Pub. L. No. 107-297, § 201(a), 116 Stat. 2337 (Nov. 26, 2002), codified at 28 U.S.C. § 1610 Note. Because the Bitcoin are blocked assets of the Iran-China Group—an agency or instrumentality of Iran—they are attachable under TRIA.

Victims also meet the procedural requirements for attachment under New York law. Article 62 of the CPLR, specifically CPLR § 6205, equips Victims to attach the Bitcoin in aid of execution of their judgments against Iran, and Victims satisfy all prerequisites for attachment under the CPLR.

Accordingly, Victims respectfully request that this Court enter a writ of attachment against the Bitcoin and the Iran-China Group's interests in them to secure the Bitcoin for satisfaction of Victims' multi-billion-dollar judgments against Iran.[1] Victims make this emergency request *ex parte*, pursuant to CPLR § 6211(a), because of the many parties who have already come forward and are imminently asserting interests in the Bitcoin. For the same reason, Victims request permission to effect alternative service of the attachment order and confirmation materials on the United States and notice of these proceedings to Iran and the Iran-China Group.

## FACTUAL BACKGROUND

### I.    Victims Secure $9.1 Billion in Judgments Against Iran for Sponsoring Terrorism

Iran's decades-long support of global terrorism is well-known and staggering. Each of the 2,282 individual plaintiffs in this case have had their lives inalterably damaged by Iran's support for terrorist attacks:

---

[1] Because the value of Bitcoin fluctuates, all the Bitcoin may be necessary to satisfy Victims' judgments once this action is completed. Attachment of all the Bitcoin is therefore warranted.

- *Iraq Abductions and Murders*:  In October 2006 and January 2007, four U.S. servicemen were abducted and murdered in Iraq by the Iranian-backed militia Asa'ib Abl Al-Haq.  Dkt. 1 ("Compl.") ¶¶ 24-32.

- *Jerusalem Bombing*:  In August 2001, the Iranian-backed terror group Hamas detonated a bomb at a Sbarro restaurant in Jerusalem, Israel, killing 15 people, including 15-year-old U.S. citizen Malka Roth.  Compl. ¶¶ 37-39.

- *Embassy Bombings*:  On August 7, 1998, al Qaeda carried out suicide bombings on the U.S. embassies in Tanzania and Kenya, with Iranian instruction and assistance.  Compl. ¶ 43.  Over 224 people were killed and more than 5,000 were wounded.  *Id.*

- *Beirut Bombing*:  On October 23, 1983, the Iranian-backed terror group Hezbollah suicide-bombed the U.S. Marine barracks in Beirut, Lebanon, killing 241 U.S. servicemen and injuring many others.  Compl. ¶¶ 49-51.

In various actions filed in the U.S. District Court for the District of Columbia beginning in 2001, Victims sued Iran for sponsoring these terrorist attacks.  Iran never appeared in the lawsuits, so, under the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs had to prove their claims "by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  The district court undertook extensive fact-finding and found Iran responsible for each attack, entering judgments against Iran totaling more than $9.1 billion.  Compl. ¶ 11; *see Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 84-86 (D.D.C. 2018) (Iraq murders); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 404 (D.D.C. 2015) (Jerusalem Bombing); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 136 (D.D.C. 2011) (Embassy Bombings); *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 25 (D.D.C. 2014) (Beirut Bombing).

## II.    Iran Evades Sanctions Through Cryptocurrency Mining

Since the 1979 Iranian Revolution, Iran has faced comprehensive U.S. sanctions aimed at combatting its capacity and willingness to sponsor terrorist operations. *See, e.g.*, Exec. Order No. 13599, 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012) (blocking assets in which Iran or its agencies and instrumentalities have an interest); *see also* 31 C.F.R. § 560.211 (Iran Transactions and Sanctions Regulations implementing the executive order); *id.* § 594.201(a)(5) (Global Terrorism Sanctions Regulations blocking assets of "officials, agents, or affiliates of Iran's Islamic Revolutionary Guard Corps"). For just as long, Iran has sought to evade these sanctions. For example, Ayatollah Khamenei declared 2011 "The Year of Economic Jihad" and directed "the Iranian nation [to] focus the major portion of its efforts on the economic arena" to combat "the centers of global power." Sara Bazoobandi, *Populism, Jihad, and Economic Resistance: Studying the Political Discourse of Iran's Supreme Leader*, 32 Dig. of Middle East Stud., 321, 325 (2023). The next year, Iranian oil minister Rostam Qasemi asserted that "[a]ll possible options have been planned in government to counter sanctions." Marcus George, *Iran Pledges to Counter "Malicious" Oil Embargo*, Reuters (July 1, 2012), https://tinyurl.com/2ck224v6. And after facing renewed sanctions in 2018, Iranian foreign minister Mohammad Javad Zarif boasted that "[i]f there is an art we have perfected in Iran … it is the art of evading sanctions." *U.S. Sanctions Won't Change Iran Policies Says FM*, Radio Free Europe (Dec. 15, 2018), https://tinyurl.com/5dayuvrx.

Over the last decade, Iran has turned to cryptocurrency as a central part of its sanctions-evasion strategy. *See generally* Declaration of Dr. Jessica Davis ("Davis Decl."). Cryptocurrency allows Iran to skirt sanctions in multiple ways. Iran uses cryptocurrency transactions to pay for imports that cannot be processed through conventional payment systems, to exchange for foreign currency, and to move capital out of Iran, since cryptocurrency exchanges are not subject to international banking controls. *Id.* ¶ 21-22, 62-65. Perhaps most importantly, Iran uses

cryptocurrency to launder its considerable oil and gas reserves, by converting them into electricity that is then used to fuel cryptocurrency mining.[2]  *Id.* ¶¶ 25-34.  Iran then conscripts the resulting cryptocurrency toward a variety of illicit purposes.  *See id.* ¶ 35.

Iranian leaders have openly broadcasted their turn to cryptocurrency to mitigate the effects of sanctions.  An official in former President Hassan Rouhani's administration, for example, explained that cryptocurrency "facilitates the movement and transfer of money to any point in the world" and thus "assists [Iran] … under sanctions conditions."  Davis Decl., Ex. 3.  A member of the Iranian Parliament similarly claimed that "[t]he use of digital currency is most efficient during times of sanctions."  *Id.*, Ex. 4  And a provincial economic official, speaking at the opening of the cryptocurrency mine operated by the Iran-China Group, asserted that Iran is "creating a form of electricity export" when it converts energy into cryptocurrency—"a solution" to U.S.-imposed sanctions.  *Id.*

To realize the sanctions-evasion potential of cryptocurrency, Iran has adopted numerous policies both to foster cryptocurrency mining and tighten governmental control over cryptocurrency.  Iran offers cheap electricity rates, critical since electricity is a "miner's greatest cost."  Declaration of Avigdor Sason Cohen ("Cohen Decl.") ¶¶ 24-25.  In 2019, Iran began requiring all cryptocurrency miners to obtain a license from the Ministry of Industry, Mines, and Trade.  Davis Decl. ¶ 37.  That same year, Iran subjected crypto miners to its standard "industrial tax" of 25% of income but provided that they could avoid the tax entirely by converting their

---

[2] Cryptocurrency mining is the process used to generate new cryptocurrency "coins" by verifying and recording transactions on the blockchain.  *See What Is Mining?*, Coinbase, https://www.coinbase.com/learn/crypto-basics/what-is-mining.  The process requires the miners to contribute "vast amount[s] of computing power" and generates coins as rewards.  *Id.*

crypto into foreign currency and funneling it back into the Iranian economy. *Id.* ¶ 58. Thus, Iran directly incentivized crypto miners to help them skirt sanctions.

Iran subsequently ratcheted up its control over cryptocurrency operations. On October 4, 2020, the Iranian Cabinet approved a resolution directing that "[c]ryptocurrencies mined under licenses issued pursuant to this resolution may be exchanged *solely* for the purpose of supplying foreign currency for the country's imports." Davis Decl. ¶ 60 & Ex. 26. The decree obligated miners to "offer the newly produced primary cryptocurrency … directly without intermediaries, to the channels designated by the Central Bank of [Iran]," in proportion to the power required to generate each unit of cryptocurrency. *Id.*, Ex. 26.

These efforts transformed Iran into a hub for cryptocurrency mining. By 2021, the electricity "used by miners in Iran" required the energy "equivalent of approximately 10 million barrels of crude oil." Davis Decl., Ex. 7, at 4.

## III.    The Iran-China Group Collaborates with Iran to Mine Cryptocurrency

In 2020, a key part of Iran's cryptocurrency initiative was the massive crypto mining "farm" located in the Rafsanjan Special Economic Zone in Kerman Province—touted by Iranian media as "the largest digital currency production unit in Iran." Cohen Decl. ¶ 48. The site was built and operated by the Iran-China Group in partnership with Iran. *Id.* ¶¶ 26-70.

Iran's cooperation was integral in setting up the Iran-China Group's facility. As Iran-China Group Chairman Mohammad Hassan Ranjbar put it, the Group's relationship with Iran is one of "mutual help." Cohen Decl., Ex. 30. Iran issued a mining license to the Iran-China Group in 2019. Cohen Decl. ¶ 38 & Ex. 11. The mine launched in December 2019 with the knowledge and approval of senior Iranian officials—an adviser to Iran's President opened the mine, and Iran's infamous Islamic Revolutionary Guard Corps, individually designated by the United States as a terrorist organization, also collaborated on the mine. Davis Decl. ¶¶ 49-51.

Moreover, Iran opened special "customs channels" and provided for ships affiliated with Iran's state-owned shipping company (the Islamic Republic of Iran Shipping Lines) to import critical tools for the Rafsanjan mine, such as powerful "Taurus" mining machines. Cohen Decl. ¶¶ 184-92. Many of the ships carrying this equipment were individually sanctioned by the United States. *Id.* ¶¶ 188, 192. Using these ships, multiple consignments of crypto-mining hardware were imported from China into Iran with "Iran & China Investment Development Group" or close variants listed as the consignee for the shipments, and the Rafsanjan Special Economic Zone listed as the destination. *Id.* ¶¶ 41-45.

Iran also offered electricity to the site at reduced rates—a critical contribution given the massive amounts of electrical power mining requires. Although facially, the mine appeared to be charged normal mining rates for electricity, careful examination of the relevant documentary, photographic, and blockchain evidence reveals that the mine was likely pulling as much as half of its power from an electric substation owned by Iran and associated with a ferrochrome factory that the Iran-China Group also built at the Rafsanjan site, which was subject to much lower industrial electricity rates. Cohen Decl. ¶¶ 156-83, 215-19. In effect, this arrangement functioned "as a state-administered subsidy on mining power." *Id.* ¶ 218. The Iran-China Group further sought special dispensations from Iran's state-owned power company: During a series of regional outages, its Chairman requested permission to restart mining operations at the Rafsanjan site during off-peak hours. *Id.* ¶ 59.

Underscoring its close working relationship with the government, the Iran-China Group built and donated critical electrical infrastructure at the Rafsanjan site to Iran. As Chairman Ranjbar touted in a January 2021 public post, the Iran-China Group "donate[d]" two electric substations for the mine and ferrochrome factory, and a portion of the Zarand-Rafsanjan power

transmission line to the Iranian government.  Cohen Decl. ¶ 160.  On Instagram, the Iran-China Group similarly boasted of donating a 175 MW transformer for the mine to the Iranian government. Cohen Decl., Ex. 33.

Once constructed, the Rafsanjan facility operated using over 50,000 high-powered computers built specially for mining cryptocurrency and capable of drawing 175 MW of electrical power—the power equivalent to that consumed by New Orleans.  Cohen. Decl. *Id.* ¶ 48-49. Electricity billing records confirm that the mine drew massive amounts of power, dwarfing typical industrial use, though even these bills likely did not show all power consumption.  *Id.* ¶¶ 179, 216-17.

"[M]any of the country's senior economic officials" attended the opening of the mine, including the Secretary of the Supreme Council of Iran's Free Trade-Industrial and Special Economic Zones, the Deputy Governor for Economic Coordination of Kerman Province, and the Member of Parliament representing Rafsanjan, underscoring the Iran-China Group's close working relationship with these authorities.  Davis Decl. ¶¶ 47-48; Cohen Decl., Exs. 37, 38.  At the opening, the Deputy Governor spoke about how the mine was "creating a form of electricity export" that was the "solution" to sanctions.  Davis Decl., Ex. 4.

Once it was operating, the Iran-China Group conducted its mining operation under the pool label "LuBian," tagging itself as "lubian.com" in transactions on the blockchain.[3]  Cohen Decl. ¶¶ 71-119.  LuBian pool's computing power matches that of the Rafsanjan site, and LuBian's block production[4] maps directly onto what would be expected from a farm the size of the Iran-

---

[3] A pool "is the consolidation of computational power amongst a group of cryptocurrency miners" to enable more efficient mining.  *Mining Pool*, https://crypto.com/en/glossary/mining-pool.

[4] Block production is the process of generating and validating new "blocks"—units of transaction data on the blockchain.  *Block Producer*, https://crypto.com/us/glossary/block-producer.

China Group's. *Id.* ¶¶ 75-85. Moreover, LuBian's block production correlates closely to the timing and capacity of the sanctioned shipments of 50,000 miners from China to the Iran-China Group in Rafsanjan—following these shipments, no other miner of that scale came online during the relevant period. *Id.* ¶¶ 107-09. LuBian's activity also correlates closely with known Iranian power outages; for example, during a power outage crisis in Iran in January 2021, LuBian's activity dropped sharply while Rafsanjan experienced multi-hour and multi-day grid interruptions, before recovering when grid conditions improved. *Id.* ¶¶ 86-88. Notably, LuBian's purported co-founder, Liu Ping, described LuBian as operating the largest compliant Bitcoin mining farm in Iran—a claim that the Iran-China Group also touted. *Id.* ¶ 110; *see also id.* ¶ 34 & Ex. 8. Ping also boasted of LuBian's "good relations" with Iran's Ministry of Energy, Ministry of Foreign Affairs, and "even the army," which mirrors reporting on and claims made by the Iran-China Group. *Id.* ¶ 110; *see, e.g.*, *id.*, Ex. 6; Davis Decl., Ex. 20, at 4. Accordingly, "'LuBian' is the dedicated pool identity of th[e] Iran-China Group mining operation." Cohen Decl. ¶ 119.

Through LuBian, the Iran-China Group's collaboration with Iran enabled it to build a massive mining operation that, at its peak in 2020, accounted for 6% of global Bitcoin mining. Cohen Decl. ¶ 98. As the U.S. government has acknowledged, LuBian "produced large sums of clean bitcoin dissociated from criminal proceeds," and was once "the sixth largest bitcoin mining operation in the world." *United States v. Approximately 127,271 Bitcoin*, No. 1:25-cv-05745, Dkt. 1 ¶ 49 (E.D.N.Y. Oct. 14, 2025) ("Forfeiture Compl."). Before it was hacked in December 2020, the Iran-China Group mined at least 11,000 Bitcoin in Iran—which under Iranian law was subject to taxation or required to be channeled to Iran's Central Bank. *Supra* pp.5-6. Through its operations, the Iran-China Group also accumulated at least another 116,000 Bitcoin in its dedicated wallets, *see* Cohen Decl. ¶ 148—digital repositories for cryptocurrency that can only be accessed

using a private key similar to a complicated password, *see Crypto Wallets*, Fidelity, https://www.fidelity.com/learning-center/trading-investing/crypto/crypto-wallet. Its total reserve was over 127,000 Bitcoin. Cohen Decl. ¶ 148.

## IV.    The Bitcoin Belonging to the Iran-China Group Are Hacked, and the United States Later Takes Custody of Them

On December 28, 2020, an anonymous, white-hat hacker breached the Iran-China Group's crypto wallets and drained over 127,000 Bitcoin, which were transferred to the hacker's own wallets. Cohen Decl. ¶ 136. The Iran-China Group—as LuBian—sent numerous messages to the hacker on the blockchain, claiming ownership of the Bitcoin (calling it "our asset") and demanding the hacker "contact us through 1228btc@gmail.com to discuss the return." *Id.* ¶¶ 137-38. To post these messages from the hacked wallets, the Iran-China Group had to have the private keys to the wallets—confirming the Group's control of the wallets. *Id.* ¶ 139.

This breach went unreported for nearly five years, as the hacker never returned or used the Bitcoin and the Iran-China Group never reported the loss. *See* Cohen Decl. ¶ 137-41. In 2025, the loss was made public by the blockchain-analysis firm Arkham Intelligence. *Arkham Uncovers $3.5B Heist – The Largest Ever*, Arkham (Aug. 2, 2025), https://info.arkm.com/ announcements/arkham-uncovers. Arkham's retrospective study concluded that all the Bitcoin taken in the hack had come from LuBian's wallets, as did other third-party researchers investigating the hack. Cohen Decl. ¶ 133-35.

The hacker apparently turned over the crypto to the U.S. government, because in July 2024, the Bitcoin were transferred from the hacker's wallets to wallets apparently controlled by the United States. *See* Forfeiture Compl. ¶ 58. Subsequently, the United States commenced a forfeiture action in this Court and obtained a warrant for arrest of the Bitcoin on October 14, 2025. *Id.* That action alleges that the Bitcoin are located in New York and subject to forfeiture because

they were derived from money-laundering and wire-fraud conspiracies. *Id.* ¶¶ 4, 15. The United States admits that at least some of the hacked wallets were "associated with Lubian," "a Chinese bitcoin mining operation that maintained bitcoin mining facilities across Asia, including in China and Iran." *Id.* ¶¶ 16, 47 n.9. But the United States minimizes LuBian's ties to Iran and does not acknowledge the third-party research tying all the wallets to LuBian or the evidence confirming the wallets were owned by LuBian (and thus by the Iran-China Group). Cohen Decl. ¶ 120-50.

## LEGAL BACKGROUND

Suits against foreign states and their agencies and instrumentalities generally are subject to the FSIA, which renders these parties immune from suit and execution and attachment of their assets unless an exception applies. *See* 28 U.S.C. §§ 1604, 1609, 1610. After the FSIA proved a roadblock for victims of terrorism to sue and recover against foreign state sponsors of terrorism, Congress enacted a series of legislation overriding foreign sovereign immunity and creating new causes of action for judgment and recovery against state sponsors of terrorism. *See Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016); 28 U.S.C. § 1605A. In 2002, Congress enacted TRIA "to deal comprehensively" with the "enforcement difficulties" terrorism victims had experienced by making it easier for victims to "satisfy [their] judgments." 148 Cong. Rec. H8728 (Nov. 13, 2002). TRIA authorizes attachment and execution of "the blocked assets of any agency or instrumentality of [a] terrorist party," including assets "seized … by the United States," "in order to satisfy … judgment[s]" against that terrorist party "[n]otwithstanding any other provision of law." TRIA § 201(a), (d)(2).

The procedure for enforcing judgments against terrorist states' assets in federal court is dictated by the law "of the state where the court is located." Fed. R. Civ. P. 64(a), 69(a); *see Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 99 (2d Cir. 2022). In New York,

Article 62 of the CPLR sets forth the procedural requirements for attachment.  CPLR § 6205 permits a court to issue "[a]n order of attachment … in aid of execution to a party that has been awarded a money judgment against a foreign state … in accordance with and subject to the limitations of 28 United States Code Section 1610 and other applicable law."  CPLR § 6212(a) sets forth the showing needed to warrant attachment:  Plaintiffs must "show, by affidavit and such other written evidence as may be submitted, [1] that there is a cause of action, [2] that it is probable that the plaintiff will succeed on the merits, [3] that one or more grounds for attachment provided in section 6201 exist, and [4] that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  And CPLR § 6211(a) authorizes *ex parte* orders of attachment, including under Section 6205.

## ARGUMENT

Victims respectfully request that this Court issue an order of attachment against the approximately 127,271 Bitcoin and the Iran-China Group's interests in them.  Victims meet TRIA's prerequisites for attachment, as well as the procedural requirements under New York law.  Victims request consideration *ex parte* under CPLR § 6211 to secure their ability to recover on their judgments in relation to numerous other creditors asserting interests in the assets.  For the same reasons, they also request that the Court permit alternative service of the attachment order.

## I.    The Bitcoin Are Subject to Attachment Under TRIA

TRIA authorizes attachment and execution "to satisfy a judgment for which there was original jurisdiction under the FSIA if certain statutory elements are satisfied."  *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 131 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018).  Victims' judgments against Iran for its terroristic acts indisputably are ones for which there was original jurisdiction under the FSIA. *See* 28 U.S.C. § 1605A (authorizing suit against foreign states for committing, or providing

12

material support or resources to, acts of terrorism); 28 U.S.C. § 1605(a)(7) (1996) (predecessor version); Compl., Attachment A (listing Victims' judgments under these statutes).  To attach property under TRIA, Victims "must show (1) that [the Iran-China Group is] a 'terrorist party' or an 'agency or instrumentality of that terrorist party,' and (2) that [the Iran-China Group's] properties are 'blocked assets.'"  *Kirschenbaum*, 830 F.3d at 131 (quoting TRIA, § 201(a)).

At the attachment stage, Victims need not definitively establish those elements (although the evidence here does so).  Before obtaining the *ultimate* relief they seek—execution against and turnover of the Bitcoin—Victims must prove under New York law that the Bitcoin are in fact "property 'in which the judgment debtor [here, Iran] has an interest."  *Levinson*, 44 F.4th at 97 (quoting CPLR § 5225(b)).  But for "pre-execution attachment," Victims need only show "it is probable" they "will succeed on the merits."  *Id.*; CPLR § 6212(a).  Thus, Victims must only demonstrate that it is probable that the Iran-China Group is an agency or instrumentality of Iran and that the Bitcoin are blocked assets of Iran.

A.    **It Is Probable That the Iran-China Group Is an Agency or Instrumentality of Iran**

TRIA's "agency or instrumentality" clause "reaches more broadly" than the corresponding one in the FSIA.  *Kirschenbaum*, 830 F.3d at 133.  An entity qualifies if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party."  *Id.* at 135.  The Iran-China Group is an agency or instrumentality of Iran under each prong.

The Iran-China Group is the "means through which" Iran accomplishes the "material function" of skirting international sanctions through the acquisition and use of cryptocurrency. *Kirschenbaum*, 830 F.3d at 135.  It provides "material services" to Iran by mining cryptocurrency that can be converted to fiat currency for Iran's purposes.  *Id.*  And its activities were "directed"

13

by Iran. *Id.* The Second Circuit has explained that "financial [and] technological support" to activities of a terrorist party satisfy these theories of agency. *Id.* n.19. Here, the Iran-China Group provided both financial and technological support to Iran by running the large-scale mining operation at Rafsanjan in partnership with the Iranian government. As the accompanying expert declarations detail,[5] the Iran-China Group played a pivotal role in bringing to fruition Iran's avowed policy of evading sanctions.

Iranian officials' repeated and brazen statements make clear that skirting sanctions, including by mining cryptocurrency at the Rafsanjan mine, *see* Davis Decl., Ex. 4, is "[o]f serious or substantial import" to Iran, *Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 518 (S.D.N.Y. 2017) (quoting *Material*, Oxford English Dictionary Online), *vacated on other grounds*, 934 F.3d 147 (2d Cir. 2019). The Ayatollah himself called Iran to combat "the centers of global power" through "Economic Jihad." *Supra* p.4. Multiple high-level officials describe cryptocurrency as a critical tool for bypassing sanctions, including by "creating a form of electricity export" allowing Iran to convert its oil reserves into cryptocurrency that can be sent around the world. Davis Decl., Ex. 4; *see also id.* (member of parliament stating that "[t]he use of digital currency is most efficient during times of sanctions"); *id.*, Ex. 3 (Deputy to Vice President for Science and Technology explaining that cryptocurrency "assists [Iran] … under sanctions conditions" by "facilitat[ing] the movement and transfer of money to any point in the world"). Scholars and third-party investigators, including an official white paper from the Iranian Presidential Center for Strategic

---

[5] Dr. Jessica Davis is an expert on terrorist financing and sanctions evasion, with vast experience investigating Iran's efforts to circumvent sanctions. Her declaration describes Iran's concerted campaign of evading sanctions through the use and control of cryptocurrency. Mr. Avigdor Cohen is a forensics investigator with special expertise in blockchain analytics. His declaration connects the Iran-China Group to LuBian and to a large cryptocurrency mine in Rafsanjan, Iran that was built and operated in partnership with Iranian authorities.

Studies, have likewise described the utility of cryptocurrency in avoiding sanctions—enabling Iran to pay for imports and move capital outside of official banking channels. Davis Decl., Ex. 6. Mining cryptocurrency bears far more than a "logical connection" to Iran's efforts to circumvent U.S. sanctions; it is a critical component that "makes it easier" for Iran to bypass international controls. *Hosseini v. Nielsen*, 911 F.3d 366, 375 (6th Cir. 2018) (quoting *Material*, Black's Law Dictionary (10th ed. 2014)); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 30 (2010). Cryptocurrency mining thus provides both a material service to and fulfills a material function for Iran.

Ample evidence—including statements in the United States' forfeiture complaint—demonstrates that the Iran-China Group "serves as an intermediary or agent" through which that material function was "carried out." *Kirschenbaum*, 830 F.3d at 135 (quoting Webster's Third New International Dictionary 1172 (1993) for definition of "instrumentality"); *see also Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1352 (11th Cir. 2022) ("instrumentality" under TRIA is "any means of accomplishing an end"). The United States asserts that LuBian is "a Chinese bitcoin mining operation" with "bitcoin mining facilities … [in] Iran," where it "produced large sums of clean bitcoin dissociated from criminal proceeds." Forfeiture Compl. ¶¶ 16, 49. And through those mining facilities, the Iran-China Group (the entity behind LuBian) provided both "financial [and] technological support" to Iran's efforts to generate cryptocurrency to avoid sanctions. *Kirschenbaum*, 830 F.3d at 135 n.19. In its own telling, the Iran-China Group built and operated the "largest" and "first official cryptocurrency production project" in Iran, Cohen Decl., Ex. 8, which at its peak mined 6% of the world's cryptocurrency, Cohen Decl. ¶ 98, and it did so working hand-in-glove with the Iranian government. The Iran-China Group contributed the high-powered computers and other equipment needed to construct the mining

facility at Rafsanjan, which were delivered through Iran's state-owned shipping line on sanctioned vessels. *Id.* ¶ 65. The Iran-China Group "built the very grid platform needed to convert Iranian electricity into Bitcoin and then handed legal title to that platform to the state." *Id.* ¶ 209. And via an effective "state-administered subsidy on mining power," *id.* ¶ 218, it then mined cryptocurrency that was required to be handed over to Iran, Davis Decl. ¶ 60. Put simply, through the Rafsanjan mine, the Iran-China Group "materially assist[ed] Iran in avoiding sanctions by converting Iranian energy into cryptocurrency." *Id.* ¶ 16.

The Iran-China Group provided these material services "in the interest or under the direction of" Iran. *Service*, Black's Law Dictionary (12th ed. 2024). The mine was opened by an advisor to the Iranian President, Davis Decl. ¶ 46, and operated in "collaboration" with the "Iranian government, including the Ministry of Energy and the Iranian military," *id.* ¶ 17. And under Iranian law, the Iran-China Group was required to pay sizeable taxes on its earnings or convert its cryptocurrency into foreign currency that was repatriated into Iran's economy and later to "offer the newly produced primary cryptocurrency" to "channels designated by the Central Bank of [Iran]" for state purposes. *Id.*, Ex. 26. These facts confirm that in providing a material service to Iran, the Iran-China Group was "directed" by Iran. *Kirschenbaum*, 830 F.3d at 135. Iran tightly controlled the Iran-China Group's every move in the country, dictating when it could operate, how much power it could use, and where the cryptocurrency must be delivered.

In short, Iran orchestrated the construction and operation of the Rafsanjan mine through and in partnership with the Iran-China Group, from which it derived substantial infrastructural and economic benefits used to avoid sanctions. Iran "could not have carried out" this project "had it not been" for the Iran-China Group's equipment and services in constructing and operating the mine. *Levin v. Bank of N.Y. Mellon*, 2019 WL 564341, at *4 (S.D.N.Y. Feb. 12, 2019) (analyzing

"material support").  Thus, as both the "means through which" Iran achieved the "material function" of skirting sanctions and as a provider of "material services" that were directed and overseen by Iran, the Iran-China Group was an agency or instrumentality of a terrorist party. *Kirschenbaum*, 830 F.3d at 135.

**B.    It is Probable that the Bitcoin Are Blocked Assets of Iran**

Under TRIA, a "blocked asset" is "any asset seized or frozen by the United States under," among other things, "sections 202 and 203 of [IEEPA]."  TRIA § 201(d)(2)(A).  In 2012, President Obama issued—pursuant to IEEPA—Executive Order 13,599, blocking "[a]ll property and interests in property of the Government of Iran" that "are in the United States," later "come within the United States," or come into "the possession or control of any United States person."  77 Fed. Reg. at 6659.[6]  Consequently, the Second Circuit has recognized that "all assets belonging to an entity that satisfies Executive Order 13,599's definition of 'Government of Iran' are automatically blocked."  *Kirschenbaum*, 830 F.3d at 137.  That definition includes both "'the Government of Iran'" and "any … agency, or instrumentality thereof, [including] … any person owned or controlled by, or acting for or on behalf of, the Government of Iran.'"  *Id.* at 120.

The Bitcoin are "property" "of" Iran because the Iran-China Group, as its agency or instrumentality, *supra* pp.13-17, owns them.  Courts applying TRIA "look to state law" to determine rights in "the property a creditor seeks to reach."  *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 156 (2d Cir. 2018).  New York recognizes property interests in "digital asset[s]," meaning "electronic record[s] in which an individual has a right or interest," which include

---

[6] The Bitcoin are "within the United States."  77 Fed. Reg. at 6659.  On information and belief—and based on the United States' allegations in its forfeiture action—the United States maintains custody of the Bitcoin in this District.  Compl. ¶¶ 16-17; *see also* Forfeiture Compl. ¶ 4 (invoking 28 U.S.C. § 1395, which requires that the Bitcoin have been "found" or brought into this District).

cryptocurrency. N.Y. Est. Powers & Trusts Law § 13-A-1. Cryptocurrency is accessed via "wallets," which in turn can be accessed only through a private key (a long alphanumeric sequence similar to a password). Whoever has the private key can use the cryptocurrency associated with the wallet. Knowledge of the private key is thus tantamount to ownership of cryptocurrency—a principle enshrined in the crypto community's adage "not your keys, not your crypto." Cohen Decl. ¶ 140. Courts accordingly recognize that "the 'private key' associated with" a cryptocurrency asset is "important to [the] owner's exercise of control over" that asset. *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 305 (S.D.N.Y. 2024). Because "no one but the person who physically has access to [the] device [where the private key is stored] … can transact on that user's behalf," *id.*, "[o]wnership of bitcoin" depends on "a user's possession or knowledge of the private key," *United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020).

LuBian—the pool name under which the Iran-China Group recorded its Bitcoin on the blockchain—held the private keys to the wallets associated with the Bitcoin, meaning the Iran-China Group owned the Bitcoin. Cohen Decl. ¶ 137-41. The messages the Iran-China Group, acting as LuBian, sent on the blockchain from the hacked wallets demanding return of the Bitcoin could only have been posted if LuBian had control of the wallets where the Bitcoin had been stored; thus, the messages confirm that the Iran-China Group held the keys. *Id.* ¶¶ 138, 139. And the Iran-China Group itself claimed ownership, messaging the hacker "from LB," *i.e.*, LuBian, seeking "our asset." *Id.* ¶ 137. Although the hacker transferred the Bitcoin out of LuBian's wallets, property taken without consent "still belongs to the original owner" under New York law. *Bakalar v. Vavra*, 619 F.3d 136, 141 (2d Cir. 2010); *accord Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 317 (Ct. App. 1991). Nor does the government's forfeiture action "transfer ownership of the [Bitcoin]" unless and until "there is a final judgment of forfeiture." *Counihan v.*

*Allstate Ins. Co.*, 25 F.3d 109, 112 (2d Cir. 1994); *accord United States v. 500 Delaware St.*, 868 F. Supp. 513, 518 (W.D.N.Y. 1994), *aff'd*, 113 F.3d 310 (2d Cir. 1997).

Accordingly, the Iran-China Group owns the Bitcoin stored in the wallets. As assets belonging to an agency or instrumentality of Iran, the Bitcoin are blocked and subject to attachment under TRIA.

## II.    The Court Should Order Attachment Under CPLR Article 62

Attachment is also procedurally proper under state law—here, CPLR Article 62. *See* Fed. R. Civ. P. 64(a), 69(a). CPLR § 6205 permits the Court to order "attachment … in aid of execution" for "a party that has been awarded a money judgment against a foreign state, as defined in 28 United States Code Section 1603, in accordance with and subject to the limitations of 28 United States Code Section 1610 and other applicable law." *See also Mistyrise Int'l Ltd. v. Corporacion Electrica Nacional S.A.*, 2024 WL 5184360 (N.Y. Sup. Ct. Dec. 20, 2024) (granting attachment of property of Venezuelan alter ego under CPLR § 6205). And Section 6212, in conjunction with Section 6201, sets forth the showing and process needed to justify attachment. Victims here satisfy these provisions.

### A.    Attachment Is Authorized Under CPLR § 6205

Section 6205 permits attachment "after a judgment has been awarded" in cases "involving a judgment against a foreign sovereign." David D. Siegel & Patrick M. Connors, *Siegel's New York Practice* § 316 (6th ed. 2020). Victims are plainly entitled to attachment under that section. They have obtained "money judgment[s] against a foreign state, as defined in 28 United States Code Section 1603." CPLR § 6205; *see Kirschenbaum*, 830 F.3d at 125 (Iran "certainly is" a foreign state); Compl., Attachment A. Attachment is therefore authorized "subject to the limitations of 28 United States Code Section 1610 and other applicable law." CPLR § 6205.

19

No such limitations preclude attachment here.  Nothing in Section 1610, which sets forth the normal rules for execution against foreign states' assets, precludes attachment here, because Victims are proceeding under TRIA, which "supersede[s]" "the FSIA's execution immunity provisions." *Havlish v. Taliban*, 152 F.4th 339, 359 (2d Cir. 2025).  And TRIA expressly permits "attachment in aid of execution" where, as here, the underlying judgments are based on an act of terrorism.  *Id.* at 358-59 (quoting TRIA § 201(a)).  Attachment is therefore "in accordance with … Section 1610," as superseded by TRIA here, and accordingly permitted under CPLR § 6205.

In any event, the only possibly relevant condition on attachment—Section 1610(c)'s notice requirement—is satisfied.  That provision prevents attachment until "a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e)."  28 U.S.C. § 1610(c).  Iran has received notice under Section 1608(e) in each of Victims' cases:  A copy of the default judgment was sent to Iran in accordance with Section 1608's service procedures, and in each case except one, a federal court has already held that a reasonable time has elapsed under Section 1610(c).  Compl. ¶ 71 & n.37.

As for the *Roth* Victims, their judgment was entered and served on Iran more than a decade ago, *see Roth v. Islamic Republic of Iran*, No. 11-1377, Dkt. 43 (D.D.C. Jan. 27, 2015)—before other judgments for which Section 1610(c) orders have already been issued.  The *Roth* Victims respectfully ask this Court to supply a Section 1610(c) order simultaneously with the order of attachment, since a decade far exceeds the time periods other courts have found "reasonable." *E.g.*, *Pharo Gaia Fund Ltd. v. Bolivarian Republic of Venezuela*, 2021 WL 2168916, at *1 (S.D.N.Y. May 27, 2021) ("[s]even months"); *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (six weeks).

### B.    Victims Satisfy All Remaining Requirements for Attachment

Victims also meet New York's ordinary attachment requirements.  Consistent with CPLR § 6212(a), (1) Victims have multiple causes of action; (2) "it is probable that [they] will succeed on the merits" of their claims for execution and turnover of the Bitcoin; (3) "one or more grounds for attachment provided in section 6201 exist"; and (4) there are no known counterclaims.  *See JDF Realty, Inc. v. Kim*, 2010 WL 231624 (N.Y. Sup. Ct. Jan. 6, 2010).[7]

*First*, Victims have causes of action.  As discussed, TRIA permits actions for execution of judgments awarded against agencies and instrumentalities of terrorist parties.  TRIA § 201(a); *Levinson*, 44 F.4th at 96.  Moreover, CPLR § 5225(b) authorizes judgment creditors like Victims to initiate "a special proceeding … against a person in possession or custody of money or other personal property in which the judgment debtor has an interest."  And CPLR § 5227 authorizes a similar proceeding against "any person who it is shown is or will become indebted to the judgment debtor."  Although there is no direct analogue to a special proceeding under the Federal Rules, these provisions create additional causes of action for Victims here.

*Second*, Victims are likely to succeed on the merits of their claims for turnover.  As discussed, there is strong evidence that the Iran-China Group owns the Bitcoin and is an agency or instrumentality of Iran, such that Victims are entitled under TRIA to execute against the Bitcoin. *See supra* Part I.  And they are likely to prevail on their turnover claims under the CPLR for similar reasons.  Success on a Section 5225(b) claim requires (1) "that [Iran, as judgment debtor,] 'has an interest' in the property the creditor seeks to reach," and (2) "either that [Iran] is 'entitled to the

---

[7] It is unclear the extent to which these requirements apply to post-judgment attachment under Section 6205.  *See Mistyrise*, 2024 WL 5184360 (granting attachment under Section 6205 without considering Section 6212(a)).  There is good reason to conclude that Section 6205 alone suffices to entitle Victims to attachment.

possession of such property,' or … that 'the [Victims'] rights to the property are superior' to those of the party in whose possession it is." *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991); *see also City of New York v. Midmanhattan Realty Corp.*, 464 N.Y.S.2d 938, 939 (Sup. Ct. 1983) (special proceedings under Sections 5225(b) and 5227 are interchangeable). Because the Bitcoin belong to an agency or instrumentality of Iran, Iran both has an interest in and is entitled to possession of them.

The United States is also a proper garnishee—*i.e.*, the person "who has property in his possession or custody in which a judgment debtor has an interest." CPLR § 105(i). The United States admits it has "actual, not merely constructive, possession or custody" of the Bitcoin. *Commonwealth of North Mariana Islands v. Canadian Imperial Bank of Com.*, 990 N.E.2d 114, 115 (N.Y. Ct. App. 2013); *see* Forfeiture Compl. ¶ 58 (the Bitcoin are "currently in the custody of the United States"). And TRIA's "[n]otwithstanding any other provision of law" clause expressly overrides "conflict[ing]" statutes, including "the civil-forfeiture statute," so Victims' rights to the Bitcoin are superior to the government's claims in its forfeiture action. *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 643 n.1 (D.C. Cir. 2025). The "clear design" of the "notwithstanding" clause is to "enable" victims "to execute on" terrorist states' assets by ensuring that all other provisions of law "do not bar victims' efforts to enforce [their] judgments." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 391-92 (2009) (Kennedy, J., concurring).

TRIA's "[n]otwithstanding any other provision of law" clause similarly abrogates federal sovereign immunity. TRIA § 201(a). TRIA supercharges terrorism victims' ability to enforce judgments against blocked assets of state sponsors of terrorism, and in light of Section 201(a)'s "plain language," as well as "its history and purpose," the Second Circuit has read TRIA's

"notwithstanding" clause to make clear that "the force of the section extends everywhere." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010). Common-law and constitutional rules such as federal sovereign immunity necessarily are among the "provision[s] of law" overridden by TRIA because, as the Supreme Court has held, "[i]t is routine to call common-law rules 'provisions.'" *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 282 (2014). When Congress uses the "expression 'any other provision of law,'" it "demonstrate[s] its intent to encompass all law, whether it be statutory law, common law, or constitutional law." *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1180 (9th Cir. 1998).[8]

Just as the "notwithstanding any other provision of law" clause is a "textual marker[]" that Congress intended TRIA to "serve[] as an independent avenue for abrogation of [foreign sovereign] immunity," *Rubin*, 583 U.S. at 212-13, so, too, the clause abrogates the United States' own sovereign immunity. TRIA's text and structure reinforce the point. TRIA specifically defines "blocked assets" available for attachment and execution to include "any asset *seized ... by the United States*" under certain statutes. TRIA § 201(d)(2)(A) (emphasis added). If Congress meant to bar Victims from attaching assets held by the United States, it would not have expressly defined the "blocked assets" attachable under TRIA to encompass those "seized … by the United States." Indeed, any holding that TRIA does not override the government's own sovereign immunity for purposes of attachment and execution would gut TRIA, since "blocked assets" are typically held by the United States.

---

[8] *Accord Savage Servs. Corp. v. United States*, 25 F.4th 925, 938-43 (11th Cir. 2022) ("[n]otwithstanding any other provision or rule of law" clause displaced common-law causes of action); *Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 958 (9th Cir. 2016) (TRIA's "notwithstanding" clause displaced common-law presumption of separateness), *abrogated on other grounds by Rubin*, 583 U.S. 202; *Brown v. United Airlines, Inc.*, 720 F.3d 60, 66-67 (1st Cir. 2013) (argument that "plain meaning of the word 'provision' does not encompass common law" is "simply wrong").

"Because the federal government has assumed control over significant portions of what limited Iranian assets remain in the United States, plaintiffs' efforts to enforce judgments [against Iran] … have often pitted victims of terrorism against the Executive Branch." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 53 (D.D.C. 2009). Prior to TRIA, the government frequently argued that such assets were "exempt from attachment or execution by virtue of the federal government's sovereign immunity." *Id.* at 53-55. But in TRIA, "Congress finally succeeded in subjecting the assets of state sponsors of terrorism to attachment and execution," opening "a wide range of blocked assets to attachment and execution." *Id.* at 57-58. Thus, TRIA "represent[s] something of a victory for these terrorism victims … over the longstanding objections of the Executive Branch." *Id.* at 58.[9]

The United States is therefore a proper garnishee. And because the Bitcoin are Iranian assets, Victims are likely to prevail in executing their judgments under TRIA and CPLR §§ 5225(b) and 5227.

*Third*, two independent grounds for attachment exist under CPLR § 6201, in addition to CPLR § 6205. Victims' "cause of action is based on a judgment, decree, or order of the United States," CPLR § 6201(5), because they seek to enforce "money judgment[s] against Iran" from a federal court, *Levinson*, 44 F.4th at 98; Compl., Attachment A. Moreover, Section 6201 also authorizes attachment because Iran "is a nondomiciliary residing without the state." CPLR

---

[9] The D.C. Circuit stands alone in holding that TRIA's "notwithstanding" clause does not waive federal sovereign immunity. *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023). It read the phrase "provision of law" narrowly to not "unequivocally" extend to judicial doctrines like sovereign immunity. *Id.* at 432-33. But it did not account for the overwhelming weight of judicial authority holding otherwise. *See supra* pp.22-23 & n.8. And it gave short shrift to TRIA's inclusion of assets "seized … by the United States" in its definition of blocked assets, dismissing this clear text as an "ambiguous," "drawn-out implication." *Greenbaum*, 67 F.4th at 424. But the court nowhere explained how assets seized by the United States could be subject to TRIA if sovereign immunity barred attachment and execution of them.

§ 6201(1).  As Victims have shown, it is probable that Iran "has assets within the State that could satisfy a judgment," *see supra* p.17, n.6, and Victims have a "reasonable … fear" that they will not be able to satisfy their judgments without attachment, *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586 (S.D.N.Y. 2012).  Iran is liable for tens of billions of dollars' worth of judgments that it has never paid.  *See Elton Leather Corp. v. First Gen. Resources Co.*, 138 A.D.2d 132, 134 (N.Y. App. Div. 1988) (attachment where defendant "'ha[d] not made timely payment'" to secured creditors); *e.g.*, *Owens v. Turkiye Halk Bankasi A.S.*, 2021 WL 638975, at *1 (S.D.N.Y. Feb. 16, 2021) (plaintiffs "owed over $10 billion by Iran" had recovered nothing); *Wamai v. Indus. Bank of Korea*, 2021 WL 3038402, at *1 (S.D.N.Y. July 14, 2021) (plaintiffs "collectively owed over $5 billion by Iran" "have been unable to collect any portion").  And as discussed below, numerous persons have already asserted interests in the Bitcoin.

*Fourth*, there were no counterclaims in the underlying suits against Iran, and there are none here.  All of Section 6212(a)'s prerequisites to attachment are therefore satisfied.

## III.    The Court Should Issue an Order of Attachment *Ex Parte* Under CPLR § 6211

To ensure prompt attachment, Victims respectfully ask the Court to issue its order *ex parte*. CPLR § 6211 specifically provides for *ex parte* orders of attachment, including orders under Section 6205.  CPLR § 6211(a).  And under Local Civil Rule 6.1(d), this Court may grant an *ex parte* order "upon a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made."  This is Victims' first request for such relief.  An *ex parte* attachment order is necessary here because, without prompt attachment of Iran's assets, Victims face substantial hurdles in trying to recover on their judgments.

Iran has thousands of judgment creditors with billions of unpaid judgments and is a known recalcitrant judgment debtor.  *Est. of Botvin by Ellis v. Heideman, Nudelman & Kalik, P.C.*, 115

F.4th 594, 600 (D.C. Cir. 2024). Given "this ever-increasing number of judgments" and the "ever-increasing competition to satisfy judgments when and if attachable Iranian assets surface," Victims must be able to move swiftly against the Bitcoin in light of their identification of its Iranian ownership. *Id.* Moreover, the United States' initiation of a forfeiture action against the Bitcoin has begun a race for numerous creditors of all stripes purporting interests in the Bitcoin to come forward. At least 487 claimants have already filed claims in the forfeiture action asserting interests in the Bitcoin. Declaration of Robert Weigel ¶ 5. Numerous others are poised to assert further claims. *Id.* The general deadline to file third-party claims in the forfeiture action is December 29. *Id.* The Court has extended the deadline for some claimants until January 19, 2026, and others are also seeking extensions. *Id.*

"[L]ongstanding equitable and common law principles … favor a diligent creditor over creditors that are less diligent." *In re Liquidation of Jugobanka, A.D.*, 995 N.Y.S.2d 906, 909 (Sup. Ct. 2014). Thus, priority among creditors depends on the order in which they secured attachment. *See* CPLR § 6226. To ensure priority over other potential claimants—who will rush to take advantage of Victims' extensive efforts to identify the connections between the Bitcoin and Iran—Victims respectfully ask the Court to order emergency attachment *ex parte*.

## IV.    The Court Should Permit Alternative Service

A levy under an attachment order "is effective only if the order is served upon the garnishee in the same manner as a summons." *Exec. House Realty v. Hagen*, 438 N.Y.S.2d 174, 178 (Sup. Ct. 1981) (citing CPLR § 6214). Service is typically carried out by the sheriff (in state court), *see* CPLR § 6214(a), or the U.S. Marshals (in federal court), *see* Fed. R. Civ. P. 4.1(a). But CPLR § 308(5) authorizes alternative service "in such manner as the court, upon motion without notice, directs, if service is impracticable under" typical avenues.

Considering the time sensitivity Victims are facing in relation to other claimants, Victims respectfully request permission to serve the United States as garnishee directly by sending the attachment order to the U.S. Attorney's Office in this District.  This method will ensure prompt notice to the United States and immediate levy for Victims, so that they can establish priority of interest in the Bitcoin.  If Victims must rely on the government's agent to secure their interest in the Bitcoin, any delay—intentional or not—could frustrate Victims' rights against other creditors.

The CPLR also requires that the underlying defendant be notified of attachment by receipt of the confirmation papers "on such notice as the court shall direct."  CPLR § 6211(b).  This "notice" is not subject to the same strictures as ordinary service of process but instead is "valid as service" under CPLR § 6211(b), as long as the Court "direct[s] service by" the method used.  *Al-Dohan v. Kouyoumjian*, 451 N.Y.S.2d 367, 369 (Sup. Ct. 1982) (notice valid under Section 6211(b), although it did not suffice as summons), *rev'd on other grounds*, 461 N.Y.S.2d 2 (1983).

Victims respectfully request permission to notify the Iran-China Group of the attachment proceedings by emailing the materials to 1228btc@gmail.com, the email address the Iran-China Group provided for information regarding LuBian's hacked wallets, and by serving the attorney who has appeared for LuBian in the forfeiture action.  Cohen Decl. ¶ 137; Weigel Decl., Ex. 2; *cf. Grp. One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 344-45 (E.D.N.Y. 2021) (collecting cases authorizing service by email).

Similarly, Victims also request permission to provide notice to Iran by sending the attachment and confirmation papers to the Office for the Protection of the Interests of the Islamic Republic of Iran in Washington, D.C.—Iran's only diplomatic presence in the United States.

**CONCLUSION**

For the foregoing reasons, Victims respectfully ask that this Court grant an *ex parte* order

of attachment against the Bitcoin and the Iran-China Group's interests in them.

Dated: December 28, 2025          GIBSON, DUNN & CRUTCHER LLP
      New York, New York

                              By:    */s/ Robert L. Weigel*
                                   Robert L. Weigel
         Jason W. Myatt
         200 Park Avenue
   New York, NY 10166
   Tel.: 212-351-4000
   rweigel@gibsondunn.com
   jmyatt@gibsondunn.com

   Jessica L. Wagner (*pro hac vice forthcoming*)
   1700 M Street, N.W.
   Washington, D.C. 20036
   Tel: 202-955-8500
   jwagner@gibsondunn.com

   *Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Memorandum of Law complies with the formatting and length requirements set forth in Local Civil Rule 7.1.  The Memorandum contains 8,750 words, excluding the caption, table of contents, table of authorities, and signature block.  The typeface, margins, and spacing comply with the Federal Rules of Civil Procedure and the Local Rules of this Court.

Dated:  December 28, 2025                     _/s/  Robert L. Weigel_____
      New York, New York                     Robert L. Weigel