**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

NOALA FRITZ, *et al.*,

                Plaintiffs,

    v.

IRAN AND CHINA INVESTMENT
DEVELOPMENT GROUP d/b/a
LUBIAN.COM,

              Defendant.

Civil Action No. 1:25-cv-07093

## <u>DECLARATION OF DR. JESSICA DAVIS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER OF ATTACHMENT</u>

I, Dr. Jessica Davis, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

that the following is true and correct:

## BACKGROUND

1.      I hold a Doctor of Philosophy in International Affairs from the Norman Paterson School of International Affairs, Carleton University.  While a doctoral candidate, my research included terrorism, counter-terrorism financing, and intelligence.  My dissertation focused on the effects of counter-terrorist financing policies and practices on levels of terrorism.  For the research I conducted in connection with my dissertation, I received the University Medal for Outstanding Graduate Work.  A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit 1**.

2.      I also hold a Master of Arts in War Studies and a Bachelor of Arts, with honors, in Economics and Politics from the Royal Military College of Canada, which is Canada's equivalent to American service academies.

3.      I currently serve as President of Insight Threat Intelligence, an evidence-based consulting firm.  In that role, I leverage my expertise on terrorism and illicit financing (including terrorist financing and sanctions evasion) to advise governments and nonprofits on strategies for combating those activities.  Some of my recent engagements include:

   a.  Analyzing Iranian threat finance networks (2025); counter-terrorism financing strategies (2024); the activities of the Islamic State and its African affiliates (2022); and terrorist financing and adaptation (2022).

   b.  Serving as lead financial investigator for war crimes, crimes against humanity, and genocide perpetrated by the Islamic State (2020).

   c.  Providing technical assistance on terrorist financing, financial investigations, and financial and economic intelligence to organizations and nations, including the United States, Qatar, Pakistan, and South Africa (various dates).

2

    d.   Teaching a course on open source responsibility frameworks for the Bank of Canada's Open Source Intelligence Program (2024-25) and a course on cryptocurrency and terrorism financing for the International Institute for Justice and the Rule of Law Foundation (2024).

4.    I am also a post-doctoral associate at the University of Calgary Faculty of Law. My research subjects include sanctions evasion and cryptocurrency.

5.    I have also served since 2021 as the President of the Canadian Association for Security and Intelligence Studies, which is a nonpartisan association with the goal of fostering debate on intelligence and security issues. In that role, I advise graduate students on their research related to security and intelligence issues.

6.    Between 2013 and 2018, I served as a Senior Strategic Analyst in Threat Financing at the Canadian Security Intelligence Service, which is Canada's national security intelligence service. In that role, I was responsible for briefings, analysis, assessments, project management, and subject-matter expertise related to financial intelligence and threat financing. I also developed and implemented the first cross-department training on threat financing, which aimed to educate strategic intelligence analysts and policy makers about that topic.

7.    Between 2009 and 2013, I served as a Team Leader on Strategic Intelligence on Terrorist Financing at the Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC"), which is Canada's financial intelligence unit and lead anti-money laundering and counter-terrorist financing regulator. There, I was responsible for monitoring conflicts, setting research priorities, guiding junior analysts, and preparing assessments. I also stewarded the development and implementation of structured analytic techniques for financial intelligence, including with large datasets, and authored strategic intelligence reports.

8.      Between 2008 and 2009, I served as a Senior Policy Analyst for Canada's Department of Foreign Affairs and International Trade.  I was responsible for policy development, briefing, and international processes.  I briefed Canada's G8 Political Director on Afghanistan, Pakistan, and global issues.  I was responsible for security-related policy analysis, specializing in terrorism.  My work included reports on the Iranian nuclear program.

9.      Between 2006 and 2008, I was a writer and researcher for Conflict Analysis, a research consultancy.  In that role, I focused on terrorism and security.  I conducted conflict analysis and briefing and published a report on issues relating to the implementation of the Comprehensive Peace Agreement in Sudan.

10.     Between 1999 and 2006, I served in the Canadian military.  I initially served as an officer cadet at the Royal Military College of Canada.  After I was commissioned as an artillery officer in 2003, I worked with the intelligence branch and conducted tactical, operational, and strategic intelligence analysis, specifically relating to Afghanistan, Haiti, and international terrorism.

11.     I am a published author on illicit financing and sanctions evasion.  Some of my recent publications and co-authorships include:

    a.  *Money for Mayhem: How Finance Fuels Terrorism—and How to Stop It*, University of Toronto Press (forthcoming 2026).

    b.  *Illicit Money: Financing Terrorism in the 21st Century*, Lynne Rienner (Sept. 2021).

    c.  *Paying Terrorist Ransoms: Frayed Consensus, Uneven Outcomes & Undue Harm*, Int'l J. (Sept. 26, 2022) (with Alex Wilner), https://doi.org/10.1177/00207020221130308.

d. *Understanding the Effects and Impacts of Counter-Terrorist Financing Policy and Practice*, Terrorism and Political Violence 1–17 (June 9, 2022), https://doi.org/10.1080/09546553.2022.2083507.

e. *Financing Violent Extremism: An Examination of Maligned Creativity in the Use of Financial Technologies*, Int'l Ctr. Stud. Radicalisation (Apr. 12, 2023) (with Marc-André Argentino and Tore Refslund Hamming), https://icsr.info/2023/04/12/financing-violent-extremism-an-examination-of-malignedcreativity-in-the-use-of-financial-technologies.

f. *Illicit Financing in Afghanistan: Methods, Mechanisms, and Threat-Agnostic Disruption Opportunities*, SOC-ACE Research Report (May 2022).

g. *Countering Hamas's Financial Network*, Lawfare (Dec. 3, 2023), https://www.lawfaremedia.org/article/countering-hamas-s-financial-network.

h. *The Challenges of Understanding Taliban Finance*, Lawfare (Aug. 23, 2021), https://www.lawfareblog.com/challenges-understanding-taliban-finance.

i. *Technology and Terrorist Financing*, GNET (Jul. 19, 2021), https://gnetresearch.org/2021/07/19/technology-and-terrorist-financing.

j. *Rethinking Global Counterterrorist Financing*, Lawfare (Dec. 6, 2020), https://www.lawfareblog.com/rethinking-global-counterterrorist-financing.

k. *New Technologies but Old Methods in Terrorism Financing*, CRAAFT Research Briefing, No. 2 (July 22, 2020).

l. *How Terrorists Use the Internet for Weapons and Component Procurement*, GNET (Feb. 26, 2020), https://gnet-research.org/2020/02/26/how-terrorists-use-the-internet-for-weapons-andcomponent-procurement.

m. *A Canadian Cryptocurrency Caper in the Sri Lanka Attack? Unlikely*, INTREPID (May 6, 2019), https://www.intrepidpodcast.com/blog/2019/5/6/a-canadian-cryptocurrency-caper-in-the-sri-lankaattack-unlikely.

n. *Canada's New Sanctions Against Iran: To List or Not to List*, Lawfare (Nov. 3, 2022) (with Leah West and Thomas Juneau).

o. *Opinion: Canada Is Shirking Its Responsibility to Afghans by Hiding behind Counterterrorism Financing Laws*, Globe & Mail (Jun. 20, 2022), https://www.theglobeandmail.com/opinion/article-canada-is-shirking-its-responsibility-to-afghansby-hiding-behind.

p. *Opinion: What Will the Taliban's Return to Power in Afghanistan Mean for Global Terrorism,* Globe & Mail (Aug. 17, 2021), https://www.theglobeandmail.com/opinion/article-what-will-the-talibans-return-to-power-in-afghanistan-mean-for-global.

12.    I am also regularly engaged for public speaking events on the topic of terrorist financing.  Among other conferences, I have delivered presentations at the EU Counter-Terrorist Financing Conference, the Canadian Defence Association Ottawa Conference, and the Empirical Anti-Money Laundering Conference.   And among other organizations, I have delivered presentations to TD Bank, the Association of Certified Anti-Money Laundering Specialists, and the Qatar Financial Information Unit (a government agency that investigates money laundering and terrorist financing).

13.    I also take courses on terrorism and illicit financing to stay updated on developments in the field, including the Terrorist Financing Investigator's Course and the Royal Canadian Mounted Police's Proceeds of Crime and Money Laundering Investigations Workshop.

## EXECUTIVE SUMMARY OF OPINIONS

14.     I have been asked to provide an opinion regarding (1) Iran's use of cryptocurrency to avoid international sanctions, and (2) the connections between crypto miners and the Iranian government, including a large cryptocurrency mine located in Rafsanjan, Iran that was reportedly operated in 2020 by the Iran-China Investment Development Group ("Iran-China Group").

15.     It is my opinion that Iranian authorities have embraced and promoted Bitcoin mining to allow them to skirt international sanctions, while monetizing Iran's significant energy reserves.  High-ranking officials have publicly acknowledged that their strategy was to convert domestic energy into cryptocurrency to generate foreign-currency earnings in the wake of U.S. sanctions.  That opinion is based on (1) public statements by Iranian officials, (2) Iran's regulatory framework for cryptocurrency mining in Iran during the relevant period, and (3) significant public reporting and scholarly analysis.

16.     It is also my opinion that if the Iran-China Group was operating a large-scale crypto mine located in Rafsanjan, Iran, it was materially assisting Iran in avoiding sanctions by converting Iranian energy into cryptocurrency that could then be used for a whole host of purposes—including terrorism—by the Iranian state.   Mining by the Iran-China Group in Iran was a direct implementation of Iran's sanctions-evasion strategy, using domestic energy resources to generate Bitcoin for that purpose.

17.     It is also my opinion that if the Iran-China Group was operating a large-scale crypto mine located in Rafsanjan, Iran, it could not have done so without collaboration from the Iranian government, including the Ministry of Energy and the Iranian military.  Not only did the Iranian government license and regulate cryptocurrency mining, but it also controlled the import channels and shipping routes miners needed to bring in the necessary cryptocurrency mining computers, as

well as the electricity needed to conduct large-scale cryptocurrency mining. Without partnering with the Iranian government, large-scale crypto mining in that country would not have been possible.

18.    It is also my opinion that if the Iran-China Group was operating a large-scale crypto mine located in Rafsanjan, Iran, the Group's crypto mining enabled Iran to turn its natural resources into currency that could be used to fund imports and bypass sanctions. At all relevant times when the Iran-China Group was operating, Iranian law imposed significant taxes on mined cryptocurrency or forced miners to exchange mined Bitcoin directly with the Central Bank of Iran. Assuming the Iranian mining framework operates as described in Iranian regulations and decrees, Bitcoin mined in Iran and held by the Iran-China Group in 2020 is therefore best characterized, in economic and factual terms, as cryptocurrency owed (in whole or in part) to Iran.

19.    I do not offer any opinion on who else may be legally entitled to the Iran-China Group's diverted assets today. I treat the Iranian mining framework as it is described in public materials and use it solely as a factual and economic premise for my conditional opinions.

20.    For this report, I treat the Exhibits as factual background and assume they are materially accurate.

## OPINIONS

## I.    Opinion 1: Iran Evades U.S. Sanctions by Mining Cryptocurrency

### A.    Technical Mechanics: How Bitcoin Mining is a Tool to Evade Sanctions

21.    From a technical and economic standpoint, Bitcoin mining allows a sanctioned state like Iran to convert domestic energy into an easily transferable asset that can be traded outside of conventional banking channels.

22.    Specifically, Iran uses electricity generated by its oil and natural gas resources to power hardware used for Bitcoin mining, which generates new Bitcoin that is deposited directly

into addresses controlled by the miner.  Once created, Bitcoin can be transferred across borders on the Bitcoin network without the involvement of correspondent banks or the SWIFT system (an international financial messaging system that serves as a central pillar of global commerce). As a result, no financial or regulatory intermediaries have the practical ability to block or reverse the transaction.

23.     When combined with Iran's regulatory framework—which requires licensed miners to deliver mined coins to the Central Bank or to convert and settle mining revenues through Iran's domestic foreign-exchange system, *see infra* **Exhibit 25**, p. 19—this structure enables Iran to turn domestic energy into Bitcoin and then into foreign currency or imported goods, allowing that country to bypass or mitigate traditional sanctions controls on bank-mediated payments.

### B.     U.S. Government Context

24.     The United States government has long been aware of the dangers that cryptocurrency mining poses to the enforcement of international sanctions, particularly in Iran. A Congressional Research Service report from 2019, for example, explains that "the Iranian government has recognized a potential role for cryptocurrencies" to avoid U.S. sanctions and discusses how the structure of cryptocurrencies like Bitcoin can complicate sanctions enforcement. Corrie Clark and Heather Greenley, *Blockchain and the Energy Sector*, CRS Report No. R45863, at 17 (2019).  A true and correct copy of that report is attached as **Exhibit 2**.

C.       **Iran's Use of Cryptocurrency to Avoid Sanctions**

25.       Iranian officials have been explicit about their decision to use cryptocurrency mining to evade sanctions.  They have repeatedly explained that cryptocurrency allows them to avoid official banking channels and thereby bypass U.S. sanctions.

26.       Public Iranian reporting further shows officials explicitly describing the country's strategy to use cryptocurrency to avoid sanctions:  Iran is exploiting its natural resources to generate cryptocurrency that can then be used to effectively "export" Iranian energy under sanctions.  In other words, the Iranian government expressly linked cryptocurrency and sanctions evasion.

27.       Iran's Deputy for Management Development and Investment Attraction of the Vice Presidency for Science and Technology has explained that promoting cryptocurrency is a significant agenda item for the Vice Presidency for Science and Technology because digital currencies facilitate global funds transfers and assist Iran while it is under sanctions.  *Alireza Daliri: The development of cryptocurrency has been placed on the agenda of the Vice Presidency for Science and Technology*, Way2Pay (July 25, 2018), https://way2pay.ir/108971.  A true and correct Farsi-to-English copy of an article discussing his statements is attached as **Exhibit 3**.

28.       This scheme was highlighted in Iranian reporting on the opening of a large cryptocurrency mine in Rafsanjan in the Kerman province of Iran that was developed with the Iran-China Group.  Sanaz Mousavi, *Launch of Iran's Largest Mining Farm in Rafsanjan with Chinese Investment*, CoinIran (Dec. 12, 2019), https://coiniran.com/iran-largest-mining-farm-launched.  At the mine opening, Mohammad Ali Dehgan, the Deputy Governor for Economic Coordination of Kerman Province (in which Rafsanjan is located), explained that cryptocurrency is a path for dealing with sanctions, similarly linking cryptocurrency mining to sanctions evasion.

According to Ali Dehgnan, the cryptocurrency "industry is a solution" to Iran's difficulties exporting its oil under sanctions. Cryptocurrency is a form of energy export, "when electricity is converted into currency." The article also discusses statements from Ahmad Anaraki Mohammadi, the Member of Parliament representing Rafsanjan in the Islamic Consultative Assembly, at the opening of the Rafsanjan mine, explaining that the use of cryptocurrency "is most efficient during times of sanctions." A true and correct Farsi-to-English translation of that article is attached as **Exhibit 4**.

29. An article published by Iranian state-run media that reports on the opening of the Bitcoin mine in Rafsanjan similarly describes the design of the mine to convert energy to virtual currency to help skirt sanctions: Iran's electricity is used to produce cryptocurrency, which can then be sold and converted into traditional currency, generating "foreign exchange earnings." *Inauguration of Mining for Digital Currency Production in Rafsanjan*, Islamic Republic of Iran Broadcasting (Dec. 11, 2019), https://www.iribnews.ir/fa/news/ 2593933/%D8%A7%D9%81%D8%AA%D8%AA%D8%A7%D8%AD-%D9%85%D8%A7%D B%8C%D9%86%DB%8C%D9%86%DA%AF-%D8%A8%D8%B1%D8%A7%DB%8C-%D8 %AA%D9%88%D9%84%DB%8C%D8%AF-%D8%A7%D8%B1%D8%B2-%D8%AF%DB% 8C%D8%AC%DB%8C%D8%AA%D8%A7%D9%84-%D8%AF%D8%B1-%D8%B1%D9%81 %D8%B3%D9%86%D8%AC%D8%A7%D9%86. A true and correct Farsi-to-English translation of that article is attached as **Exhibit 5**.

30. Similarly, the Iranian Presidential Center for Strategic Studies explained that mining Bitcoin helps Iran avoid sanctions because newly mined Bitcoin are preferable to existing ones because they are less traceable. Behnam Gholipour, *Official Report: Iran Could Use Cryptocurrencies to Avoid Sanctions*, IranWire (Mar. 2, 2021),

https://iranwire.com/en/features/69084. A true and correct copy of that article is attached as **Exhibit 6**.

31.     These statements from Iranian officials indicate that Iran aims to use cryptocurrency mining as a method of transforming the country's natural resources into cryptocurrency and circumventing U.S. sanctions.

32.     Iran's energy-to-crypto sanctions evasions scheme has also been the subject of extensive public reporting outside Iran.

33.     For example, a blockchain analytics company issued a report explaining how Iran converts energy to cryptocurrency, allowing it to evade sanctions. Dr. Tom Robinson, *How Iran Uses Bitcoin Mining to Evade Sanctions and "Export" Millions of Barrels of Oil*, Elliptic (May 21, 2021), https://www.elliptic.co/blog/how-iran-uses-bitcoin-mining-to-evade-sanctions. That report estimates that the energy required to account for Iran's cryptocurrency was on the order of 10 million barrels of oil per year. A true and correct copy of that report is attached as **Exhibit 7**.

34.     Similarly, the French national bank explained that converting oil to Bitcoin is a "cornerstone" of Iran's sanctions evasion strategy. Roxana Moghadam, *Lessons from a Parallel Economy: Crypto and the Limits of Central Banks*, Banque de France (Nov. 6, 2025), https://www.banque-france.fr/en/publications-and-statistics/publications/lessons-parallel-economy-crypto-and-limits-central-banks. A true and correct copy of that article is attached as **Exhibit 8**.

35.     News outlets have reported that Iran made its first import purchase under U.S. sanctions using cryptocurrency. *Iran makes first import order using cryptocurrency—report*, EuroNews (Sept. 8, 2022), https://www.euronews.com/next/2022/08/09/iran-trade-crypto-currency. One report states that the transaction was "a move that could enable the Islamic Republic

to circumvent U.S. sanctions that have crippled the economy." The report also notes that in 2021, about 4.5% of global Bitcoin mining took place in Iran. A true and correct copy of that report is attached as **Exhibit 9**.

        **D.**    **Iranian Government Involvement in Large-Scale Crypto Mining**

36.    Creating and operating a large-scale crypto mine in Iran is not possible without significant government partnership and involvement. Not only has the Iranian government specifically regulated mining, but it also controls the electricity necessary to start and run any significant mining operation.

37.    In 2019, Iran imposed a requirement that cryptocurrency miners obtain a license from the Iranian Ministry of Industry, Mine and Trade. *Executive Regulations for 'Performance-Based Budgeting of Executive Bodies' Approved/Agreement with the Extraction of Cryptographic Processing Products*, Dolat.ir (Jul. 18, 2019), https://dolat.ir/detail/325511. A true and correct Farsi-to-English translation of this article providing notice of the licensing requirement is attached as **Exhibit 10**.

38.    Iran tightly controls shipping channels, and in 2020, it was reportedly illegal to import crypto mining machines. The only way to get significant numbers of crypto miners into the country was with special government permission. An investigation from France 24 reported that "only people who have the police, customs officers and even the [IRGC] in their pockets can import these machines . . . and run their firm legally . . . ordinary Iranian citizens don't have this luxury, but the Chinese do." Alijani Ershad, *In Iran, Power Outages Reveal Secret Business of Chinese Bitcoin Farms*, France24 (Jan. 2, 2021), https://observers.france24.com/en/middle-east/20210203-in-iran-power-outages-reveal-the-secret-business-of-chinese-bitcoin-farms. A true and correct copy of the article is attached as **Exhibit 11**.

39.     Once a mining operation was created, the Ministry of Energy, through Iran's national electricity company, Tavanir, controls the amount of electricity that crypto farms receive. As has been widely reported, Tavanir is "responsible for generation and transmission expansions and wholesaling" of electricity in Iran.   G. Reza Yousefi and Sajjad Kaviri, et al., *Electricity Industry Restructuring in Iran*, 108 Energy Policy 212, 213 (2017).  A true and correct copy of this article is attached as **Exhibit 12**.

40.     Iran has partnered with Chinese companies to run mining farms, offering them special financial arrangements.  *See* **Exhibit 11** (reporting that "Iranian authorities are said to reward Chinese companies with lucrative contracts and special deals").

41.     Chinese-run crypto farms like the large-scale operation in Rafsanjan reportedly received special electricity rates from the government of Iran that were not available to ordinary Iranian citizens.  One article asserted that "the government grants low-price electricity to the Chinese-held center to extract bitcoin at the time that the power outages have disrupted people's lives and employment."  Hoshang Amiri, *Power Outages in Iran as China Extracts its Bitcoins*, Iran Focus (Jan. 13, 2021), https://iranfocus.com/iran-general/46049-power-outages-in-iran-as-china-extracts-its-bitcoins.  A true and correct copy of the article is attached as **Exhibit 13**.

42.     One such partnership involved the Iran-China Group, which operated the previously mentioned large crypto farm in Rafsanjan, Iran.  An Instagram post by the Iran-China Group describes a partnership between Iran and China in areas that include "cryptocurrency mining." Iranchinaidg        (@iranchinaidg),        Instagram        (Mar.        13,        2020), https://www.instagram.com/iranchinaidg/p/B9q6UmLlYNs.  A true and correct copy of a Farsi-to-English translation of that Instagram post is attached as **Exhibit 14**.

43. Other reporting also notes Chinese partnerships with the Iranian government in crypto mining, including the "large mining farm in Rafsanjan." Shamsi Saadati, *How Khamenei's crypto cartel plunges Iran into darkness for profit*, People's Mojahedin Organization of Iran (May 17, 2025), https://english.mojahedin.org/article/how-khameneis-crypto-cartel-plunges-iran-into-darkness-for-profit. A true and correct copy of this report is attached as **Exhibit 15**.

44. The Iran-China Investment Development Group's Rafsanjan operation was massive. In November 2020, a bill reportedly meant for the Iran-China Investment Development Group recorded 30-day electricity usage of over 58.6 million kilowatt-hours. Attached as **Exhibit 16** is a true and correct copy of a report containing the bill. *What is the Story Behind the 40 Billion Toman Electricity Bill?* Khabar Online (Jan. 18, 2021), https://khabaronline.ir/xgznh.

45. An Instagram post by the Iran-China Group account explained that the group registered the internet connections to the site as part of Iran's "essential industries infrastructure," which ensures uninterrupted access during emergencies. Iranchinaidg (@inanchinaidg), Instagram (Jan. 29, 2021), https://www.instagram.com/iranchinaidg/p/B9q6UmLlYNs. A true and correct Farsi-to-English translation of that post is included as **Exhibit 17**.

46. Government involvement in Bitcoin mining extended beyond electricity and internet. In at least one case, a high-ranking Iranian official was involved in the creation of cryptocurrency mines. The Rafsanjan project was launched with the involvement and awareness of a senior executive-branch adviser. It was framed in public communications in a manner designed to obscure its mining function. Specifically, an advisor to the Iranian president reportedly opened the Rafsanjan mine disguised as a data center. "Bitcoin Mining in Iran Only Profitable for Chinese, Says Insider," Iran Int'l Newsroom (Apr. 11, 2021), https://web.archive.org/web/20210411124944/https://www.iranintl.com/en/world/bitcoin-mining-

iran-profitable-only-chinese-says-insider.  A true and correct copy of that article is attached as **Exhibit 18**.

47.    The opening of the Rafsanjan mine was reportedly attended by the Secretary of the Supreme Council of Iran's Free Trade-Industrial and Special Economic Zones, the Deputy Governor for Economic Coordination of Kerman Province (in which Rafsanjan is located), and the Member of Parliament representing Rafsanjan in the Islamic Consultative Assembly, alongside the Director of the Iran-China Group.  **Exhibits 4, 5**.

48.    A January 2021 Instagram post by the Iran-China Investment Development Group celebrated the opening of the Rafsanjan site, which was also attended by the company's board Chairman and "many of the country's senior economic officials." A true and correct copy of a Farsi-to-English translation of that Instagram post is attached as **Exhibit 19**. Iranchinaidg (@iranchinaidg),          Instagram          (Jan.          21,          2021), https://www.instagram.com/iranchinaidg/p/CKUXOXMhAUF.

49.    The Islamic Revolutionary Guard Corps ("IRGC")—a branch of Iran's armed forces that has long been sanctioned by the United States as a Specially Designated Global Terrorist—also has been directly involved in creating and sheltering cryptocurrency mining operations in Iran.  Widespread reporting suggests any significant cryptocurrency mining operation in Iran is only possible in close cooperation with the IRGC.

50.    One report explains that the IRGC has "partnered" with Chinese Bitcoin miners to make up for the country's demand for dollars.  Shahriar Kia, *Bitcoin Mining in Iran: IRGC Operations and the Power Grid*, National Council of Resistance of Iran (May 26, 2025), https://www.ncr-iran.org/en/publications/special-reports/bitcoin-mining-in-iran-irgc-operations-and-the-power-grid-crisis.  The article also describes a large mining operation in Rafsanjan as a

joint venture between the IRGC and the Chinese.  A true and correct copy of that report is attached as **Exhibit 20**.

51.    Indeed, the IRGC or "military" was publicly reported by multiple sources to be collaborating with Chinese miners in creating a large crypto mine in Rafsanjan.  **Exhibit 18**; *see also* **Exhibit 7** ("These [Chinese Bitcoin mining companies] have described establishing good relationships with 'the army in Iran,' and one particularly large facility in the Rafsanjan Special Economic Zone was reportedly built in collaboration with a 'military organization.'").

52.    Highlighting the Iranian government's involvement, one article quotes the founder of LuBian, a mining pool that I understand others have associated with the Iran-China Group but have not personally verified, as stating that LuBian has its own "customs clearance channels" in Iran and enjoys positive relationships with the Ministry of Energy and the "army."  Vincent He, *China-based Lubian.com Boasts the Largest Compliant Bitcoin Mining Farm in Iran*, 8BTC.COM (Aug. 12, 2020), https://web.archive.org/web/20230505201231/https://news.8btc.com/china-based-lubian-com-boasts-the-largest-compliant-bitcoin-mining-farm-in-iran.  A true and correct copy of that report is attached as **Exhibit 21**.

53.    One nonprofit think tank reported that the Iranian State's cryptocurrency-mining push resulted in an electricity crisis.  Dalga Khatinoglu, *How Iran's Cryptocurrency Gamble Empowers the Revolutionary Guards and Drains the State*, Middle East Forum (May 14, 2025), https://www.meforum.org/mef-observer/how-irans-cryptocurrency-gamble-empowers-the-revolutionary-guards-and-drains-the-state.  But the IRGC ensured its partnered mining operations continue unabated.  In 2022, Iran granted military institutions the right to "establish their own private electricity connections," which gave the IRGC "access to both subsidized electricity and portions of free electricity reserved for public-sector use—resources it could redirect to crypto

17

mining with little or no government oversight." A true and correct copy of that report is attached as **Exhibit 22**.

54.     The IRGC protects mining operations with relative impunity, going so far as to use violence to protect mining farms under its supervision. **Exhibit 20** (claiming the IRGC polices unlicensed Bitcoin mining operations, a duty not within its responsibilities).

55.     One report discusses the IRGC's shooting at Tanavir employees. Dalga Khatinoglu, *Blackouts; The Sham War Between the IRGC and the Government*, Deutsche Welle (May 25, 2021), https://www.dw.com/fa-ir/%D8%AE%D8%A7%D9%85%D9%88%D8%B4%DB%8C%D9%87%D8%A7-%D8%AC%D9%86%DA%AF-%D8%B2%D8%B1%DA%AF%D8%B1%DB%8C-%D8%B3%D9%BE%D8%A7%D9%87-%D9%88-%D8%AF%D9%88%D9%84%D8%AA/a-57653344. A true and correct Farsi-to-English translation of that report is attached as **Exhibit 23**.

**E.     July 2019 Cabinet Resolution – Industrial Tax Regime**

56.     Article 105 of Iran's Direct Taxes Act sets a tax rate of 25% except for special cases. Article 105 of the Direct Taxes Act, Najitax, https://najitax.com/article-105-direct-taxes-law (last visited Dec. 19, 2025). A true and correct Farsi-to-English translation of that statute is attached as **Exhibit 24**.

57.     In July 2019, the Iranian Cabinet legally classified cryptocurrency mining as an "industrial activity" and required miners to obtain licenses from the government. **Exhibit 10**.

58.     Simultaneously with the imposition of the licensing requirement, Iran further subjected licensed miners to the standard industrial tax framework—a 25% tax on net income—but provided a 0% tax rate where foreign-currency earnings from mining are converted and settled through Iran's domestic foreign-exchange system. Iran's state-run news agency reported that "in the event of the return of currency resulting from the export of cryptocurrencies to the economic

cycle, [miners] will be subject to tax at a zero rate." *Tax Regulations for Digital Currency Mining Farms were Notified*, Islamic Republic News Agency (Sept. 8, 2019), https://www.irna.ir/news/ 83468983/احکام-مالیاتی-مزارع-استخراج-ارزهای-دیجیتال-ابلاغ-شد 1/1. A true and correct Farsi-to-English translation of that report is attached as **Exhibit 25**.

59.    In practical terms, this framework acknowledged mining as a significant industrial activity and created a choice for cryptocurrency miners between paying industrial tax on mining income or routing foreign currency earnings from mined assets into Iran's domestic economy via regulated channels.  The latter option not only benefited miners but also furthered Iran's ability to avoid sanctions by creating a pathway through which Iran could pay for imports and obtain foreign currency.  *See* **Exhibit 20**.

**F.    October 2020 Decree – Mandatory Sale of Mined Crypto to the Central Bank**

60.    A subsequent resolution on cryptocurrency mining, enacted by the Iranian Cabinet in October 2020, introduced a new rule for mined coins.  Under this decree, licensed miners are required to supply cryptocurrency produced to the Central Bank of Iran ("CBI") or designated intermediaries in exchange for local state-issued currency, and those coins are intended to fund imports.   The decree required miners to use mined coins "solely for the purpose of supplying foreign currency for the country's imports."  After this decree, licensed miners no longer had the option to hold newly mined coins indefinitely.  Instead, output correlated to the amount of electricity consumed by a mine was to be sold to channels directed by the Central Bank of Iran.  A true and correct Farsi-to-English translation of a copy of this resolution is attached as **Exhibit 26**.

61.    In a letter to executive-branch officials, Senators Elizabeth Warren and Angus King have explained that crypto miners in Iran are required to sell their mined coins to the CBI as a means for Iran to avoid sanctions.  Letter from Sens. Elizabeth Warren and Angus King to the

Hons. Lloyd Austin and Janet Yellen, and Mr. Jake Sullivan (May 1, 2024). A true and correct copy of that letter is attached as **Exhibit 27**.

       **G.**      **State Trading Platform/Import Mechanism**

     62.     The Iranian government subsequently developed a platform operated by the Iranian Central Bank for miners to convert their cryptocurrency into rials, the official currency of Iran. Cryptocurrency obtained through the platform could then be used by the Iranian government to finance imports.

     63.     One report explains that by April of 2021, Iran had finalized the regulations under the amended October 2020 decree for using Bitcoin to pay for imports. *Exchanges and Banks Authorized*, Coingram (Apr. 22, 2021), https://www.coingram.com/news/ 4767/%D8%A8%D8%A7%D9%86%DA%A9-%D9%85%D8%B1%DA%A9%D8%B2%DB%8 C-%D8%AA%D8%B5%D9%88%DB%8C%D8%A8-%DA%A9%D8%B1%D8%AF%D8%9B- %D8%A7%D8%B3%D8%AA%D9%81%D8%A7%D8%AF%D9%87-%D8%A7%D8%B2-%D 8%B1%D9%85%D8%B2%D8%A7%D8%B1%D8%B2-%D8%AA%D9%88%D9%84%DB%8 C%D8%AF-%D8%AF%D8%A7%D8%AE%D9%84%DB%8C-%D8%A8%D8%B1%D8%A7 %DB%8C-%D8%B5%D8%B1%D8%A7%D9%81%DB%8C-%D9%88-%D8%A8%D8%A7. A true and correct Farsi-to-English translation of a copy of that report is attached as **Exhibit 28**.

     64.     The press has reported that Iran's first official import order using cryptocurrency was successfully registered in August 2022, which an Iranian news agency described at the time as "an event that could be a highway for bypassing sanctions and facilitating trade with the world." The news agency also explained that the authorities were working to create a government-run platform through which Iranian importers could apply for access to cryptocurrency to use in their transactions. "How to Conduct Imports Using Cryptocurrencies?," IBENA (Aug. 13, 2022),

https://www.ibena.ir/fa/news/140402/%DA%86%DA%AF%D9%88%D9%86%D9%87%20%D
8%A7%20%D8%B1%D9%85%D8%B2%D8%A7%D8%B1%D8%B2%E2%80%8C%D9%87
%D8%A7%20%D9%88%D8%A7%D8%B1%D8%AF%D8%A7%D8%AA%20%D8%A7%D9
%86%D8%AC%D8%A7%D9%85%20%D8%AF%D9%87%DB%8C%D9%85%D8%9F.  A true
and correct Farsi-to-English translation of that web page is attached as **Exhibit 29**.

65.    From a technical standpoint, Iran created a state-supervised on- and off-ramp:
mined Bitcoin is moved into an Iranian-government platform and then converted into domestic
Iranian currency. Authorized companies can also access cryptocurrency reserves to help facilitate
payment for imports: "Companies that currently have the necessary trade connection with their
suppliers and/or buyers can [use this] to secure financial exchange with the supplier or buyer by
entering their information in the form below."  **Exhibit 29**.

### H.    Public Reporting of Licensed Mining

66.    Other public materials also describe the overarching regulatory framework in which
domestically mined Bitcoin is expected to be sold or made available to the state, often via the
Central Bank or designated intermediaries.  Under this framework, licensed miners are expected
to operate from approved facilities, use regulated electricity at designated mining tariffs, and
comply with tax, sale, and delivery obligations in respect of their mined output.

67.    One article summarizing those obligations explains that the "Iranian government
has required [miners] to sell . . . to the central bank, which in turn uses this digital money to fund
imports and exports.  [Miners must also] sell a fixed supply of cryptocurrency to the central bank."
Eric Lob, *Iran and cryptocurrency: Opportunities and obstacles for the regime*, Middle East
Institute    (Dec.    27,    2022),    https://www.mei.edu/publications/iran-and-cryptocurrency-

opportunities-and-obstacles-regime. A true and correct copy of that article is attached as **Exhibit 30**.

68. An Iranian news article similarly observed that miners must sell cryptocurrency to the Central Bank of Iran and that this cryptocurrency can be used to reduce the risk of being impacted by U.S. sanctions. *Mechanism For Using Cryptocurrencies in Foreign Trade Finalized*, Tehran Times (Jan. 8, 2022), https://www.tehrantimes.com/news/468855/Mechanism-for-using-cryptocurrencies-in-foreign-trade-finalized. A true and correct copy of that article is attached as **Exhibit 31**.

### I. Analysis of Preceding Materials

69. On the basis of the factual material set out above and my experience analyzing illicit finance and sanctions evasion, I draw the following conclusions.

70. *First*, senior Iranian officials have explicitly framed cryptocurrencies and mining in sanctions-evasion terms. Statements by members of the executive branch repeatedly describe digital currencies as methods to bypass sanctions. These are not incidental remarks; instead, they reflect the Iranian government's view that cryptocurrency mining provides a powerful tool for evading sanctions.

71. *Second*, the 2019 tax law operationalized this policy by giving mining a formal place in the industrial tax and foreign-exchange regime. By classifying mining as an industrial activity subject to a 25% tax on net income but foregoing that tax when Bitcoins are sold to the Central Bank and the resulting foreign-currency revenue returned to Iran, the law ensures that licensed mining activity is tied either to tax collection or the control of cryptocurrency through approved government channels. In other words, the policy aims to capture the proceeds of Bitcoin mining for the benefit of the Iranian state.

72.    *Third*, the October 2020 decree on mined coins goes further by mandating direct delivery of all newly mined cryptocurrency into Central Bank channels.  Under this decree, licensed miners are required to supply their output to the Central Bank or its designees in exchange for state-issued currency, with the exchange rate of Bitcoin to Iranian rials calibrated to metered electricity consumption at the mining tariff.  This ties the coins that must be delivered, and the price paid for them, directly to the amount of energy drawn from the grid (rather than the market price of Bitcoin), embedding mining within a state-managed energy-to-crypto conversion framework.

73.    *Fourth,* Iran has worked to create a government-run platform through which importers could apply to access cryptocurrency in their transactions.  Mined cryptocurrency would thus have directly powered the Iranian state's "highway for bypassing sanctions."

74.    *Fifth*, Iranian officials describe mining as a form of "electricity export" and a "solution" under sanctions: domestic electricity, generated from Iran's energy resources, is used to produce cryptocurrency, which is then sold and converted into foreign currency to create "acceptable foreign exchange" for the country or used to pay for imports.  That language makes clear that the intended function of mining is to convert local energy into internationally usable value in a sanctions environment.

75.    Taken together, these elements—the explicit sanctions framing, the industrial tax, the provision of foreign currency from cryptocurrency sales, and the mandatory provision of mined coins to the Central Bank—describe a coherent strategy.  Large-scale mining is to be licensed, powered with domestic energy, and used to generate cryptocurrency to pay for imports when conventional banking routes are constrained. In my opinion, this is best understood as the deliberate adoption of mining as a sanctions-evasion tool.

76.     Based on public statements by Iranian officials, the 2019 regulatory framework for mining and the October 2020 decree, it is my opinion that Iranian authorities structured and promoted Bitcoin mining to be used as a tool for evading sanctions by converting domestic energy resources into cryptocurrency and channelling that output into state-supervised trade-settlement channels.

77.     It is also my opinion that large-scale cryptocurrency mining in Iran could not occur with government collaboration and partnership.  Government control of imports, shipping channels, and electricity required large-scale farms to work hand-in-hand with the government to set up and operate a crypto mine in Iran.

II.     **Opinion 2: Characterization of the Iran-China Group Under Iran's Mining Framework**

        A.     **Regulatory Framework and Timeline**

78.     Based upon the materials referenced in this report and public reporting, I understand that the Iran-China Group operated in Iran in 2020.  I also understand that in December 2020, approximately 127,000 Bitcoin were diverted from wallets controlled by a mining pool called LuBian that I understand others have linked to the Iran-China Group but have not personally verified.  *$15 billion seized by US originates from Iran/China bitcoin miner "theft"*, Elliptic (Oct. 14, 2025), https://www.elliptic.co/blog/15-billion-us-seizure-reveals-prince-groups-connection-to-iran-china-bitcoin-mining-theft.  A true and correct copy of the above article is attached as **Exhibit 32**.

79.     Public materials and translated government texts describe two key regulatory phases relevant to the Iran-China Group's 2020 operating period.

        a.     ***August 2019 Cabinet Resolution – Industrial Tax/Repatriation Regime***:
               A Cabinet Resolution dated August 4, 2019 (ratified August 26, 2019) classified

24

cryptocurrency mining as an industrial activity subject to the standard industrial tax framework. Under this regime, licensed miners were treated as industrial taxpayers and could either (1) pay a 25% industrial tax on net income or (2) receive a 0% tax rate if they converted and settled all foreign-currency earnings from mining through Iran's domestic foreign-exchange system or provided all mined Bitcoin to the Central Bank of Iran. As a result, from the start of the Iran-China Group's production in early 2020 until late October 2020, coins mined by a licensed operation (like the Iran-China Group mine) either carried a 25% tax obligation on net income or an obligation to be converted and settled through Iran's domestic foreign-exchange cryptocurrency to rial system in exchange for the 0% rate. **Exhibits 24–25**.

b.    ***October 2020 Cabinet Decree – Central Bank Exchange Regime***: A subsequent decree on cryptocurrency mining, enacted in October 2020, introduced a new rule for mined coins. Under this decree, licensed miners were required to supply cryptocurrency produced to the Central Bank of Iran or its designees in exchange for state-issued currency, and those coins were intended to fund imports. After the decree, licensed miners no longer had the option to hold newly mined coins indefinitely. Instead, output was to be delivered to the Central Bank. *See* **Exhibit 26** (requirement for miners to sell mined Bitcoin directly to channels designated by the Central Bank of Iran, "solely for the purpose of supplying foreign currency for the country's imports").

i.    To facilitate the conversion of mined Bitcoin into local currency, the Iranian government worked to develop a platform allowing importers to access

cryptocurrency for use in their transactions. Various public reporting confirms this framework, explaining that domestically mined Bitcoin is expected to be sold or made available to the state (via the Central Bank or designated intermediaries) and that licensed miners are expected to operate from approved facilities, use regulated electricity, and comply with tax, sale, and delivery obligations in respect of their mined output. *See* **Exhibits 26, 28–29**.

**B.    Government Climate**

80.    During the time that the Iran-China Group reportedly operated in Iran and leading up to the 2020 December Lubian hack, the Iranian government tightly controlled shipping and imports, required miners to obtain government licenses, and controlled electricity transmission.

81.    Chinese miners reportedly received special discounted electricity rates, supplied by Iran's national electricity company, Tavanir. **Exhibits 13, 18**.

82.    Moreover, there were significant reports of government involvement in a large-scale crypto mine located in Rafsanjan; a mine there was reportedly opened by an advisor to the Iranian President, and the military was also reported to be working in collaboration with Chinese miners in Rafsanjan. **Exhibits 4–5, 18.**

**C.    Analysis of Iran-China Group Under Iran's Mining Framework**

83.    On the basis of the factual material set out above I draw the following conclusions, on the assumption that the Iranian mining framework operates as described in the decrees and public materials cited.

84.     It is my opinion that a crypto operation of the Iran-China Group's size and scale located in Iran would have been created and operated in partnership with the Iranian government, including the Ministry of Energy and the IRGC.  **Exhibits 11, 13, 21**.

85.     Presuming that the Iran-China Group was operating in Iran, it is my opinion that the Iran-China Group would have been subject to the decrees, regulations, and restrictions imposed by the government of Iran, and as further described in Opinion 1, *supra*.

86.     It is my opinion that a cryptocurrency mining operation the size and scope of the one operated by the Iran-China Group would have materially helped Iran skirt sanctions and served as the functional equivalent of an energy-to-Bitcoin conversion scheme.  Indeed, as described in this report, the Iran-China Group would have been required to sell its Bitcoin directly to Iran.  Iran provided the electricity that was generated from its oil reserves; the Iran-China Group mined the Bitcoin; the Iran-China Group sold the Bitcoin to Iran, and Iran then used that Bitcoin to pay for imports and acquire foreign currency, evading U.S. and international sanctions.

87.     During the time period relevant to the Iran-China Group's mining operation leading up to the December 2020 hack,  Iran's policy treated industrial cryptocurrency mining as an instrument for evading sanctions; licensed miners were subject to tax or mandatory surrender, requiring them to sell mined assets to the state in exchange for domestic currency, in proportion to their power consumption, or provide their foreign currency from cryptocurrency sold on international markets to the Government of Iran.  It is my opinion that a crypto operation in Iran of the size and scale of the Iran-China Group would have been materially supporting the state in its plan to evade international sanctions.

88.     For the period from July 2019 to October 2020, licensed mining was treated as an industrial activity subject either to a 25% industrial tax on net income or to a 0% tax rate

conditional on surrender of foreign currency earnings from mined Bitcoin in exchange for domestic currency. During that time, crypto mined by the Iran-China Group in Iran was subject to these requirements. For the period after October 2020 and before the December 2020 hack, the Decree on mined coins required licensed miners to deliver cryptocurrency to the Central Bank or its designees, for a price set proportionally to the power consumed to create the coins. **Exhibit 26**.

## CONCLUSION

89.     In order to operate in Iran, the Iran-China Group would have had to partner with the government of Iran—to import its mining devices, obtain licensing, and secure the electricity critical to mining cryptocurrency as part of the Iranian government's stated policy to use cryptocurrency mining as a means of evading sanctions. The Iran-China Group also would have been required to adhere to the government of Iran's regulations regarding cryptocurrency operations, registration, and payments. Given that the government of Iran required mined Bitcoin to be provided to the Central Bank of Iran, Iran almost certainly benefited financially from operations by the Iran-China Group in Iran in 2020, and in light of their partnership, the government of Iran likely continues to have financial interests in the Iran-China Group and the Iran-China Group-mined Bitcoin. Assuming the facts discussed in this opinion and considered as a whole, it is my opinion that the Iran-China Group provided material support to Iran by helping it to export its energy and evade sanctions.

*     *     *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   December 21, 2025
                    Ottawa, Ontario

Dr. Jessica Davis