

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| AFM:CBB | *271 Cadman Plaza East* |
| F. #2024R00105 | *Brooklyn, New York 11201* |

February 23, 2026

<u>By ECF</u>

The Honorable Rachel P. Kovner
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  <u>Noala Fritz, *et al.* v. Iran and China Investment Development Group d/b/a Lubian.com
       Civil Docket No. 25-7093 (RPK)</u>

Dear Judge Kovner:

    The government respectfully opposes the "emergency" motion for an *ex parte* order of attachment filed by Plaintiffs Noala Fritz, *et al.* (the "Fritz Claimants"), *see* Dkt. 70 (Mem. of Law in Support of Pls.' Emergency Mot. For *Ex Parte* Order of Attachment), and requests leave to move to dismiss the Fritz Claimants' turnover action.[1]

    The Fritz Claimants comprise 2,282 victims of Iranian terrorism who hold more than $9.1 billion in default judgments against Iran. Dkt. 1 (Compl. for Execution & Turnover). They have filed this turnover action seeking to "attach" and force the United States to turn over to them approximately 127,271 Bitcoin (BTC) (the "Defendant Cryptocurrency") that constitutes the *res* at issue in a civil forfeiture proceeding pending before this Court, *United States v. Approximately 127,271 Bitcoin*, No. 25-CV-5745 (RPK). The Fritz Claimants have also entered an appearance in the civil forfeiture proceeding and filed a claim of interest in Defendant Cryptocurrency. *See 127,271 Bitcoin*, Dkt. 29. A flood of additional victims of Iranian terrorism—collectively representing more than 19,000 individual and corporate litigants holding over $137 billion in default judgments—have sought to follow in the Fritz Claimants' footsteps by filing their own (untimely) claims in the civil forfeiture proceeding. Some of these additional

---

[1] Contemporaneous with this filing, the government is filing a Pre-Motion Letter pursuant to Rule IV.A.2 of this Court's Individual Practice Rules, for leave to move to dismiss the Fritz Claimants' Complaint for Execution and Turnover for lack of subject matter jurisdiction and failure to state a claim. If leave is granted, the government requests that this opposition be construed as the government's letter memorandum in support of its cross-motion to dismiss.

victims have also filed turnover motions in other courts.[2] The government condemns terrorism in any form, and the victims of Iranian terrorism deserve to see their day in court against Iran. But their turnover actions and claims all arise out of the same misunderstanding—that the civil forfeiture case concerns Iranian assets. It does not.

The Defendant Cryptocurrency originated from virtual currency wallets in the possession of the criminal defendant Chen Zhi ("Chen"). *127,271 Bitcoin*, Dkt. 1 (Verified Compl. *In Rem*) (the "Forfeiture Complaint"), ¶¶ 44-57. The Defendant Cryptocurrency represents criminal proceeds of fraud and instrumentalities of money laundering arising out of Chen's sprawling criminal conspiracy, which, under the umbrella of the Prince Group, operated forced-labor scam compounds across Cambodia to engage in cryptocurrency investment fraud schemes (sometimes referred to as "pig butchering" schemes). *Id.* ¶¶ 2, 15, 21-43. As set forth in the criminal indictment against Chen and parallel civil forfeiture complaint, Chen and his co-conspirators managed these scam compounds and the trafficked victims inside them with abject brutality. *Id.*, Attachment B (Indictment, *United States v. Chen Zhi*, No. 25-cr-312 (RPK)), ¶¶ 30, 39-40. They used bribery to ensure a permissive environment for their lawless activities. *Id.*, ¶¶ 36-40. And they targeted victims in the United States and worldwide for fraud schemes that appear to have yielded billions of dollars in criminal proceeds. *Id.*, ¶¶ 41-53. Indeed, numerous cyber fraud victims have filed claims of their own in the civil forfeiture proceeding.[3] The Defendant Cryptocurrency, in other words, arises out of an international fraud scheme unrelated to any acts of terrorism, with masses of victims and losses in its own right, and bearing only the most tenuous of connections to any Iranian entity. The Fritz Claimants are therefore misguided in looking to the Defendant Cryptocurrency to satisfy their judgments against Iran.

Of course, the Fritz Claimants disagree. They argue that the Defendant Cryptocurrency does not belong to Chen or to the victims of Chen's criminal conspiracy, but to a Bitcoin mining operation known as LuBian, which laundered some of Chen's criminal proceeds, and which the Fritz Claimants characterize as an instrumentality of the Government of Iran. *See* Dkt. 70, at 13-19. Their factual assertions will be hotly contested in the civil forfeiture proceeding. They stand in tension with the allegations in the government's forfeiture complaint, and they are at odds with claims filed by other claimants, including Chen, the Prince Group, and various fraud victims. Meanwhile, LuBian has filed its own claim in the civil forfeiture proceeding, and while

---

[2] *See, e.g.*, *Ashton v. al Qaeda Islamic Army*, No. 02-cv-06977 (S.D.N.Y.); *Havlish v. Bin-Laden*, No. 03-cv-09848 (S.D.N.Y.); *Hoglan v. Islamic Republic of Iran*, No. 11-cv-07550 (S.D.N.Y.); *Anaya v. Islamic Republic of Iran*, No. 18-cv-12341 (S.D.N.Y.); *Chairnoff v. Islamic Republic of Iran*, No. 18-cv-12370 (S.D.N.Y.); *Ray v. Islamic Republic of Iran*, No. 19-cv-00012 (S.D.N.Y.).

[3] Though these fraud victims lack standing in the civil forfeiture proceeding, *see* Dkt. 126, following the completion of the forfeiture, the Department of Justice will be able to grant meritorious petitions for remission to victims under applicable regulations. *See* 28 U.S.C. § 524(c)(1)(E)(i); 18 U.S.C. § 981(d); 28 C.F.R. Part 9. The Attorney General has delegated the authority to decide petitions for remission to the Chief of the Department of Justice's Money Laundering, Narcotics, and Forfeiture Section (MNF). *See* 28 C.F.R. § 9.1(b)(2).

the Fritz Claimants and LuBian agree on LuBian's claim of ownership, they will presumably disagree about LuBian being an instrumentality of Iran.

This "emergency" turnover proceeding is a poor vehicle to resolve such a web of factual disagreements. The Fritz Claimants are seeking *ex parte* relief, which they have repeatedly urged this Court to grant without hearing from the government (the custodian of the Defendant Cryptocurrency named as "Garnishee" in this action),[4] from LuBian (the putative "terrorist party" named as the defendant but not yet served),[5] or from any other claimant to the same property, including any of the other victims of terrorism.

The Fritz Claimants should not be allowed to short-circuit the adversarial testing of competing claims in the civil forfeiture proceeding by means of this *ex parte* attachment and turnover action. Numerous grounds exist to deny their motion and to dismiss the action in its entirety. As explained below, the turnover action is barred by federal sovereign immunity as well as the bar on intervention in criminal forfeiture proceedings under 21 U.S.C. § 853(k). In addition, the Defendant Cryptocurrency is not the kind of asset made available to terrorism victims under the Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297, 116 Stat. 2322 (2012) (codified at 28 U.S.C. § 1610 note), because it is not a "blocked asset[] of [a] terrorist party," *id.* § 201(a). It is not "blocked" because the government holds the Defendant Cryptocurrency pursuant to an arrest warrant *in rem* and as authorized by a general license for the official business of the United States government, and it is not the property "of" a "terrorist party" because, even if LuBian were such a party, it was under the dominion and control of Chen, not LuBian. The Court should dismiss this turnover action and allow the Fritz Claimants to litigate their claims in orderly fashion, alongside all the other claimants, in the civil forfeiture proceeding.

## **LEGAL STANDARD**

In New York, a party seeking to attach property must begin by establishing four statutory criteria: (1) "there is a cause of action," (2) "it is probable that the plaintiff will succeed on the merits," (3) "one or more grounds for attachment provided in [N.Y. CPLR] section 6201 exist," and (4) "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." N.Y. CPLR § 6212(a). "Under New York law, an order of attachment is considered a 'drastic remedy,' and should be 'strictly construed in favor of those against whom it may be employed.'" *Am. Transit Ins. Co. v. Pierre*, No. 24-CV-360 (RPK) (CLP), 2025 WL 3300327, at *1 (E.D.N.Y. Sept. 9, 2025) (quoting *Grp. One Ltd. v. GTE GmbH*, No. 20-CV-2205 (MKB)

---

[4] The Fritz Claimants filed their attachment motion *ex parte* and under seal, *see* Dkt. 69, and only notified the government of their turnover action after being ordered to do so, twice, by Magistrate Judge Henry. *See* Dec. 31, 2025 Minute Order (finding that "the Government should have an opportunity to respond" and ordering Fritz Claimants to serve *ex parte* motion on government); Jan. 5, 2026 Minute Order (noting that "[t]o date, Plaintiffs have failed to comply" with Dec. 31, 2025 order). They have continued to argue that the Court should "grant them an immediate attachment ex parte, without waiting for the government's response." Dkt. 85, at 3.

[5] The docket reflects that a summons for LuBian was issued on December 29, 2025, *see* Dkt. 76, but there is no indication that LuBian has been served.

(JRC), 2023 WL 8472798, at *3 (E.D.N.Y. Sept. 15, 2023), *report and recommendation adopted in part*, 2023 WL 7489974 (E.D.N.Y. Nov. 13, 2023)). "Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007).

"Even if plaintiff satisfies the statutory criteria, the issuance of such relief is discretionary, and since attachment is a harsh remedy, the court must exercise care in its application." *Signal Cap. Corp. v. Frank*, 895 F. Supp. 62, 64 (S.D.N.Y. 1995). As construed by the Second Circuit, a plaintiff must make a showing of necessity in addition to satisfying the four statutory factors. *See Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 221 (2d Cir. 2006) ("Sections 6212 and 6223 require, in addition to one of Sections 6201 grounds, probability of success on the merits on a claim in excess of all known counterclaims as well as need for an order of attachment. Thus, the existence of a statutory ground under Section 6201 is not sufficient absent satisfaction of the other requirements."); *id.* ("[A] motion court's 'discretion' to grant an application depends on its determination that a plaintiff both satisfies the statutory requirements and establishes the need for an attachment."). Courts have recognized that grounds for necessity might include risk of dissipation or the need to secure *in rem* jurisdiction over the assets. *See* Siegel, N.Y. Prac. § 317 (6th ed.) ("[I]f the judge should perceive from the papers that the plaintiff does not need an attachment, either for jurisdiction or security, discretion is appropriately exercised against it even though a CPLR 6201 showing has been made."); *see also Cap. Ventures*, 443 F.3d at 221 (evaluating whether necessity exists "to obtain *quasi in rem* jurisdiction over the property of non-resident defendants and provide security for potential judgments").[6]

Here, even assuming the other factors are met, the Fritz Claimants cannot carry their burden of showing probability of success on the merits. Nor can they show that attachment is necessary to secure the Court's *in rem* jurisdiction over the Defendant Cryptocurrency or to prevent its dissipation.

## ARGUMENT

1. **Federal Sovereign Immunity Bars Attachment and Turnover of Property Held by the Government for Forfeiture**

As a threshold matter, Fritz Claimants' turnover action is barred by the doctrine of federal sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional in nature," *id.*, meaning that it is an issue this Court "'must first decide' before reaching the merits," *Mowrer v. United States Dep't of Transp.*, 14 F.4th 723, 735 (D.C.

---

[6] The Fritz Claimants originally submitted their attachment motion *ex parte*, pursuant to N.Y. CPLR § 6211, which requires a heightened showing of necessity. *See* LCvR 6.1(d) ("No ex parte order, or order to show cause to bring on a motion, will be granted, except upon a clear and specific showing by affidavit that contains good and sufficient reasons why a procedure other than by notice of motion is necessary . . . .").

Cir. 2021) (Katsas, J., concurring) (quoting *Meyer*). "[S]overeign immunity bars creditors from attaching or garnishing funds in the Treasury, or enforcing liens against property owned by the United States." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 264 (1999) (internal citations omitted). As other circuits have held, sovereign immunity extends to funds in the government's possession, such as funds held in a government escrow account, even if the government does not presently hold legal title in the funds. *See Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 431 (D.C. Cir. 2023) ("[T]he *sine qua non* of federal sovereign immunity is the federal government's *possession* of the money in question. The government need not have an actual interest in the funds in order to invoke the defense.") (quoting *Kalodner v. Abraham*, 310 F.3d 767, 770 (D.C. Cir. 2002)) (emphasis in original); *Harger v. Dep't of Lab.*, 569 F.3d 898, 903 (9th Cir. 2009) ("Sovereign immunity is at issue because Foulds, in essence, sued agencies of the United States, DOL and NIOSH, for money in its possession."); *see generally In re Search of 2847 E. Higgins Rd., Elk Grove Vill., Ill.*, 390 F.3d 964, 967–68 (7th Cir. 2004) (discussing *Kalodner* in relation to a Rule 41(g) motion for the return of seized funds, and explaining that "[t]his suggests that it is not the nature of the government's claim, but simply whether (fungible) money is in the government's possession, that triggers the immunity," but that "doesn't mean that the equitable owner of the money held in escrow has no remedy, or stated differently that the government has the right to keep the money; it just means that the owner must proceed in the Court of Federal Claims rather than the district court, if as here he is claiming more than $10,000").

Accordingly, at least two courts have squarely held that federal sovereign immunity bars TRIA plaintiffs from attaching property held by the federal government for civil forfeiture. *See Greenbaum*, 67 F.4th at 435 (holding that "federal sovereign immunity prevents the attachment and garnishment of oil proceeds in a bank account of the United States and . . . TRIA does not waive that immunity"); *Miller v. Juarez Cartel*, No. CV 24-05351-DMG, 2025 WL 2846693, at *5 (C.D. Cal. Sept. 26, 2025) (holding that, "absent a waiver, federal sovereign immunity bars Judgment Creditors' execution against the defendant currency" and "Judgment Creditors have failed to establish the TRIA unmistakably waives federal sovereign immunity as required by Supreme Court precedent"). Here, as in *Greenbaum* and *Miller*, the Defendant Cryptocurrency is held in the government's possession for purposes of the pending civil forfeiture proceeding. *See 127,271 Bitcoin*, Dkt. 1, ¶ 6. The Court should follow those well-reasoned decisions to the same outcome here.

The Fritz Claimants argue the "notwithstanding" clause in § 201(a) of TRIA overrides the federal government's sovereign immunity. Dkt. 70, at 22-24. To the government's knowledge, no court has ever ruled in favor of this position and both *Greenbaum* and *Miller* explicitly rejected it. And for good reason. Waiver of federal sovereign immunity is subject to a "'clear statement' rule," under which courts "will permit a suit against the government only when a statute 'unmistakabl[y]' allows it" and the waiver is "'unmistakably clear in the language of the statute.'" *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024) (quoting *FAA v. Cooper*, 566 U.S. 284, 291 (2012), and *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 76 (2000)). Indeed, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *Cooper*, 566 U.S. at 290.

TRIA's "notwithstanding" clause simply does not make out an "unmistakably clear" waiver of federal sovereign immunity. Nothing in the text of TRIA § 201(a) refers to the United States, federal sovereign immunity, or liability on the part of the United States. *See*

5

*Greenbaum*, 67 F.4th at 433 ("[T]he TRIA does not expressly mention the United States, its sovereign immunity, or its susceptibility to suit under the statute."). Compare § 201(a), for example, to statutes like the Federal Tort Claims Act or the Bankruptcy Code, which provide clear and unmistakable language waiving federal sovereign immunity. *See, e.g.*, 28 U.S.C. § 2674 (FTCA) ("The United States shall be liable [for certain tort claims] . . . in the same manner and to the same extent as a private individual under like circumstances . . . ."); 11 U.S.C. § 106(a) (Bankr. Code) ("Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section . . . ."). By contrast, the only entity referred to in the text of § 201(a) is the "terrorist party" whose assets are subject to execution and attachment. In other words, the focus of the statutory text is on the debtor terrorist entities, not the United States. That is far from an unmistakable waiver of federal sovereign immunity.

Nor can § 201(a)'s glancing reference to "any other provision of law" supply the necessary clarity for a waiver. "[T]he 'notwithstanding' clause applies only when some 'other provision of law' conflicts with TRIA." *Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003). As *Greenbaum* explained:

> The [notwithstanding] clause does not define the scope of the TRIA. It merely signals that the TRIA prevails over conflicting provisions of law. The reach of the notwithstanding clause is therefore necessarily determined by the substantive text that follows it, and the appellants' argument that the notwithstanding clause "standing alone" could waive federal sovereign immunity is but a solecism.

67 F.4th at 433 (internal citations and quotations omitted). In other words, the Court must look first to the substantive reach of § 201(a), and only if another provision of law conflicts with the substance of § 201(a) does the "notwithstanding" clause operate to override it. Here, where § 201(a) "has nothing express to say about federal sovereign immunity," *id.*, there is no reason to conclude the "notwithstanding clause" overrides it.

The Fritz Claimants argue that TRIA abrogates *federal* sovereign immunity because it abrogates *foreign* sovereign immunity under the FSIA, Dkt. 70, at 23-24, but this is a non sequitur. Federal sovereign immunity and foreign sovereign immunity are different doctrines, arising from different sources of law, which serve different purposes.[7] There is no reason to suppose that abrogation of one implies the abrogation of the other. TRIA § 201(a) was clearly

---

[7] *Compare Alden v. Maine*, 527 U.S. 706, 715-16 (1999) ("The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity. . . . Although the American people had rejected other aspects of English political theory, the doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified."); *with Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) ("Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States, and the primacy of federal concerns is evident. To promote these federal interests, Congress exercised its Article I powers by enacting a statute [*i.e.*, the Foreign Sovereign Immunities Act] comprehensively regulating the amenability of foreign nations to suit in the United States.").

written to carve out exceptions to *foreign* sovereign immunity, as codified in the FSIA, 28 U.S.C. § 1602, *et seq.*, because the FSIA was the principal obstacle to plaintiffs seeking to collect on terrorism judgments against state sponsors of terror. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (citing legislative history of TRIA stating that "Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state . . . available for attachment and/or execution of a judgment issued against that terrorist state"); *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 531 (S.D.N.Y. 2010) (collecting cases and noting that "[o]ther courts examining the scope of TRIA § 201(a) have concluded that the Notwithstanding Clause specifically addresses potential conflicts of sovereign immunity"); *Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006) (holding that "it makes sense to interpret § 201(a) of TRIA to indeed provide such an exception to immunity," based on TRIA's codification as a note to the FSIA and its legislative history). Thus, for instance, the Second Circuit ruled in *Havlish v. Taliban*, 152 F.4th 339 (2d Cir. 2025), that while the FSIA provides immunity to assets of a foreign central bank, *see* 28 U.S.C. § 1611, those "immunity provisions in the FSIA conflict with the TRIA," and therefore TRIA "supersedes" the immunity provisions of the FSIA. *Id.* at 358-60. But all of this only strengthens the conclusion that § 201(a) is a statute that deals with *foreign* sovereign immunity, while having no bearing on the sovereign immunity of the United States—as the text, statutory context, and legislative history of TRIA are all focused on making the assets of terrorist parties, including state sponsors of terror, available to satisfy victims' judgments. Nothing in TRIA speaks to making the United States itself liable for such compensation.

The Fritz Claimants argue by implication that TRIA's definition of "blocked asset" as an asset that has been "seized or frozen by the United States," TRIA § 201(d)(2)(A), implies a congressional intent to waive federal sovereign immunity, "since 'blocked assets' are typically held by the United States." Dkt. 70, at 23. That is a dubious factual claim, as blocking orders issued by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) often freeze assets in place at financial institutions—meaning that assets are frequently "blocked" without being taken into the custody of the United States. *See, e.g.*, *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 637-39 (D.C. Cir. 2025) (explaining that OFAC issued blocking order to Wells Fargo Bank which provided that "the Funds may do nothing but sit in a bank account"). In any event, *Greenbaum* considered and rejected the exact same argument-by-implication raised by the Fritz Claimants here: "A drawn-out implication from the definition of blocked asset falls far short of the 'unmistakable statutory expression' required for a waiver of federal sovereign immunity." 67 F.4th at 434 (quoting *Cooper*, 566 U.S. at 291).

Accordingly, the Court should hold that federal sovereign immunity bars the Fritz Claimants' turnover action.

### 2. The Bar on Intervention in Criminal Forfeiture Proceedings Precludes the Attachment and Turnover Action

The "Bar on intervention" codified at 21 U.S.C. § 853(k) independently precludes the Fritz Claimants from attaching the Defendant Cryptocurrency in a turnover action. On October 8, 2025, a federal grand jury in this District returned an indictment against Chen on charges of wire fraud conspiracy, in violation of 18 U.S.C. § 1349, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). *See United States v. Chen Zhi*, No. 25-CR-312 (RPK), Dkt. 1

7

(Indictment). Each count included a Forfeiture Allegation naming the Defendant Cryptocurrency as specific property subject to criminal forfeiture. *Id.* at 21-24 (alleging forfeiture of "approximately 127,271 bitcoin" previously stored at specified virtual currency addresses). That indictment remains pending. The Defendant Cryptocurrency is therefore subject to forfeiture in Chen's criminal case, even if Chen continues to evade the arrest warrant issued by this Court.

"It is well established that third parties may not intervene during criminal forfeiture proceedings to assert their interests in the property being forfeited." *DSI Assocs. LLC v. United States*, 496 F.3d 175, 183 (2d Cir. 2007). Under § 853(k), which governs the criminal forfeiture proceeding in Chen's case pursuant to 18 U.S.C. § 982(b)(1), third parties are prohibited from attempting to circumvent the criminal forfeiture process in either of two ways:

> Except as provided in subsection (n) [relating to third-party interests], no party claiming an interest in property subject to forfeiture under this section may—
>
> (1) intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this section; or
>
> (2) commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

21 U.S.C. § 853(k). This bar on intervention applies even if the defendant remains a fugitive. *See Roberts v. United States*, 141 F.3d 1468, 1470-71 (11th Cir. 1998). As relevant here, subsection (2) is commonly raised to preclude third-party lienholders from, for instance, initiating foreclosures or tax lien sales on real property subject to forfeiture in a pending criminal case. *See, e.g.*, *United States v. Phillips*, 185 F.3d 183, 187-88 (4th Cir. 1999) (foreclosure sale); *SKL Invs., Inc. v. United States*, No. 13-MC-38 (RHC), 2014 WL 4365297, at *4-6 (W.D. Tenn. Sept. 2, 2014) (tax lien sale).

Subsection (2) applies here to bar the Fritz Claimants' turnover action. The turnover action is "an action at law or equity against the United States" that concerns "the validity of [their] alleged interest" in property subject to criminal forfeiture within the meaning of § 853(k)(2). To be sure, the turnover complaint is captioned as a complaint against Iran and China Investment Development Group d/b/a LuBian.com as defendant. But the turnover complaint pleads in the United States as a third-party "Garnishee" and seeks relief against the United States—by issuing a writ of attachment against property in the United States' possession, and "[e]nter[ing] an order directing Garnishee the United States to turn over the 127,271 Bitcoin currently within its possession." Dkt. 1, Compl. ¶¶ 14, 114-27 & Prayer for Relief. As garnishee, the United States would also (in theory) be liable for monetary damages if it failed to comply with the turnover

order.[8]  *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 472-73 (2d Cir. 2018). The turnover action is therefore an action "against" the United States. Indeed, this action is much more directly "against" the government than, for instance, foreclosure sales, which courts have consistently held fall within the scope of § 853(k). *See, e.g.*, *Phillips*, 185 F.3d at 188 (holding that a "foreclosure action constituted 'an action at law or equity against the United States' and was statutorily barred under § 853(k)"); *United States v. MacInnes*, 223 F. App'x 549, 553-54 (same); *Marzouca v. GFG Realty Fund, LLC*, No. 12-CV-62 (GRA), 2012 WL 910010, at *2-3 (D.S.C. Mar. 16, 2012) (same). And the turnover action plainly concerns the "validity" of the Fritz Claimants' interest, as it seeks an "order conveying, assigning, and directing the payment of the 127,721 Bitcoin to Plaintiffs, along with all rights, title, and interest of Iran and the Iran-China Group in the 127,271 Bitcoin." Compl. ¶ 123. The Fritz turnover action is therefore barred, and should be dismissed, under the plain terms of § 853(k).

Nor can the Fritz Claimants circumvent § 853(k) by relying on TRIA's "notwithstanding" clause, TRIA § 201(a). As the Second Circuit has emphasized, "the 'notwithstanding' clause applies only when some 'other provision of law' conflicts with TRIA." *Smith*, 346 F.3d at 271. But the "notwithstanding" clause does not directly conflict with § 853(k). Section 201(a) of TRIA defines, as a substantive matter, *what* assets are available to compensate victims of terrorism—namely, "the blocked assets of [a] terrorist party." TRIA is not a procedural statute, and it does not provide any freestanding cause of action or procedural mechanism for TRIA plaintiffs to enforce their judgments: "TRIA itself . . . provides no procedures for enforcement. In seeking attachment or execution, therefore, a judgment holder must follow the procedures of state law and, to the extent it applies, federal law." *Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 97 (2d Cir. 2022). Section 853(k), by contrast, is *solely* a procedural statute. It does not define or limit what assets may be subject to criminal forfeiture. Instead, it merely channels all claims of ownership into a forfeiture proceeding where they can be adjudicated in an orderly manner. This serves the overall "purpose" of the forfeiture laws—"to conclusively determine ownership rights in the seized property." *In re Matthews*, 395 F.3d 477, 481 (4th Cir. 2005). Because the two statutes address different subject matter and serve different purposes, there is no conflict, and § 853(k) should be enforced according to its terms.

Consistent with this conclusion, the Fifth Circuit squarely held in *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677 (5th Cir. 2013), that TRIA's "notwithstanding" clause does not override § 853 because the two statutes do not come into conflict. *Id.* at 689 ("We therefore hold that § 201 of the TRIA does not trump the criminal forfeiture provisions of 21 U.S.C. § 853."). That holding explicitly encompassed § 853(k)'s bar on intervention. *See id.* at 684 (specifically citing § 853(k), (n), and explaining that "[t]he criminal forfeiture statute bars a third party claiming an interest in forfeitable property from intervening in the criminal trial or appeal, and also prohibits a third party from commencing a separate action against the United States on the basis of that party's interest in the property."). The government is unaware of any court reaching the opposite conclusion.

---

[8] As explained above, federal sovereign immunity bars the turnover action and would also bar an action to recover such damages.

9

Of course, *Holy Land* considered a standalone criminal forfeiture proceeding. Here, there are two forfeiture proceedings running in parallel. The government acknowledges that the Fritz Claimants are not barred by operation of § 853(k) from filing their claim in the parallel civil forfeiture proceeding, Dkt. No. 25-CV-5745. Section 853(k) prohibits only two things—intervention by third parties in a "trial or appeal of a criminal case" involving the property subject to forfeiture, or commencement of a separate "action at law or equity against the United States" concerning their interest in the property. 21 U.S.C. § 853(k)(1)-(2). A parallel civil forfeiture proceeding is neither. Accordingly, while § 853(k) bars this turnover action, it does not by itself bar the Fritz Claimants' claim in the civil forfeiture proceeding (although their claim fails on other grounds).

### 3. TRIA Does Not Apply Because the Defendant Cryptocurrency Is Not a "Blocked Asset" of a "Terrorist Party"

In addition to the above, TRIA does not apply in this case because the Defendant Cryptocurrency is not a "blocked asset" that belongs to a "terrorist party" within the meaning of TRIA. Section 201(a) limits the kinds of assets that victims of terrorism can reach: a plaintiff who "has obtained a judgment against a terrorist party" can only attach "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." *Id.* § 201(a). The Defendant Cryptocurrency is not presently "blocked" within the meaning of TRIA, nor is it the property "of" a terrorist party or its instrumentality.

#### a. The Defendant Cryptocurrency Is Not Seized or Frozen Under IEEPA

TRIA authorizes plaintiffs to attach "blocked assets." TRIA § 201(a). *See Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 374 (2009) (TRIA permits "a person with a terrorism-related judgment to attach an asset . . . provided the asset was a 'blocked asset'"). As used in TRIA, "blocked asset" is a term of art defined in the following terms, with exceptions not relevant here:

> (2) BLOCKED ASSET.—The term "blocked asset" means—
>
> (A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702) . . . .

*Id.* § 201(d)(2)(A). That means that a blocked asset must have been both "seized or frozen," and seized or frozen "under" the Trading with the Enemy Act (TWEA) or the International Emergency Economic Powers Act (IEEPA). *See Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 75 (E.D.N.Y. 2004) ("[T]he term 'blocked' under the TRIA is specifically limited to assets that are 'seized or frozen'—a limitation that this Court cannot ignore."); *Bank of New York v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007) (adopting *Weinstein*).

Prior to the filing of the government's civil forfeiture complaint, the Defendant Cryptocurrency was not a "blocked asset" because it had not been seized or frozen "under" IEEPA. In *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910 (11th Cir. 2013), the

Eleventh Circuit rejected attempts to garnish assets under TRIA that were frozen under a different authority—in that case, the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), 21 U.S.C. § 1901 *et seq.*—in order to satisfy a judgment against a terrorist party, the Revolutionary Armed Forces of Colombia (FARC). In that case, the fact that FARC was a "Specially Designated Global Terrorist" (SDGT) under IEEPA was irrelevant because the assets had been frozen under the Kingpin Act rather than IEEPA. *See Stansell*, 704 F.3d at 913. The Eleventh Circuit's analysis began and ended with the "unambiguous" language of the statute:

> Section 201(d)(2)(A) declares that "blocked asset" *means* an asset frozen under select provisions of the Trading Act [TWEA] and the Economic Powers Act [IEEPA]. Assets frozen under the Kingpin Act, however, are absent from that definition. The unavoidable conclusion is that "blocked assets" under the Terrorism Act [TRIA] does not mean assets frozen pursuant to the Kingpin Act.

*Id.* at 915 (emphasis in original). Similarly, the Supreme Court considered and rejected the argument that assets restrained under separate authorities counted as seized "under" IEEPA. *Elahi*, 556 U.S. at 377 ("It is true that . . . the export of certain military equipment remained subject to regulation under other statutes, including the Arms Export Control Act. But that fact does not show that military equipment remained *blocked* under IEEPA.") (emphasis in original). The Second Circuit relied on the same reasoning to hold that TRIA "does not 'reach those funds which the government has been given authorization to control through another means.'" *Kirschenbaum v. 650 Fifth Ave. & Related Props*, 830 F.3d 107, 139 (2d Cir. 2016) (quoting *Holy Land*, 722 F.3d at 685). Specifically, in *Kirschenbaum*, the court found that the court appointment of a receiver to control the defendant's real estate assets did not bring those assets within the scope of TRIA, because the receiver's authority over the property did not come from IEEPA.[9] *Id.* The same logic applies in this case: even if the government took control over the Defendant Cryptocurrency before filing the civil forfeiture complaint, it was not seized "under" IEEPA or TWEA.

The Fritz Claimants nevertheless argue that the Defendant Cryptocurrency was "'automatically blocked'" under Executive Order 13,599 and the Iranian Transaction and Sanctions Regulations (ITSR), 31 C.F.R. § 560.201 *et seq.*, based on the Second Circuit's opinion in *Kirschenbaum*. *See* Dkt. 70, at 24 (quoting *Kirschenbaum*, 830 F.3d at 137); Dkt. 89, at 2 (same).

As a preliminary matter, the defendants rely on the phrase "automatically blocked" from *Kirschenbaum*, but they are taking that phrase out of context from a different part of the *Kirschenbaum* opinion having nothing to do with the meaning of the statutory terms "seized or frozen." Instead, the phrase relates to whether sanctions naming the "Government of Iran" also apply—"automatically"—to unnamed instrumentalities of the Government of Iran, such as Bank

---

[9] The assets in *Kirschenbaum* were also subject to forfeiture in a pending civil forfeiture case, *see* 830 F.3d at 121, but the Second Circuit explicitly reserved judgment on the question of whether the government's forfeiture action "effectively unblocked" the assets—thus removing them from TRIA's reach—because neither of the (private) litigating parties raised that issue. *Id.* at 139 n.24.

11

Melli, even if they have not been separately listed on OFAC's Specially Designated Nationals and Blocked Persons ("SDN") List. *See* 830 F.3d at 139 (reading in full: "Accordingly, if Defendants satisfy Executive Order 13,599's definition of Government of Iran, their assets are *automatically blocked* pursuant to that Order regardless of whether they are on the SDN List or Executive Order 13,599 List.") (emphasis added). That may answer a different question in this case—whether LuBian counts as an instrumentality of Iran even if it has not been listed on the SDN List—but it does nothing to illuminate whether the Defendant Cryptocurrency was "seized or frozen" within the meaning of TRIA.[10]

Moreover, *Kirschenbaum* reiterated that the seizing or freezing of assets (for purposes of TRIA) does not happen automatically, but requires the transfer of some "possessory interest" in the property. *See* 830 F.3d at 139-41; *see also Smith ex rel. Est. of Smith v. Fed. Reserve Bank of New York*, 346 F.3d 264, 272 (2d Cir. 2003) ("To seize or freeze assets transfers *possessory* interest in the property.") (emphasis in original). The *Kirschenbaum* court found that when the property in that case was "within the United States" the Iranian sanctions regime "provid[ed] the government with sufficient control of such property to be recognized as a possessory interest." *Id.* at 140. At most, this suggests that assets of an Iranian instrumentality might become subject to TRIA when they come "within the United States." Here, however, any interest LuBian might have held in the Defendant Cryptocurrency was extinguished long before the property came into the United States, because LuBian had transferred the Bitcoin to Chen.

The government acknowledges, however, that the Defendant Cryptocurrency arguably became blocked on October 14, 2025. On the same date that the government filed its forfeiture complaint, OFAC announced sanctions against 146 targets within the Prince Group Transnational Criminal Organization (TCO), including the designation of Chen as an SDN. *See* U.S. Dep't of the Treasury, *U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia* (Oct. 14, 2025), available at https://home.treasury.gov/news/press-releases/sb0278; *U.S. Dep't of the Treasury, Transnational Criminal Organizations Designations; Issuance of TCO-related General License* (Oct. 14, 2025), available at https://ofac.treasury.gov/recent-actions/20251014. The designation of Chen would have blocked any property belonging to him, including, arguably, the Defendant Cryptocurrency. This fact, however, is unavailing to the Fritz Claimants. Chen was designated under OFAC's transnational criminal organization-related authorities, not its terrorism authorities, and no party has suggested Chen qualifies as a "terrorist party" within the meaning of TRIA. *See* TRIA § 201(d)(4). If the Defendant Cryptocurrency belongs to Chen, it may be blocked, but it is not the property of a

---

[10] The Fritz Claimants further rely (Dkt. 89, at 2) on a footnote in *Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91 (2d Cir. 2022). But that footnote, at best, is dicta and unrelated to the court's more limited holding—which simply remanded to the district court to make factual findings as to whether the defendant in that case was an agency or instrumentality of Iran and whether the assets were "blocked" in the first instance under TRIA. *Id.* at 97, 99.

terrorist party. If the Defendant Cryptocurrency belongs to LuBian, as the Fritz Claimants assert, then it was not blocked by operation of OFAC's October 14, 2025 designation of Chen.[11]

### b. The Defendant Cryptocurrency Is Subject to a General License and Restrained Under Separate Forfeiture Authority

Even if the Defendant Cryptocurrency qualified as a "blocked asset" at some point in time, it is no longer "blocked" under IEEPA within the meaning of TRIA. First, regardless of the source of the blocking authority, the government has a general license to engage in transactions involving blocked property for the "official business of the United States Government." *See, e.g.*, 31 C.F.R. § 560.557 (ITSR) ("All transactions prohibited by this part that are for the conduct of the official business of the United States Government by employees, grantees, or contractors thereof are authorized."); 31 C.F.R. § 590.510 (Transnational Criminal Organizations Sanctions Regulations) (same). The Second Circuit has held that a general license effectively unblocks assets and removes them from the scope of TRIA. *See Rubin*, 484 F.3d at 150 ("[W]e hold that assets blocked pursuant to Executive Order 12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979), and its accompanying regulations, see 31 C.F.R. Part 535, that are also subject to the general license of 31 C.F.R. § 535.579, are not blocked assets under the TRIA and therefore are not subject to attachment under that statute."). Accordingly, under binding Second Circuit precedent, the government's general license renders the Defendant Cryptocurrency "not subject to attachment under [TRIA]." *Id.*

Second, even setting aside the government's general license, the Defendant Cryptocurrency has been restrained under separate forfeiture authority—the arrest warrant *in rem* issued by this Court—so it no longer counts as seized or frozen "under" IEEPA. The Seventh Circuit's decision in *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607 (7th Cir. 2015), is instructive on this point. In *R.J. O'Brien*, OFAC initially blocked several million dollars in investments made by an al Qaeda financier at a U.S. financial institution. *Id.* at 612. The government then initiated civil forfeiture proceedings against the blocked assets, first by obtaining a license from OFAC for purposes of civil forfeiture, and then by obtaining and executing an arrest warrant *in rem* from the district court. *Id.* at 615. As here, a group of TRIA plaintiffs sought to attach the assets under TRIA and intervene as claimants in the civil forfeiture proceeding. *Id.* at 612-13. The Seventh Circuit found that the forfeiture license and arrest warrant *in rem* had effectively un-seized and un-frozen the funds: "once the United States executed its warrants of arrest *in rem*, the funds—at least by that point—were no longer 'seized or frozen' as TRIA contemplates the terms . . . . Instead, the funds were seized under civil forfeiture." *Id.* at 625; *see also id.* at 626 ("These funds are now part of an OFAC licensing scheme, they are arrested, and they therefore outside the ambit of TRIA. . . . They are excluded from the definition of 'blocked assets' under the statute."); *id.* at 627 ("By the time Appellees filed their initial, verified claims, OFAC had already issued its license and the funds had already been arrested to preserve them for forfeiture. In sum, the funds were no longer blocked.").

---

[11] In light of the designation of Chen, and based on further consultations within the U.S. government, the government withdraws and corrects its prior statement that the Defendant Cryptocurrency had "never" been seized or frozen under IEEPA, *see, e.g.*, Dkt. 88, at 1.

The Seventh Circuit's opinion in *R.J. O'Brien* relied in turn on the Fifth Circuit's decision in *Holy Land*. The fact pattern in *Holy Land* was similar—involving blocked assets of an organization involved in terrorist fundraising—except that the government proceeded through criminal rather than civil forfeiture. *See Holy Land*, 722 F.3d at 681-82. The government obtained a forfeiture license from OFAC and then obtained a judicial restraining order pursuant to 21 U.S.C. § 853(e)(1)(A) in order to "preserve the availability of property" subject to criminal forfeiture. *Id.* at 681-82. As the Fifth Circuit explained, the issue was "whether the government essentially unblocked HLF's assets when it obtained a restraining order under 21 U.S.C. § 853(e)(1)(A) to pursue the criminal forfeiture of those assets"—which the court answered in the affirmative. *Id.* at 685. The text of TRIA "specifically limits the definition of 'blocked' assets to those that are seized or frozen under § 5(b) of the Trading with the Enemy Act or § 202 or § 203 of the IEEPA," but it does not "reach those funds which the government has been given authorization to control through another means." *Id.* at 685. The restraining order "initiates the forfeiture proceedings and secures the government's interest so that, upon conviction, the relation-back doctrine [under 21 U.S.C. § 853(c)] can operate as was intended." *Id.* at 686. By placing the assets into the court's jurisdiction for disposition under the criminal forfeiture laws, "the government's restraint of HLF's assets took those assets out of the reach of the TRIA." *Id.* at 686 n.5. The Fifth Circuit's holding in *Holy Land* was adopted by the Second Circuit in *Kirschenbaum*, *see* 830 F.3d at 139-40 (quoting *Holy Land*)—although, as noted above, the Second Circuit did not reach the question of whether the government's forfeiture action unblocked the assets for purposes of TRIA. *Id.* at 139 n.24. But the clear holding of *Holy Land* is that the initiation of a forfeiture action "essentially unblock[s]" assets that would otherwise be subject to TRIA, *see* 722 F.3d at 685, and the Second Circuit's endorsement of *Holy Land*'s reasoning supports application of that holding here. Because the government has executed an arrest warrant *in rem* and brought the Defendant Cryptocurrency into the jurisdiction of this Court, the Defendant Cryptocurrency, if it ever had been blocked, is no longer "seized or frozen" within the meaning of TRIA.

The Fritz Claimants rely on the D.C. Circuit's recent decision in *Estate of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632 (D.C. Cir. 2025). *Levin* is an outlier that departs from the general consensus of nearly every other court to consider the reach of TRIA—including the Second Circuit's decision in *Rubin*, the Fifth Circuit's decision in *Holy Land* which the Second Circuit endorsed in *Kirschenbaum*, and the Seventh Circuit's decision in *R.J. O'Brien*. *See id.* at 640-42. *Levin* relies on an idiosyncratic definition of "frozen" drawn from the 1961 edition of Webster's New International Dictionary and Black's Law Dictionary, *see* 156 F.4th at 639, that is at odds with the possessory interest test articulated by the Second Circuit, *see Smith*, 346 F.3d at 272, as well as *Holy Land*'s holding that the Second Circuit adopted in *Kirschenbaum*, *see* 830 F.3d at 139. And *Levin* did not consider a scenario where, as here, the government holds a general license to engage in transactions involving arguably blocked assets—which, in the Second Circuit, means that the assets are "not blocked assets under TRIA," *Rubin*, 484 F.3d at 150. Because *Levin* is incompatible with the prevailing case law in the Second Circuit, this Court should disregard it and hold that the Defendant Cryptocurrency is not presently "blocked" under IEEPA.

### c. The Defendant Cryptocurrency Does Not Belong to LuBian

Even if the Defendant Cryptocurrency were blocked, TRIA only authorizes plaintiffs to attach property "of" the "terrorist party" against whom they hold a judgment—in this case, the Government of Iran and its agencies and instrumentalities. *See Est. of Heiser v. Islamic*

14

*Republic of Iran*, 885 F. Supp. 2d 429, 438 (D.D.C. 2012), *aff'd sub nom. Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013) ("[T]he plain language, as informed by the common law, strongly indicates that Congress intended to permit terrorist victims to execute on only the assets 'of'—or, in other words, 'belonging to'—the terrorist state committing the act."); *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 157 (2d Cir. 2018) ("It is beyond cavil that attachment will only lie against the property of the debtor, and that the right to attach the property is only the same as the defendant's own interest in it.") (internal citations and quotation marks omitted).

The Fritz Claimants argue that LuBian is such an "instrumentality" of the Government of Iran. Dkt. 70, at 13-17. The government expresses no view here as to whether that is true—but it does not matter unless the Defendant Cryptocurrency actually belongs to LuBian. It does not.

At best, only a minority percentage of the Defendant Cryptocurrency is traceable back to the LuBian mining pool. As the forfeiture complaint states, LuBian is associated with the cluster of Bitcoin addresses labeled Cluster Index-4 (out of 13 clusters), which totals approximately 23,738.17 BTC. Forfeiture Compl., ¶ 47.d. That represents less than 20 percent of the Defendant Cryptocurrency. Further, that cluster contains relatively little newly minted Bitcoin ("only 30%") and is mostly composed of Bitcoin from other sources which "suggests the commingling of funds for the purpose of laundering." *Id.* ¶ 47.d n.9. Even the defendant's own expert states that only 11,000 BTC—less than nine percent of the Defendant Cryptocurrency—can be traced directly to newly-minted coins from the LuBian pool. *See* Dkt. 72, Cohen Decl., ¶¶ 16, 103.

Further, the evidence indicates that, prior to December 2020, LuBian transferred to Chen ownership and control over all of the relevant Bitcoin that it held. *See* Forfeiture Compl., ¶ 44 & n.7. The forfeiture complaint shows that Chen laundered his illicit proceeds by investing them in cryptocurrency mining operations, among other methods, and he even boasted that "the profit [from Bitcoin mining] is considerable because there is no cost." *Id.* ¶ 42. Chen maintained a chart documenting elaborate laundering transactions involving newly-minted funds that were subsequently consolidated into Cluster Index-4. *Id.* ¶ 51. FBI analysis corroborates that funds from Bitcoin mining underwent spraying and funneling transactions before ending up in Cluster Index-4, among other clusters. *Id.* ¶¶ 52-53. Finally, Chen maintained the seed phrases associated with the private keys for each cluster, including Cluster Index-4, indicating his ownership and control over the Bitcoin. *Id.* ¶ 44 n.6. *See United States v. Harmon*, 474 F. Supp. 3d 76, 82 (D.D.C. 2020) ("Ownership of bitcoin is thus based on a user's possession or knowledge of the private key associated with a public key and address."). In short, LuBian was just one of Chen's money laundering tools—similar to a casino in which a criminal purchases chips, plays a few hands, and then cashes out. The Defendant Cryptocurrency no more "belonged" to LuBian after it had passed into Chen's possession and control than the criminal's casino winnings "belong" to the casino after they have been cashed out.

To be sure, LuBian's alleged ownership of the Defendant Cryptocurrency is a factual question that will likely require further discovery to resolve. LuBian has filed a bare-bones claim in the forfeiture proceeding and will be asserting its ownership over the Defendant Cryptocurrency—and so, it seems, the Fritz Claimants will be advocating on LuBian's behalf. The

government opposes these claims, and they are factually incompatible with competing claims over the same property filed by Chen and other claimants. While this factual dispute remains outstanding, it would be premature for the Court to conclude that "it is *probable*" that the Fritz Claimants "will succeed on the merits," N.Y. CPLR § 6212(a) (emphasis added), in establishing that the Defendant Cryptocurrency belongs to LuBian. At the very least, the Court should deny attachment until relevant facts regarding LuBian's claim of ownership are developed through the adversarial process in the civil forfeiture proceeding.

### 4. The Fritz Claimants Have Not Obtained a Property-Specific Certification Under 28 U.S.C. § 1610(c)

Finally, the Fritz Claimants have not obtained a certification under 28 U.S.C. § 1610(c) finding that they can satisfy their judgments against the Government of Iran by attaching the specific property at issue in this case, the Defendant Cryptocurrency. All but one of their certifications were obtained prior to the filing of the civil forfeiture complaint and none of them addresses the Defendant Cryptocurrency. *See* Compl. ¶ 71 & n.37.

The FSIA contains certain exceptions to foreign sovereign immunity that allow plaintiffs to sue and obtain judgments against foreign states—including the provisions under which the Fritz Claimants obtained their judgments, 28 U.S.C. § 1605A and its predecessor statute, § 1605(a)(7), which abrogate foreign sovereign immunity for acts of terrorism, see Dkt. 70, at 12-13. In turn, § 1610(a) and (b) make certain categories of property belonging to foreign states or their instrumentalities available to satisfy those judgments. Section 1610(c) imposes a certification requirement before plaintiffs can seek to attach property made available pursuant to § 1610(a) or (b).

Although § 1610(c) speaks primarily in terms of timing—requiring that "a reasonable period of time has elapsed" following the judgment and any notice to the foreign defendant—courts in the Second Circuit have also interpreted § 1610(c) to require the district court to make a property-specific certification. In other words, the district court must certify that the *specific* property at issue is available for attachment to satisfy the plaintiffs' judgment. *See Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 291 (2d Cir. 2011) (finding that § 1610(c) "requires a prior judicial determination that the execution is warranted under one of the § 1610(a) or (b) exceptions and with respect to specifically identified property"); *see also id.* ("'[A] judgment creditor seeking to invoke an exception to § 1609 immunity must first identify the property on which it seeks to execute.'") (quoting *Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 979 (7th Cir. 2011)). In practice, this often depends on details regarding the property's location and its status—whether, for instance, the property is located "in the United States" and is being "used for a commercial activity in the United States" within the meaning of 28 U.S.C. § 1610(a). *See, e.g.*, *Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("'Even when a foreign state completely waives its immunity from execution, courts in the U.S. may execute only against property that meets these two statutory criteria.'") (quoting *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002)). Necessarily, the certification also requires a finding that the property belongs to a "foreign state" or instrumentality in the first place. *See id.* ("[T]he property that is subject to attachment and execution must be 'property in the United States of a foreign state' . . . ."). The Fritz Claimants have not satisfied this basic prerequisite, because they have not established that the Defendant Cryptocurrency belongs to

16

LuBian.[12]  LuBian's claim of ownership is one of the disputed issues of fact in the civil forfeiture proceeding, and it would be premature for the Court to resolve it here in the context of a § 1610(c) certification.

The Fritz Claimants do not argue that TRIA displaces the procedural safeguard of § 1610(c), *see* Dkt. 70, at 20.  TRIA might make certain assets available to satisfy judgments against state sponsors of terrorism—namely, the "blocked assets of [a] terrorist party," TRIA § 201(a)—but it does not conflict with the substantive requirements of § 1610(c).  *See Levin v. Bank of New York*, No. 09-CV-5900 (RPP), 2011 WL 812032, at *10 (S.D.N.Y. Mar. 4, 2011) ("TRIA does not invalidate or override section 1610(c), and does not erase the reference to section 1605(a)(7) in the pre-2008 versions of 1610(a) and (b) or the reference to 1605A in the updated version of the statute.  There is no indication in the text of TRIA or 1610 that TRIA was intended to eliminate 1610(c)'s court order requirement in the context of terrorist assets, and no evidence that Congress intended for TRIA to trump section 1610.").[13]  Indeed, TRIA only reinforces the same limitation addressed in the § 1610(c) certification—that the property to be attached must be, in fact, the property *of* the terrorist party against whom the plaintiffs have a judgement.  *Cf. Est. of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429 (D.D.C. 2012), *aff'd sub nom. Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013) (noting that "Congress intended TRIA as a vehicle to compensate victims of terrorist attacks while also punishing terrorist states by making them pay for their acts," but if attachment were allowed on property not legally owned by Iran, then "[s]uch an attachment would actually reduce Iran's liability for the judgments entered against it while imposing a potentially heavy cost on innocent property owners").

5. **Attachment Is Not Necessary To Prevent Dissipation or To Secure This Court's *In Rem* Jurisdiction**

Finally, the Court should decline to exercise its discretion to grant the attachment motion because the Fritz Claimants have not made any showing of necessity.  The Defendant Cryptocurrency is secure within the government's possession.  There is no risk of "dissipation," which is generally understood to refer to efforts by the debtor to spend the assets before the creditor can reach them.  *See, e.g.*, *Greuner Med. of NJ PC v. Brown*, No. 17-CV-04569 (AMD) (PKC), 2017 WL 3841856, at *3 (E.D.N.Y. Sept. 1, 2017) (denying attachment motion in part because

---

[12] They must also establish that LuBian qualifies as an instrumentality of the Government of Iran.  As noted above, the government takes no position on that issue here.

[13] The Second Circuit's decision in *Havlish v. Taliban* is not to the contrary.  In *Havlish*, unlike here, all parties agreed that "[n]one of the exceptions in section 1610 appl[ied]."  152 F.4th at 358.  Rather, *Havlish* considered whether TRIA overrides the general sovereign immunity otherwise accorded to a "foreign state" under the FSIA, 28 U.S.C. § 1604—a question that does not involve or implicate the certification procedure under § 1610(c).  *See id.* at 358-61.  And *Havlish* confirmed that TRIA plaintiffs are still required to establish that the blocked assets they are seeking to attach are "the assets of the terrorist party or the terrorist party's agency or instrumentality," *id.* at 361-62; *see generally id.* at 361-65 (affirming dismissal of attachment motion because the assets belonged to an entity that "is not an agency or instrumentality of the Taliban under the TRIA").

"there is currently no evidence that Defendant has attempted to dissipate the funds at issue"). And the Defendant Cryptocurrency remains within this Court's jurisdiction pursuant to the arrest warrant *in rem* issued in the forfeiture proceeding. There is no reason why the Fritz Claimants should not wait until LuBian's claim is adjudicated in the forfeiture proceeding before seeking to attach LuBian's share—if any—of the Defendant Cryptocurrency.

## **CONCLUSION**

For the foregoing reasons, the Fritz Claimants cannot establish probability of success under N.Y. CPLR § 6212(a) for their *ex parte* motion for an order of attachment. The motion should be denied, and the Court should dismiss their turnover and attachment motion as barred by federal sovereign immunity and 21 U.S.C. § 853(k) and for failure to state a claim upon which relief can be granted. The Court should deny similar attachment and turnover motions, and dismiss any separate actions filed by other TRIA claimants, on the same grounds.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:   /s/
Alexander F. Mindlin
Tanisha R. Payne
Benjamin Weintraub
Andrew D. Reich
Rebecca M. Schuman
Assistant U.S. Attorneys
(718) 254-7000

Christopher B. Brown
Supervisory Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice

cc:     Clerk of Court (RPK)
         Counsel of Record