**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

NOALA FRITZ, et al.,

              Plaintiffs,

     v.

IRAN AND CHINA INVESTMENT
DEVELOPMENT GROUP, d/b/a
LUBIAN.COM,

              Defendant.

Civil Action No. 1:25-cv-07093

**REPLY IN SUPPORT OF PLAINTIFFS'
EMERGENCY MOTION FOR *EX PARTE* ORDER OF ATTACHMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

    I.    The Bitcoin Are Subject to Attachment Under TRIA ......................................... 3

        A.    TRIA Overrides Federal Sovereign Immunity................................. 3

        B.    The Criminal-Forfeiture Statute Is Irrelevant.................................. 7

        C.    The Bitcoin Are "Blocked Assets" Under TRIA.................................... 10

        D.    It Is Probable That The Bitcoin Are Blocked Assets Of Iran .................. 17

        E.    Section 1610(c) Does Not Require Property-Specific Certification Orders—And Is Irrelevant In Any Event Under TRIA ........................... 21

        F.    Attachment Is Necessary to Preserve Plaintiffs' Priority and Ability to Execute ................................................................................ 23

    II.    The Government Is Not Entitled To Seek Dismissal Of This Action................... 24

CONCLUSION........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arthur Andersen LLP v. United States*,
    544 U.S. 696 (2005)................................................................................................................6

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016)..............................................................................................................11

*Bank of N.Y. v. Rubin*,
    2006 WL 633315 (S.D.N.Y. Mar. 15, 2006) ........................................................................14

*Bank of New York v. Rubin*,
    484 F.3d 14 (2d Cir. 2007)....................................................................................................14

*California v. Hodari D.*,
    499 U.S. 621 (1991)................................................................................................................6

*Cap. Ventures Int'l v. Republic of Argentina*,
    443 F.3d 214 (2d Cir. 2006)..................................................................................................24

*Commodities & Minerals Enters. Ltd. v. CVG Ferrominera Orinoco, C.A.*,
    423 F. Supp. 3d 45 (S.D.N.Y. Sept. 18, 2019) ..............................................................22, 25

*Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*,
    120 F. Supp. 2d 401 (S.D.N.Y. 2000)..................................................................................21

*Cortez Byrd v. Corporacion Forestal y Industrial de Olancho, S.A.*,
    974 F. Supp. 2d 264 (S.D.N.Y. 2013)...................................................................................21

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
    879 F.3d 462 (2d Cir. 2018)..................................................................................................25

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
    601 U.S. 42 (2024).......................................................................................................4, 5, 6, 7

*Est. of Levin v. Wells Fargo Bank, N.A.*,
    156 F.4th 632 (D.C. Cir. 2025).........................................................9, 10, 14, 15, 16, 17

*G&A Strategic Inv. I LLC v. Petróleos de Venezuela, S.A.*,
    2025 WL 3237166 (S.D.N.Y. Nov. 20, 2025)......................................................................22

*Greenbaum v. Islamic Republic of Iran*,
    67 F.4th 428 (D.C. Cir. 2023).......................................................................................3, 4, 5, 6, 7

**Page(s)**

*Griffin v. City of New York*,
  2025 WL 2198715 (S.D.N.Y. Aug. 1, 2025) ...............................................................25

*Harrison v. Republic of Sudan*,
  838 F.3d 86 (2d Cir. 2016) .........................................................................................10

*Havlish v. Taliban*,
  152 F.4th 339 (2d Cir. 2025) ...............................................................8, 19, 21, 22

*Hawkins v. Zoegall*,
  2023 WL 4106645 (E.D.N.Y. June 20, 2023) ...........................................................20

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
  830 F.3d 107 (2d Cir. 2016)...........................................1, 6, 11, 12, 13, 16, 17

*Levin v. Bank of N.Y.*,
  2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) ...............................................................23

*Levin v. Bank of N.Y.*,
  2019 WL 11824922 (S.D.N.Y. Oct. 3, 2019) ...........................................................22

*Levinson v. Kuwait Finance House (Malaysia) Berhad*,
  44 F.4th 91 (2d Cir. 2022) ...............................................................9, 10, 11, 24

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
  471 F.3d 377 (2d Cir. 2006).......................................................................................25

*Mex. Infrastructure Fin., LLC v. Corp. of Hamilton*,
  2024 WL 1468415 (S.D.N.Y. Mar. 15, 2024) ...................................................21, 22

*Miller v. Juarez Cartel*,
  2025 WL 2846693 (C.D. Cal. Sept. 26, 2025) ...........................................................4

*Nw., Inc. v. Ginsberg*,
  572 U.S. 273 (2014)......................................................................................................5

*Olin Holdings, Ltd. v. Libya*,
  2023 WL 6066237 (S.D.N.Y. Sept. 18, 2023).........................................................21

*Pacheco v. Serendensky*,
  393 F.3d 348 (2d Cir. 2004)........................................................................................8

*Peterson v. Bank Markazi*,
  121 F.4th 983 (2d Cir. 2024) ...............................................................................8, 25

*Picaro v. Pelham 1135 LLC*,
  2015 WL 1854272 (S.D.N.Y. Apr. 21, 2015)...........................................................25

iii

**Page(s)**

*Shoshone Indian Tribe of Wind River Rsrv. v. United States,*
364 F.3d 1339 (Fed. Cir. 2004)................................................................................5

*Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.,*
346 F.3d 264 (2d Cir. 2003)..............................................................................6, 9

*Stansell v. Revolutionary Armed Forces of Colombia,*
704 F.3d 910 (11th Cir. 2013) ...............................................................................13

*Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.,*
424 F.Supp. 1125 (S.D.N.Y. 1976) .......................................................................20

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.,*
783 F.3d 607 (7th Cir. 2015) ..............................................................5, 15, 16, 17

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.,*
892 F. Supp. 2d 1038 (N.D. Ill. Sept. 25, 2012) .....................................................5

*United States v. Daugerdas,*
892 F.3d 545 (2d Cir. 2018)....................................................................................8

*United States v. Holy Land Found. for Relief & Dev.,*
722 F.3d 677 (5th Cir. 2013) ...............................................................10, 15, 16, 17

*U.S. ex rel Eisenstein v. City of New York,*
556 U.S. 928 (2009)...............................................................................................25

*Walters v. Industrial & Commercial Bank of China, Ltd.,*
651 F.3d 280 (2d Cir. 2011)..............................................................................21, 22

*Weinstein v. Islamic Republic of Iran,*
609 F.3d 43 (2d Cir. 2010)...............................................................................1, 10

*Wyler v. United States,*
725 F.2d 156 (2d Cir. 1983).....................................................................................18

**Statutes**

21 U.S.C. § 853(k) .................................................................................................7, 10

28 U.S.C. § 1395......................................................................................................13

28 U.S.C. § 1604......................................................................................................23

28 U.S.C. § 1610.............................................................................................21, 22, 23

TRIA, Pub. L. No. 107-297, § 201, 116 Stat. 2337 (Nov. 26, 2002) .............1, 2, 4, 6, 7, 9, 10, 17

iv

**Page(s)**

CPLR 105.................................................................................................................8

CPLR 6205........................................................................................................1, 2, 24

CPLR 6012.................................................................................................................2

CPLR 6212....................................................................................................3, 12, 25

**Regulations**

31 C.F.R. § 535.579 ................................................................................................14

31 C.F.R. § 560.211 ................................................................................................11

31 C.F.R. § 560.557 ...........................................................................................15, 16

31 C.F.R. § 590.510 ................................................................................................15

46 Fed. Reg. 14,330 (Feb. 26, 1981) ......................................................................14

77 Fed. Reg. 6,659 (Feb. 8, 2012) ..........................................................................11

**Rules**

Fed. R. Civ. P. 12 ...................................................................................................25

Fed. R. Civ. P. 69 .....................................................................................................1

Fed. R. Crim. P. 32.2 ..............................................................................................10

**Other Authorities**

148 Cong. Rec. S11524 (Nov. 19, 2002)..................................................................7

American Heritage Dictionary (4th ed. 2000) .........................................................16

Black's Law Dictionary (10th ed. 2014)....................................................................6

Muyao Shen & Patrick Howell O'Neill, *China Accuses US of Orchestrating $13 Billion Bitcoin Hack*, Bloomberg (Nov. 11, 2025), https://tinyurl.com/bdemf6c6 ...................................................................................13

New Oxford American Dictionary (3d ed. 2010) ......................................................6

N.Y. B. Jacket 2010 S.B. 6360, Ch. 468, https://tinyurl.com/yx4ndt6y.................1, 24

Siegel, N.Y. Prac. (6th ed.) .......................................................................................3

**Page(s)**

Webster's Third New Int'l Dictionary (1993) ...................................................................................6

## INTRODUCTION

The Terrorism Risk Insurance Act (TRIA) authorizes Victims' attachment motion. TRIA was designed to "'establis[h] once and for all'" that judgments against terrorist parties "'are to be enforced against any assets available in the U.S., and that the executive branch has no statutory authority to defeat such enforcement under standard judicial processes[.]'" *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010). TRIA's plain text therefore subjects the "blocked assets" of terrorist parties to "execution or attachment in aid of execution" "*in every case*" to satisfy such judgments, "[n]otwithstanding any other provision of law." TRIA, Pub. L. No. 107-297, § 201(a), 116 Stat. 2337 (Nov. 26, 2002), *codified as a note to* § 28 U.S.C. § 1610. TRIA's text clearly encompasses the Bitcoin here, which were "automatically blocked" as Iranian property as soon as they entered the United States under the Executive Order 13,599 and its implementing regulations. *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 141 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018)).

TRIA relies on local law to supply the attachment procedures. Fed. R. Civ. P. 69(a)(1). In New York, CPLR 6205 provides that "attachment may be granted in aid of execution to a party that has been awarded a money judgment against a foreign state." This provision was enacted to protect the priority of "diligent" creditors who have engaged in "costly efforts" to identify "property of the foreign sovereign" in the United States against other creditors who only "lear[n] through monitoring" the dockets of "the existence of such property" during the pendency of "lengthy and costly" FSIA litigation. N.Y. B. Jacket 2010 S.B. 6360, Ch. 468, https://tinyurl.com/yx4ndt6y.

That is precisely the situation here. Before the government ever filed its forfeiture complaint, Plaintiffs, who are Gold Star families and victims of terrorist attacks sponsored by Iran ("Victims") and hold judgments against Iran, spent months and hundreds of hours diligently investigating the connections between Iran and the subject Bitcoin. After they sought ex parte emergency attachment under TRIA and the CPLR based on the undeniable Iranian origins of the Bitcoin, thousands of copycat claimants both in this District and elsewhere have sought to bring

1

claims totaling over one hundred billion dollars against the Bitcoin. To protect their interests against these copycat claimants during the pendency of litigation with the government over the Bitcoin, Victims need an attachment now.

Inexplicably, the United States has decided to support Iran over Gold Star families by opposing Victims' attachment motion. But each of the arguments in the United States' legal grab bag runs into TRIA's plain text and its authorization of attachment "notwithstanding any other provision of law." Although the government mysteriously refuses to reveal when or how it obtained the Bitcoin, it nonetheless contends, relying on a D.C. Circuit decision that has since been abrogated by intervening Supreme Court precedent, that because it currently holds the Bitcoin, Victims' attachment is barred by its own sovereign immunity. This argument cannot be squared with TRIA's explicit provision for attachment of "blocked assets" "seized" by and in the possession of the United States. § 201(d)(2)(A). Similarly, the government's claim that the criminal forfeiture statute bars attachment is foreclosed by TRIA's "notwithstanding" clause, as is its claim that FSIA Section 1610(c) prevents Victims' attachment. And the government's argument that the Bitcoin are not "blocked" within the meaning of TRIA founders on multiple fronts, including the unambiguous text of Executive Order 13,599 providing that "[a]ll property and interests in property of the Government of Iran … in the United States ... are blocked."

Tellingly, the government did not provide an affidavit or any other evidentiary material in support of its opposition. Nor does it dispute Victims' detailed evidentiary showing that the Iran and China Investment Development Group (Iran-China Group), also known as LuBian, is an instrumentality of Iran. Rather, despite acknowledging in its forfeiture complaint that LuBian mined to and controlled addresses holding the Bitcoin prior to the hack, the government contends—without any documentary support—that at some unspecified time before the hack LuBian transferred its Bitcoin to Chen Zhi, the subject of the government's separate criminal indictment. The government's civi-forfeiture complaint against the Bitcoin has its own serious problems—chief of which is the government's inability to connect the Bitcoin to Chen's purported schemes in the United States before the Bitcoin was hacked in 2020. But the government's naked

2

assertion of a transfer, citing generalized statements in the forfeiture complaint, does not even address, let alone refute, the specific facts set forth in Victims' experts' affidavits establishing that the Bitcoin mined by LuBian in Iran went directly into the wallet discussed in the government's forfeiture complaint and were never transferred before the hack.

At this early stage, Victims need only show "that it is probable" they will succeed on the merits of their claims for execution against the Bitcoin.  CPLR § 6212(a).  The Court need not conclusively resolve any evidentiary disputes or adjudicate the merits of the government's legal and factual arguments for forfeiture.  And if attachment is granted, the government or other claimants are free to raise further challenges to Victims' claims for execution as part of the confirmation process provided by New York law.  Ex parte attachment under CPLR Article 62 is designed to be speedy, provisional, and "not a very difficult burden."  Siegel, N.Y. Prac. § 316 (6th ed.).  Victims are clearly entitled to have their priority protected from the thousands of copycat claimants while the Court resolves whether Victims ultimately may execute upon the Iranian Bitcoin at issue.  Thus, the Court should grant attachment now, while deferring any motion to dismiss, which in any event, it is improper for the government to make since it is not a Defendant in this suit.

## ARGUMENT

### I.       The Bitcoin Are Subject to Attachment Under TRIA

#### A.       TRIA Overrides Federal Sovereign Immunity

The government's lead contention is that attachment should be denied due to federal sovereign immunity.  According to the government, property in its possession (like the Bitcoin here) enjoys immunity from execution, and TRIA supposedly lacks "an unmistakable waiver of federal sovereign immunity."  Dkt. 96 (Opp.) 6 (emphasis added).  The reality is just the opposite: TRIA unmistakably permits execution on assets held by the United States.

The government's entire sovereign-immunity argument reduces to a request that this Court adopt the D.C. Circuit's decision in *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428 (D.C.

3

Cir. 2023), that TRIA does not override federal sovereign immunity.[1]  But *Greenbaum* was clearly abrogated by the Supreme Court's intervening decision in *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024), which repudiated key aspects of *Greenbaum*'s analytical framework.  *Greenbaum*, like the government now, contended that "TRIA does not expressly mention the United States, its sovereign immunity, or its susceptibility to suit under the statute."  67 F.4th at 433.  That premise is factually wrong—TRIA's definition of "blocked asset" expressly includes "the United States," TRIA § 201(d)(2)(A)—and in any event is irrelevant under *Kirtz*, which made clear that Congress need "not discuss sovereign immunity in so many words" to effect a clear waiver, 601 U.S. at 50.  Indeed, *Kirtz* reinforced that Congress "need not use 'magic words'" nor "state its intent in any particular way."  601 U.S. at 48. *Greenbaum* likewise disclaimed that TRIA's "blocked asset" definition clearly informs the scope of TRIA's "notwithstanding" clause—deeming the argument a "drawn-out implication."  67 F.4th at 434.  Yet *Kirtz* flatly rejected such reasoning, holding that "separate definitional provision[s]" *can* render an "enforcement provision" clear enough to waive immunity.  601 U.S. at 55.

The government entirely ignores *Kirtz*'s repudiation of *Greenbaum*'s key analytical premises.  But *Kirtz*—not *Greenbaum*—controls the disposition of this case.  The relevant questions are thus simply whether TRIA clearly addresses execution against assets held by the United States when it authorizes execution on the "blocked assets" of a terrorist party, "[n]otwithstanding any other provision of law."  TRIA § 201(a).  And both of those critical phrases unmistakably show that Congress intended to waive federal sovereign immunity.

Starting with the "notwithstanding" clause, the government never disputes that this phrase overrides *some* sovereign immunity—it just says the abrogation extends only to foreign, not federal, sovereign immunity.  The government pretends to rely on *Greenbaum* for that point yet does not even mention (much less defend) *Greenbaum*'s reasoning.  Viewing the notwithstanding

---

[1] The government also cites *Miller v. Juarez Cartel*, 2025 WL 2846693 (C.D. Cal. Sept. 26, 2025), as purportedly supportive.  Opp. 5.  But *Miller* simply adopted *Greenbaum*'s analysis wholesale.  *See id.* at *7 (rejecting the plaintiffs' TRIA argument "[f]or the reasons articulated in *Greenbaum*").  *Miller* thus adds no independent analysis.

4

clause "'standing alone,'" *Greenbaum* narrowly focused on the word "provision," 67 F.4th at 432—contravening *Kirtz*'s directive to evaluate waivers in light of the "sum total" of the statute, 601 U.S at 55. *Greenbaum* then claimed that "provision" naturally refers to *positive law* "written legal document[s]," like statutes or contractual provisions, but not unwritten doctrines of federal sovereign immunity—purportedly creating ambiguity in the statute. 67 F.4th at 432.

The government likely does not defend this aspect of *Greenbaum*'s reasoning because Victims already refuted it. *See* Dkt. 70 (Mot.) 23. Indeed, "[i]t is routine to call common-law rules 'provisions,'" meaning there is "*no basis*" for excluding "common law" doctrines from the scope of the term "provision." *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 282 (2014) (emphasis added). Courts have thus frequently concluded that similar "notwithstanding" clauses encompass judge-made doctrines. *See* Mot. 23 n.8. They have also deemed them sufficiently clear to abrogate federal sovereign immunity, *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 364 F.3d 1339, 1346 (Fed. Cir. 2004), including under TRIA, *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 892 F. Supp. 2d 1038, 1044 (N.D. Ill. Sept. 25, 2012) (TRIA "unequivocally waived the government's sovereign immunity"), *vacated on other grounds*, 783 F.3d 607 (7th Cir. 2015). TRIA's "notwithstanding" clause thus plainly encompasses federal sovereign immunity.

Eschewing that aspect of *Greenbaum*, the government instead relies on *Greenbaum*'s pronouncement that nothing in "the substantive text that follows" the notwithstanding clause makes its "scope" unmistakably clear. Opp. 6 (quoting *Greenbaum*, 67 F.4th at 433). But that conclusion can only be reached by ignoring TRIA's definition of "blocked assets"—in defiance of *Kirtz*, 601 U.S. at 55. In authorizing execution against "blocked assets," TRIA defines the term to mean "any asset *seized* or *frozen by the United States*" under either of two statutes—the International Emergency Economic Powers Act (IEEPA) or the Trading With the Enemy Act (TWEA). TRIA § 201(d)(2)(A) (emphasis added). TRIA thus clearly "refers to the United States," *contra* Opp. 5, and just as clearly provides for execution on assets possessed by the United States.

The plain meaning of an asset "seized" by the United States is an asset *in the possession of* the United States.  Indeed, "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" *California v. Hodari D.*, 499 U.S. 621, 624 (1991).  Contemporary dictionaries—which supply "a clear answer" about the term's "natural meaning," *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005)—say the same thing:  "seizure" refers to "possession."  *See* Webster's Third New Int'l Dictionary 2057 (1993) ("to take possession of," as in, "[the] government *seized* the entire foreign-owned oil industry"); New Oxford American Dictionary 1582 (3d ed. 2010) ("take possession of (something) by warrant or legal right"); Black's Law Dictionary 1564 (10th ed. 2014) ("To forcibly take possession").

Lacking any principled basis for ignoring TRIA's reference to "seized" property, the government changes the subject.  It says assets also can be "blocked" when frozen "in place at financial institutions," Opp. 7, meaning litigants could execute on *those* assets without implicating the government's possessory interest (and thus sovereign immunity), preserving some work for TRIA to perform.  That TRIA also covers "frozen" assets, however, obviously does not erase its distinct reference to "seized" assets, TRIA § 201(d)(2)(A), which alone clearly establishes that TRIA reaches government-possessed property.  And in any event, the notion that freezing confers no governmental possessory interest is clearly wrong under Second Circuit precedent, which repeatedly has held the opposite.  *Kirschenbaum*, 830 F.3d at 139-40 ("[T]o seize or freeze assets transfers *possessory* interest in the property." (quoting *Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 272 (2d Cir. 2003)).  Thus, TRIA's "blocked asset" definition would be a nullity if TRIA did not override federal sovereign immunity allegedly deriving from governmental possession.

The government's sole response is to parrot *Greenbaum*—that the plain meaning of assets "seized or frozen by the United States" purportedly constitutes "[a] drawn-out implication" insufficiently clear to waive sovereign immunity.  Opp. 7 (quoting *Greenbaum*, 67 F.4th at 434).  Not so.  In reality, looking to the "blocked assets" definition is a straightforward application of *Kirtz*, which makes clear that waivers must be assessed by the "sum total" of a statute, including

6

relevant "separate definitional provision[s]."  601 U.S. at 55.

The government also ignores other textual evidence that TRIA plainly contemplates execution against property owned, possessed, or controlled by the United States.  Notably, Section 201(b) of TRIA provides that the President, "on an asset-by-asset basis," can waive TRIA's immunity waiver as to diplomatic property, effectively reinstating its immunity.  TRIA § 201(b)(1).  But subsection (b)(2)(A) creates an exception to that exception, providing that such waivers "shall not apply" to diplomatic property "that has been used by the United States for any nondiplomatic purpose (including use as rental property), or the proceeds of such use."  TRIA § 201(b)(2)(A).  In other words, TRIA provides that diplomatic property in the United States' possession or control that the government *in fact* uses for non-diplomatic purposes is subject to execution under TRIA § 201(a).  This provision would be meaningless if, as the government asserts, TRIA does not authorize execution against property in the United States' possession.

Finally—despite spending most of its argument advocating for an ultra-clear-statement rule—the government invokes the "legislative history of TRIA."  Opp. 7.  Legislative history is, of course, irrelevant to whether statutory *text* supplies a clear statement.  *See Kirtz*, 601 U.S. at 49. But the government grossly mischaracterizes that history in any event.  It cites a floor statement from Senator Harkin that TRIA "operates to strip a terrorist state of its immunity from execution," purportedly showing that TRIA only concerns *foreign* states' immunity.  Opp. 7.  But in reality, Senator Harkin said the exact opposite—that TRIA's definition of "blocked asset" is "an explicit waiver of any principle of law under which the United States might not be subject to service and enforcement of any judicial order or process relating to execution of judgments," and that "terrorist party assets *held by the United States* are not immunized from court procedures to execute against such assets."  148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (emphasis added).  Text, context, and precedent thus all refute the government's sovereign-immunity argument.

**B.    The Criminal-Forfeiture Statute Is Irrelevant**

The government next contends that the criminal-forfeiture statute's "[b]ar on intervention," which forbids "an action at law or equity *against the United States*," forecloses Victims' suit.  21

7

U.S.C. § 853(k) (emphasis added); *see* Opp. 7-8.  But that provision is irrelevant:  Victims' suit is not "against the United States."  Instead, as the government acknowledges, Victims' suit is against *the Iran-China Group*, doing business as LuBian.  *See* Compl ¶ 6; Mot. 1-2; Opp. 8.  And it seeks to attach the Iran-China Group's interests in the Bitcoin—not interests owned by the United States or Chen Zhi, the defendant in the criminal-forfeiture proceeding.  Compl ¶ 6; Mot. 1-2.

Victims' suit thus may proceed under binding Second Circuit precedent.  As that court has recognized, when a person seeks to recover interests in property belonging to a third party, rather than the defendant in a criminal-forfeiture proceeding, the suit is not one "against the United States" for purposes of the criminal-forfeiture statute, even though the third-party and criminal defendant both claim interests in the same property.  *Pacheco v. Serendensky*, 393 F.3d 348, 349 (2d Cir. 2004) (allowing foreclosure on third party's interest in real property that was jointly owned by defendant in criminal-forfeiture proceedings).  Because "criminal forfeiture is an *in personam* action" that seeks to punish the defendant for his crimes, "only *the defendant's interest* in the property may be forfeited" by the government.  *United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018) (emphasis added and citation omitted); *Pacheco*, 393 F.3d at 349 ("[A] criminal defendant can only be made to forfeit what was his in the first place.").  Thus, the bar on intervention does not protect Bitcoin belonging to the Iran-China Group, even though the government simultaneously seeks to criminally forfeit Chen's interest in the same Bitcoin.

The fact that the United States is garnishee of the Bitcoin changes nothing.  Opp. 8-9.  A garnishee merely holds "property in his possession or custody in which a judgment debtor has an interest," CPLR § 105(i), and "is not substantively liable for satisfying the judgments that the Plaintiffs hold," *Peterson v. Bank Markazi*, 121 F.4th 983, 999 (2d Cir. 2024).  Victims are seeking to vindicate their interest in property owned by the Iran-China Group, not to impose liability on the government.  Even assuming a future *hypothetical* suit could be "against the United States," *see* Opp. 8-9, Victims' *actual* suit is not seeking any damages against the United States.

In any event, even if Section 853(k)'s intervention bar were relevant here, TRIA would render that bar "inoperative."  *Havlish v. Taliban*, 152 F.4th 339, 361 (2d Cir. 2025) (citation

8

omitted).  TRIA provides that "in *every* case," terrorist parties' blocked assets "*shall* be subject to execution or attachment in aid of execution."  TRIA § 201(a) (emphasis added).  That language unequivocally "allows … judgment holders to enforce their judgments using attachment or execution."  *Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91, 96 (2d Cir. 2022).  If, as the government contends, Section 853(k) effectively says the opposite, that "unmistakable conflict … is flatly prohibited by [TRIA]."  *Havlish*, 152 F.4th at 361.  Indeed, in the related context of *civil* forfeiture, the D.C. Circuit has explained that TRIA's notwithstanding clause "clearly requires courts to disregard other statutory provisions that conflict with the scope of the TRIA."  *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 643 n.1 (D.C. Cir. 2025).  Thus, where TRIA "specifically allows attachments that the civil-forfeiture statute specifically prohibits, TRIA prevails."  *Id*.  The same is true of Section 853(k)'s purported bar here.

For its part, the government acknowledges that TRIA's notwithstanding clause supersedes any provision of law that "conflicts" the statute.  Opp. at 9 (quoting *Smith*, 346 F.3d at 271).  But the government insists that Section 853(k) does not "directly conflict" with TRIA.  Opp. 9.  That argument fails.

The government first claims that "TRIA is not a procedural statute" and "does not provide any … procedural mechanism for TRIA plaintiffs to enforce their judgments."  Opp. 9.  In the government's telling, that means that TRIA cannot conflict with Section 853(k), which it characterizes as "*solely* a procedural statute."  Opp. at 9.  But this argument starts from a false premise.  As the government's own case recognizes, TRIA expressly empowers plaintiffs to "enforce their judgments *using attachment or execution*."  *Levinson*, 44 F.4th at 96 (emphasis added).  TRIA thus directs procedural mechanisms for judgment enforcement that conflict with—and therefore supersede—the purported bar on intervention in Section 853(k), even if TRIA relies on state law to provide the exact contours of those mechanisms.  *Id*. at 97; *cf. Levin*, 156 F.4th at 643 n.1 ("[I]f TRIA specifically allows attachments that the civil-forfeiture statute specifically prohibits, TRIA prevails.").

Regardless, TRIA's "notwithstanding *any* other provision of law" clause makes no

9

distinction between substantive and procedural law.  § 201(a) (emphasis added).  The Second Circuit has thus recognized that TRIA clears away procedural barriers to enforcement.  *See Weinstein*, 609 F.3d at 47 (lack of subject-matter jurisdiction); *Harrison v. Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016) (obligation to obtain an OFAC license).  The portrayal of Section 853(k) as "*solely* a procedural statute" cannot preclude Victims' attachment.  Opp. 9.

The government next suggests that Section 853(k) is supposed to "channe[l] all claims of ownership into a forfeiture proceeding where they can be adjudicated in an orderly manner." Opp. 9; *see* 21 U.S.C. § 853(n).  But this argument merely underscores the conflict with TRIA.  In the context of criminal forfeiture, those proceedings cannot begin (and Victims could not participate), until *after* the defendant is sentenced and a preliminary order of forfeiture entered. *See* 21 U.S.C. § 853(n); Fed. R. Crim. P. 32.2(c).  At that point—when the property has already been forfeited to the government—the government would almost certainly argue that such forfeiture order unblocks the property, defeating execution under TRIA.  *Cf. United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677 (5th Cir. 2013).  Such a heads I win, tails you lose approach, under which Victims could *neither* participate in the criminal-forfeiture proceedings *nor* execute under TRIA, cannot be reconciled with TRIA's broad "notwithstanding" clause.  *See Weinstein*, 609 F.3d 43, 49 (explaining that the "force" of the clause "extends everywhere").

Finally, the government relies on *Holy Land*, 722 F.3d 677, which found no conflict between TRIA and the forfeiture statute.  Opp. 9; *Holy Land*, 722 F.3d at 687-89.  But *Holy Land* reached that conclusion because it believed that the assets at issue in the case were not blocked, and therefore were no longer subject to TRIA, since an order of criminal forfeiture had been entered.  *See* 722 F.3d at 687-89.  Here, by contrast, the Bitcoin *are* blocked, *see infra* 10-14, meaning Section 853(k)—if applicable—clearly conflicts with TRIA.

## C.    The Bitcoin Are "Blocked Assets" Under TRIA

The government relatedly contends that the Bitcoin are "not a 'blocked asset'" subject to attachment under TRIA.  Opp. 10-14.  It argues that the Bitcoin were not blocked under IEEPA, and that they in any event are no longer blocked because of the effect of other legal provisions.

10

Neither theory has any purchase.

### 1.    The Bitcoin Are Blocked Assets

The government's first contention is squarely foreclosed by Second Circuit precedent, which makes clear that the Bitcoin's status as property of the Iran-China Group, an Iranian instrumentality, renders them blocked under IEEPA.  *See* Mot. 17.  The Second Circuit has repeatedly held that "regardless of whether it has been [separately] frozen or seized," "any property belonging to the Government of Iran (as well as its agencies or instrumentalities) under the relevant executive orders is 'blocked' within the meaning of TRIA." *Levinson*, 44 F.4th at 98 n.6 (citing *Kirschenbaum*, 830 F.3d at 137-41).

That conclusion necessarily follows from Executive Order 13,599 and its implementing regulations.  *See Kirschenbaum*, 830 F.3d at 137-41.  Under that Order, "[a]ll property and interest in property of the Government of Iran … that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, *are blocked* and may not be transferred, paid, exported, withdrawn, or otherwise dealt in."  77 Fed. Reg. 6,659, 6,659 (Feb. 8, 2012) (emphasis added); *see* 31 C.F.R. § 560.211 (same).  In *Kirschenbaum*, the Second Circuit explained that because the President "specifically invoked his IEEPA authority in issuing" the Order, the Order renders all "assets belonging" to the "Government of Iran"—including its agencies or instrumentalities—"automatically blocked" for purposes of TRIA when they enter the United States.  830 F.3d at 137, 141; *see also Bank Markazi v. Peterson*, 578 U.S. 212, 222 n.10 (2016) (EO 13,599 "blocked the assets [of Iran] and thereby opened the door to execution under the TRIA").  Thus, "the U.S. property of any entity satisfying the definition of 'Government of Iran'" is "subject to attachment under TRIA." *Kirschenbaum*, 830 F.3d at 141.  While the government tries to rewrite *Kirschenbaum*, Opp. 11-12, the decision speaks for itself:  "[A]ll assets belonging to an entity that satisfies Executive Order 13,599's definition of 'Government of Iran' are automatically blocked" for purposes of TRIA, 830 F.3d at 137.  No "context" is missing from that conclusion.  *Contra* Opp. 11.

The government next misreads a line from *Kirschenbaum* saying that TRIA's text "does not 'reach those funds which the government has been given authorization to control through another means.'" 830 F.3d at 139. But that line simply recognized that appointment of a court monitor to control property was "insufficient to render [property] blocked for purposes of TRIA" because TRIA requires that an asset be frozen or seized pursuant to IEEPA or TWEA. *Id.* at 140. It does not mean what the government claims—that property otherwise subject to government control cannot also be blocked under TRIA. To the contrary, in *Kirschenbaum*, the property at issue was subject to a court monitor and the object of a separate government forfeiture proceeding, and the Second Circuit *still* concluded it was independently blocked under TRIA, so long as it was shown to belong to an Iranian agency or instrumentality. *Id.* at 121, 139-41.

Here, Victims have shown—at a minimum—it is "probable" the Iran-China Group is an Iranian instrumentality, and the government does not dispute—and thereby concedes—this showing. CPLR 6212(a); *see* Mot. 13-17; Opp. 15 ("[t]he government expresses no view" as to whether LuBian is "an 'instrumentality'" of Iran). Because they belonged to the Iran-China Group, *see infra* Part I.D, the Bitcoin thus were "automatically blocked" the moment they entered this country "pursuant to Executive Order 13,599" and the regulations implementing IEEPA. *Kirschenbaum*, 830 F.3d at 137, 140.

The government next contends that TRIA blocking "requires the transfer of some 'possessory interest' in the property" to the government, Opp. 12, apparently ignoring how this undercuts its sovereign immunity argument (*i.e.*, that property possessed by the government supposedly cannot be reached under TRIA). But the government downplays *Kirschenbaum*'s conclusion that the automatic Iranian sanctions blocking regime provides the "government with sufficient control of [Iranian] property to be recognized as a possessory interest." 830 F.3d at 140. Ultimately, the government concedes that *Kirschenbaum* "suggests that assets of an Iranian instrumentality might become subject to TRIA when they come 'within the United States.'" Opp. 12. But the government ignores the fact that the Bitcoin are—by its own telling—*held in the United States by the government*, which undoubtedly gives it a possessory interest in the Bitcoin.

12

*See* Forfeiture Compl. ¶ 4 (invoking 28 U.S.C. § 1395, which requires that the Bitcoin have been "found" or brought into this District).

Instead, without citing a single shred of evidence—or even allegations in the forfeiture complaint—the government baldly asserts that "any interest LuBian might have held in the [Bitcoin] was extinguished long before the property came into the United States, because LuBian had transferred the Bitcoin to Chen." Opp. 12.[2] Such a naked assertion without any evidentiary support cannot be a basis to deny attachment, especially where the record evidence is to the contrary. Rather than being transferred to Chen, the evidence shows that LuBian, *i.e.*, the Iran-China Group, held the vast majority of the Bitcoin in its own wallets up until the December 2020 hack, *see infra* Part I.D, at which point there is reason to believe it may have entered the United States, *see, e.g.*, Muyao Shen & Patrick Howell O'Neill, *China Accuses US of Orchestrating $13 Billion Bitcoin Hack*, Bloomberg (Nov. 11, 2025), https://tinyurl.com/bdemf6c6. Certainly, the hacked cryptocurrency entered the United States no later than 2024, when it was transferred to the government wallets where it is currently held. Dkt. 72-25 at 3; Supp. Cohen Decl. ¶ 41.a; Forfeiture Compl. ¶ 4.

The government's citation of *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910 (11th Cir. 2013), proves nothing. Opp. 10-11. *Stansell* reiterates what is clear from TRIA's text: Assets frozen pursuant *only* to statutes besides IEEPA or TWEA—like the Foreign Narcotics Kingpin Designation Act—do not meet TRIA's definition of "blocked assets." 704 F.3d at 915. *Stansell* does not address situations, as here, where the government both blocks assets pursuant to IEEPA—thus satisfying TRIA's preconditions—*and* has a purportedly alternative basis for seizing them. In those scenarios, the additional authority for seizure "does not displace

---

[2] The government concedes that even under its own theory, the Bitcoin are presently blocked under IEEPA, based on the sanctions it issued against Chen. Opp. 12. But it argues that if the Bitcoin belongs to Chen, "it is not property of a terrorist party.*" Id.* at 12-13. This, of course, ignores the possibility that Chen was a principal or agent of LuBian and thus by extension an instrumentality of Iran.

13

the IEEPA block." *Levin*, 156 F.4th at 641.[3]

### 2.    The Bitcoin Have Not Become Unblocked

The government's second contention—that even if the Bitcoin initially were blocked, either the government's regulatory license to engage in "official business" or the forfeiture proceedings "unblocked" the Bitcoin, Opp. 13-14—has no more legs than its first.    The government notes that it holds a license under 31 C.F.R. § 560.557 to engage in "official business of the United States Government," and then suggests that this narrow authorization *ipso facto* means the Bitcoin are "effectively unblock[ed]" and "remove[d]" from TRIA under *Bank of New York v. Rubin*, 484 F.3d 14 (2d Cir. 2007) (per curiam). Opp. 13. Yet *Rubin* is blatantly inapposite. That case concerned a different regulation implemented in the wake of the 1981 Algiers Accords resolving the Iran hostage crisis, 31 C.F.R. § 535.579, which was designed to "revoke certain trade and financial sanctions against Iran," 46 Fed. Reg. 14,330, 14,330/3 (Feb. 26, 1981), by authorizing transactions in Iranian property that entered the United States after January 19, 1981, *id.* at 14,336/3.  Property subject to 31 C.F.R. § 535.579's sweeping authorization to deal in Iranian property thus in effect was "never blocked," *Bank of N.Y. v. Rubin*, 2006 WL 633315, at *4, *8 (S.D.N.Y. Mar. 15, 2006), as the district court explained in the "fine opinion" the Second Circuit adopted, *Rubin*, 484 F.3d at 150.[4]

The regulation at issue in *Rubin*—which broadly *authorized* transactions in Iranian property—obviously has no relevance here.  After *Rubin* was decided, the Executive Branch instituted comprehensive blocking measures against Iran, *see supra* 11, hence why the government never invokes the *Rubin* regulation.  Instead, the government relies on different, far narrower regulations permitting it to deal in Iranian property (or the property of transnational criminal organizations) for a *specific, limited purpose*—to prosecute "official business."   31 C.F.R. §§

---

[3] The government's discussion of whether the OFAC sanctions against Chen blocked the Bitcoin, Opp. 12-13, is thus likewise beside the point.  The Bitcoin were blocked under IEEPA when they came within the United States, whether or not any other authority also blocked them.

[4] Although the Second Circuit imprecisely stated that the funds were "blocked" under an executive order before stating that they were not "blocked" because of the license, 484 F.3d at 15, the district court's explanation—endorsed by the Second Circuit, *id.*—that they were "never blocked," 2006 WL 633315, at *8, is the accurate formulation.

560.557, 590.510.  Fundamentally unlike the *Rubin* regulation, however, authorizing limited-purpose transactions does not displace a general block on property.  Indeed, as the D.C. Circuit has explained, "an asset may be … 'blocked' under IEEPA even if [a regulation] allows particular uses or transactions for the funds."  *Levin*, 156 F.4th at 641; *see also id.* at 639 (rejecting argument "that *any* OFAC license authorizing *any* use unfreezes otherwise blocked funds" as contrary to the text and context of TRIA); *id.* (under ordinary definition of "frozen," an asset need only be "subject to a significant restriction; the restriction need not be fully immobilizing").[5]  A contrary reading would be absurd:  If the limited "official business" license meant the property was unblocked, the United States' sanctions regimes would be pointless, as the property then could be returned to Iran or criminal organizations.  *See* 31 C.F.R. Parts 560, 590.  That cannot possibly be correct.

Nor does the civil forfeiture proceeding, which in any event has its own serious flaws, *see, e.g.*, Dkts. 309, 310, 317, *United States v. Approximately 127,271 Bitcoin*, No. 1:25-cv-05745, (E.D.N.Y.) (*Forfeiture Case*), operate to unblock the Bitcoin.  The government does not dispute that the logic of the D.C. Circuit's decision in *Levin* is squarely on-point.  There, the court concluded that assets that "meet all the elements of [the] statutory definition" of "blocked assets" remain blocked—and hence attachable under TRIA—even *after* "the government move[s] to confiscate them by civil forfeiture."  156 F.4th at 638-39.  The D.C. Circuit soundly rejected the view that "the Executive [can] thwart attachment of blocked assets simply by authorizing itself to initiate forfeiture proceedings" as inconsistent with TRIA's goal of "eliminat[ing] the President's discretion" to bar terrorism victims from enforcing their judgments.  *Id.* at 639.  That view also makes no practical sense under Executive Order 13,599:  It cannot be that "if the government fails in its civil forfeiture action"—a distinct possibility here—the "funds are … then "available to" Iran.  *R.J. O'Brien*, 783 F.3d at 629 (Manion, J., dissenting in part).  Rather, the initiation of a forfeiture action does not unfreeze blocked assets unless and until the government obtains a

---

[5] Moreover, there would be no need for the government to obtain licenses to pursue forfeiture of blocked assets as it did in the government's cases, *see* Opp. 13-14, if the licenses in §§ 560.557 and 590.510 automatically unblocked those assets, *see Holy Land*, 722 F.3d at 682; *All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d at 615.

forfeiture order, vesting title in the United States (so that they no longer belong to Iran), which has not occurred here.  *Levin*, 156 F.4th at 639, 641.

The government claims that *Levin* relied on an "idiosyncratic definition of 'frozen,'" Opp. 14, but the government cites no competing dictionary definitions to undercut the D.C. Circuit's view that, "[i]n both ordinary and legal parlance, an asset is frozen if it is difficult to convert into cash," and it need not be "fully immobilized" but merely "subject to a significant restriction" to qualify.  *Levin*, 156 F.4th at 637-39 (collecting dictionary definitions); *accord* American Heritage Dictionary 702 (4th ed. 2000) (defining "freeze" as "[t]o prevent or *restrict* the exchange, withdrawal, liquidation, or granting of by governmental action," as in "froze[n] foreign assets held by U.S. banks" (emphasis added)).  Nor does the government explain how this definition is "at odds" with *Kirschenbaum*, Opp. 14, which if anything, suggests that insofar as the government has a "possessory interest" in assets "automatically" blocked under Iranian sanctions, such assets are not "fully immobilized" but are nonetheless blocked, 830 F.3d at 137, 139.  In any event, *Levin* concluded that assets that are the subject of a civil-forfeiture proceeding remain "fully immobilized" for TRIA purposes, absent a final forfeiture order, as here.  156 F.4th at 639, 641.

The government deems *Levin* an "outlier" that "departs from the general consensus."  Opp. 14.  But the D.C. Circuit in *Levin* ably explained why the cases the government relies on are "either inapposite or unpersuasive" (or both).  156 F.4th at 641.  As discussed, *Rubin* cannot be read to mean that "any license unfreezes an asset."  *Id.*  Moreover, in *Levin*, the government specifically raised one of the same regulations authorizing it to conduct "official business" that it raises here, *see* Doc. #2040038 at 31, *Estate of Levin v. Wells Fargo Bank, N.A.*, No. 23-7080 (D.C. Cir. Feb. 12, 2024) (citing 31 C.F.R. § 560.557), and the D.C. Circuit found it of no moment.

In *Holy Land*, the Fifth Circuit reasoned that assets subject to criminal forfeiture were no longer blocked under TRIA.  722 F.3d at 685-87.  But as the D.C. Circuit explained in *Levin*, the criminal-forfeiture statute—like its civil counterpart—"does not displace the IEEPA block" because "an asset may be 'frozen' and thus 'blocked' under IEEPA" (*i.e.*, subject to a "significant restriction") "even if some other statute allows particular uses or transactions."  156 F.4th at 639,

16

641. The Fifth Circuit reached the opposite conclusion "[w]ithout textual analysis or citations to precedent" and ignored the fact that "the IEEPA block still prevented all dealing in the funds unless and until a court entered a final forfeiture order." *Id.*[6]

Similar flaws appear in the Seventh Circuit's decision in *R.J. O'Brien*, which held that TRIA plaintiffs "could proceed with their claims notwithstanding the conflicting provisions of civil forfeiture," 783 F.3d at 621, but nonetheless concluded that a specific license authorizing the government to pursue civil forfeiture unblocked the funds for purposes of TRIA, *id.* at 624-25. No such license is at issue here. But in any event, by its definitional terms, TRIA only unblocks funds if they are subject to a license "'required by a statute *other than*' IEEPA or the [United Nations] Participation Act," *Levin*, 156 F.4th at 641 (emphasis added) (quoting TRIA § 201(d)(2)(B)(i)). The license at issue in *R.J. O'Brien* was required by IEEPA, so it "did not unblock the frozen assets." *Id.* at 641-42 (citing *R.J. O'Brien*, 783 F.3d at 630 (Manion, J., dissenting in part)).

These cases are also distinguishable on their facts. First, the government in *Holy Land* had obtained title to the assets at issue through a "preliminary order of forfeiture" in criminal-forfeiture proceedings before the claimants asserted their claims under TRIA. *See* 722 F.3d at 682. By contrast, the government here has not received an order of forfeiture in the civil forfeiture action and thus does not have ownership of the Bitcoin. Moreover, the claimants in both *Holy Land* and *R.J. O'Brien* obtained judgments against terrorist entities allowing them to pursue attachment under TRIA only *after* the government initiated forfeiture actions. 722 F.3d at 682; 783 F.3d at 615. Here, Victims obtained judgments against Iran in advance of the forfeiture proceeding involving the Bitcoin and timely asserted their claim to the Bitcoin based on those judgments.

### D.    It Is Probable That The Bitcoin Are Blocked Assets Of Iran

The government next factually attacks the Bitcoin's status as assets of an Iranian instrumentality, the Iran-China Group d/b/a LuBian. Opp. 15. But that argument relies on unsupported assertions and purported contradictions with the government's forfeiture complaint.

---

[6] Although the government claims *Kirschenbaum* "adopted" *Holy Land*'s holding, Opp. 14, it elsewhere admits that the Second Circuit "explicitly reserved judgment" on the specific issue here, *id.* at 11 n.9 (citing 830 F.3d at 139 n.24).

17

The government has offered zero documentary evidence or exhibits to support its assertions. While its complaint purports to be verified, it was only "verified" by an FBI agent on "information and belief," including "information provided by other [unnamed] law enforcement officers." Dkt. 1 at 41, *Forfeiture Case. But see Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) (affidavit "not based on first-hand knowledge is not entitled to any weight"). In a factual contest between those "verified" assertions and Victims' detailed evidentiary showing—now supported by *three* expert declarations and over 300 pages of supporting exhibits—the latter must prevail.

The government's key contention is that the Bitcoin stolen during the December 28, 2020 hack did not belong to the Iran-China Group but to Chen Zhi as proceeds of a complicated fraud and money-laundering scheme. Yet the government itself acknowledges that "Lu[B]ian is associated with" the Bitcoin addresses it places in its self-described Cluster 4. Opp. 15. The government's own forfeiture complaint alleges that "all four addresses in Cluster Index-4 were associated with Lubian (in particular, one address showed a 'Lubian.com' notation on the blockchain and the remaining three co-spent with that address, demonstrating shared ownership)." Dkt. 1, ¶ 27 n.9, *Forfeiture Case*; *see also id.* ¶ 47.d. Nonetheless, the government now claims that at some unspecified point "prior to December 2020, LuBian transferred" its Bitcoin "to Chen," citing the thinnest of allegations, namely its claim that Chen held all the wallets and seed phrases to them. Opp. 15. That theory finds no support in publicly available records of on-chain transactions before, during, and after the hack—which show the same actor that mined the Bitcoin deposited in Cluster 4, namely, LuBian, also owned 100% of the Bitcoin taken in the 2020 hack.

*First*, and perhaps most importantly, the vast majority of LuBian's pre-hack mined Bitcoin output (approximately 11,115 out of approximately 11,166 BTC) was "sent directly" to an address in Cluster 4. Supp. Cohen Decl. ¶ 30; *see also* Dkt. 1, ¶ 50, *Forfeiture Case* (acknowledging that approximately 11,000 "newly mined bitcoin were sent directly to Cluster Index-4"). And up until the hack, LuBian's newly mined, Lubian-stamped Bitcoin stayed precisely where it was initially deposited; it never left Cluster 4, directly contradicting the government's unsupported claim that at some point before the hack, LuBian transferred its Bitcoin to Chen. Supp. Cohen Decl.

18

¶¶ 32-33.

*Second*, the timing of creation and first funding of various "Clusters" of Bitcoin involved in the hack strongly suggest that all clusters were created by a single actor, and thus that the clusters all were under the common control of that same actor. Clusters 1, 3, and two of the addresses in Cluster 5 were all created and funded by a single address within the same three-hour window on April 5, 2019. Supp. Cohen Decl. ¶ 35a. Addresses in Clusters 2, 4, 5, 7 and 10 (along with an address that was later used to fund an address in Cluster 9) were then created and funded simultaneously at 7:24:52 AM by another single address on April 24, 2019. *Id.* ¶ 35.a-c. And still more addresses in Clusters 4, 5, 7, 12, and 13 were created and funded simultaneously over a period of eleven minutes that same day. *Id.* ¶ 35.d. The simultaneous creation and funding of these groups of clusters on April 5 and April 24 strongly suggests that a single entity was responsible for each of these groups. And the fact that addresses in Cluster 5 were created during each of the three events on both days points to a common creator and operator of all of the groups (i.e., Clusters 1, 2, 3, 4, 5, 7, 10, 12, 13, and subsequently Cluster 9). *Id.* ¶ 36.

Moreover, because the creator of a wallet address controls its private key, there is good reason to conclude that the same entity that made and funded the addresses in Cluster 4 on April 24 was also the same entity that subsequently deposited its newly mined cryptocurrency directly into Cluster 4—namely LuBian. Supp. Cohen Decl. ¶¶ 18, 31, 36. Thus, based on their common creation and initial funding, and LuBian's subsequent deposit of newly mined cryptocurrency into Cluster 4, the blockchain evidence strongly suggests that LuBian controlled all of these Clusters, which held 99.8% of the total Bitcoin taken in the hack. *Id.* ¶ 66.

*Third*, the hacker apparently exploited a common vulnerability in the seed phrases of all of the wallets drained on December 20. Supp. Cohen Decl. ¶¶ 37-38. That all addresses were subject to the same, novel vulnerability further suggests that a common actor created and controlled all of them. *Id.* ¶ 40. Indeed, it is "exceedingly unlikely that separate entities employed the same seed phrase generation flaw, which was exploited by the same hacker at the same time." *Id.* ¶ 60.

*Fourth*, following the hack, LuBian continued mining but began directing its newly mined

19

"LuBian-stamped" cryptocurrency into Recovery Address 1, where rescued Bitcoin from Clusters 1, 4, 5, and 7 had been placed during the hack.  Supp. Cohen Decl. ¶ 43; *see id.* ¶ 41.c.  This indicates LuBian's control over Recovery Address 1 and Clusters 1, 4, 5, and 7, which had their holdings moved into it during the hack.  *Id.* ¶ 41.c.

*Fifth*, about two months after the hack, a coordinated "sweep" of residual Bitcoin in addresses in Clusters 1, 4, 5, 7, and 13 took place, moving those assets to another recovery address. Supp. Cohen Decl. ¶¶ 45-48.  This "systematic collection of residual funds … into a single destination is strikingly similar" to the "unified emergency response" occurring the day of the hack, and strongly suggests that the same unified actor—again, LuBian—maintained control for months thereafter.  *Id.* ¶ 49.

*Sixth*, in the months following the hack, all of the addresses in all of the government's Clusters broadcast messages to the blockchain seeking to convince the hacker to return the funds, spending over $40,000 in Bitcoin to do so.  Supp. Cohen Decl. ¶ 51.  These "messages . . . self-identified the owner of each address as 'LB,' shorthand for LuBian."  *Id.*  The messages directed the hacker to contact LuBian at 1228btc@gmail.com, an address that both correlates to the hack—which occurred on December 28 (12/28)—and is nearly identical to the email address LuBian currently lists on its website—1228@lubian.com.  *Id.*  To send those messages, LuBian necessarily would have needed "the seed phrase associated with the private key for the address, or the private key directly," indicating LuBian's continued ownership of all relevant wallets.  *Id.* ¶ 52.

Those evidentiary showings—combined with Victims' already-submitted evidence— easily establish LuBian's ownership of the Bitcoin and the "prima facie" case needed for attachment, *Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.*, 424 F. Supp. 1125, 1132 (S.D.N.Y. 1976), particularly where "all legitimate inferences should be drawn in favor of the party seeking attachment," *Hawkins v. Zoegall*, 2023 WL 4106645, at *6 (E.D.N.Y. June 20, 2023).  Any purported inconsistency with the forfeiture complaint, for which the government has adduced no documentary evidence, thus is irrelevant.  Factual disputes "need not be resolved at this early stage" to grant attachment, and the government is correct that further factual

development can occur at a later date.  *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 120 F. Supp. 2d 401, 406 (S.D.N.Y. 2000).

> **E.  Section 1610(c) Does Not Require Property-Specific Certification Orders— And Is Irrelevant In Any Event Under TRIA**

The government next contends that attachment should be denied because in its view Victims have not obtained satisfactory certification orders under 28 U.S.C. § 1610(c) of the FSIA. Opp. 16.  According to the government, under Section 1610(c), judgment creditors of foreign sovereigns are required to obtain court orders "certify[ing] that the *specific* property at issue is available for attachment"—apparently before execution proceedings as to those specific assets may begin.  *Id.*  This argument is inapposite or wrong for multiple reasons.

Most fundamentally, the government's Section 1610(c) argument is irrelevant.  Victims are not seeking attachment under the FSIA, but *under TRIA*—"an independent basis" for enforcement that "overrides any jurisdictional or execution immunities" the FSIA otherwise would afford.  *Havlish*, 152 F.4th at 359.  Moreover, because Victims are not moving for attachment under either Section 1610(a) or (b) of the FSIA, Section 1610(c)'s terms, which address "attachment[s] … referred to in subsections (a) and (b)," plainly are inapplicable on their face.

The government has no coherent response.  It falsely asserts that Plaintiffs "do not argue that TRIA displaces … § 1610(c)," Opp. 17, but Victims' attachment motion says the opposite, Mot. 20.  The government also cites an unpublished, 2011 district court order to claim there is "no evidence that Congress intended for TRIA to trump section 1610," given that "TRIA is codified as a note to section 1610."  Opp. 17 (citing *Levin v. Bank of N.Y.*, 2011 WL 812032, at 10 (S.D.N.Y. Mar. 4, 2011)).  But *Havlish* subsequently deemed Section 1610's "execution immunity provisions … superseded by the TRIA," explicitly rejecting the argument that TRIA's codification as a note to Section 1610 had any interpretive force.  152 F.4th at 359-60.[7]

Finally, the government vaguely asserts that the Court should transplant Section 1610(c)

---

[7] The government also wrongly suggests that *Havlish* only concerned *jurisdictional* immunity "under the FSIA, 28 U.S.C. § 1604," Opp. 17 n.13, when *Havlish also* explicitly addressed "execution immunity" in "28 U.S.C. §§ 1609-1611" and deemed it overridden by TRIA.  152 F.4th at 358-59, 361.

into TRIA because both purportedly recognize "the same limitation"—that execution is appropriate only against "the property *of* the terrorist party."  Opp. 17.  Victims agree that TRIA requires property to belong to a terrorist party or its agency or instrumentality, but TRIA employs a "different" and "broader" agency-or-instrumentality test than the FSIA, making it inappropriate to incorporate the FSIA's requirements wholesale.  *Havlish*, 152 F.4th at 344, 362, 364.  And TRIA says nothing about timing and notice of judgment.

In any event, even if Section 1610(c) did apply here, it would present no obstacle to attachment.  To start, the timing and notice determinations in Victims' existing 1610(c) orders are plainly valid because nothing in Section 1610(c) requires judgment creditors to have identified specific property *before* seeking an order that "a reasonable period of time has elapsed following the entry of judgment" and that "notice" of the judgment was given to the foreign sovereign.  28 U.S.C. § 1610(c).  Courts routinely enter orders determining that Section 1610(c)'s timing and notice requirements are satisfied before any specific, executable assets are identified.  *See, e.g.*, *Mex. Infrastructure Fin., LLC v. Corp. of Hamilton*, 2024 WL 1468415, at *1 (S.D.N.Y. Mar. 15, 2024); *Olin Holdings, Ltd. v. Libya*, 2023 WL 6066237, at *2 (S.D.N.Y. Sept. 18, 2023); *Cortez Byrd v. Corporacion Forestal y Industrial de Olancho, S.A.*, 974 F. Supp. 2d 264, 269 (S.D.N.Y. 2013).   Thus, that Plaintiffs' existing Section 1610(c) orders did not make findings as to the Bitcoin, Opp. 16, in no way undermines those orders' findings that Section 1610(c)'s timing and notice requirements have been met.[8]

The government invokes the Second Circuit's decision in *Walters v. Industrial & Commercial Bank of China, Ltd.*, 651 F.3d 280 (2d Cir. 2011), and Section 1610(c)'s distinct requirement that there be a "judicial determination that the property at issue falls within one of the exceptions to immunity set forth in [§ 1610(a) and (b)]."  *See Walters*, 651 F.3d at 296-97.  But *Walters* deemed *that* aspect of Section 1610(c) unsatisfied because the plaintiffs had failed to

---

[8] The government does not directly attack the timing and notice determinations in Victims' existing Section 1610(c) orders or assert that Section 1610(c)'s notice and timing requirements are unsatisfied.  They plainly are.  Victims have served all relevant judgments on Iran, and their years-old judgments easily satisfy the "reasonable period of time" requirement, as numerous courts already have said.  *See* Mot. 20.

identify "the specific accounts or funds" held by Chinese banks "upon which they seek to execute judgment," meaning they had failed to identify property subject to the execution-immunity exceptions in subsections (a) or (b) of Section 1610. *Id.* at 297. That is a separate issue from whether Section 1610(c)'s timing and notice requirements are satisfied. And "[n]either the plain language of § 1610(c) nor *Walters* require[s] that specific assets be identified prior to a finding that a reasonable period of time has elapsed following the entry of a judgment," as in Victims' existing Section 1610(c) orders. *Mex. Infrastructure Fin., LLC*, 2024 WL 1468415, at *1.

The distinct attachability determinations referenced in Section 1610(c) are determinations to be made by the judgment *enforcing* court, not the judgment *issuing* court. *See, e.g.*, *G&A Strategic Inv. I LLC v. Petróleos de Venezuela, S.A.*, 2025 WL 3237166, at *1 (S.D.N.Y. Nov. 20, 2025). And Victims satisfy *Walters'* specific-property requirement because they have identified specific Bitcoin in their attachment motion on which they seek to attach. Thus, that Plaintiffs' existing Section 1610(c) orders did not "addres[s] the Defendant Cryptocurrency," Opp. 16, is irrelevant. The Court can and should make any Section 1610(c) attachability findings it deems necessary in the order issuing attachment.[9] The government's suggestion that a court needs to make a finding that the specific property is attachable before making that same finding in an attachment order is nonsensical. Thus, the government's Section 1610(c) argument is wrong and (even if correct) easily overcome.

**F.        Attachment Is Necessary to Preserve Plaintiffs' Priority and Ability to Execute**

As a last-ditch effort, the government argues that attachment is unnecessary because the Bitcoin are "secure within the government's possession" and within this Court's jurisdiction under the arrest warrant issued in the forfeiture proceeding. Opp. 17-18. But TRIA expressly provides for attachment of "blocked assets," which by definition a defendant "has no power to dissipate," *Levinson*, 44 F.4th at 98 n.6, and thus TRIA attachment in no way turns on the risk of debtor

---

[9] Victims already requested that the Court make timing and notice determinations for the *Roth* Victims simultaneously with issuing attachment, Dkt. 70, at 20; if the Court believes Section 1610(c)'s timing and notice determinations should be made in the same order as specific findings with respect to the Bitcoin, *see, e.g., Levin v. Bank of N.Y.*, 2019 WL 11824922, at *2 (S.D.N.Y. Oct. 3, 2019), Victims respectfully extend that request to the other Victims.

"dissipation," Opp. 17.  Rather, absent attachment, Plaintiffs risk having their ability to execute on their judgments undermined by thousands of proposed intervenors and copycat claims against the Bitcoin, brought in both in this District and elsewhere.  *See* Dkt. Nos. 94, 95.  The attachment procedures in CPLR § 6205, which TRIA relies on, *see Levinson*, 44 F.4th at 96, are designed for precisely these circumstances:   to "secure priority for the judgment creditor whose time, efforts and expenditures have located" sovereign property that is subject to execution over "creditor[s] who lear[n] through monitoring foreign sovereign debt litigation of the existence of such property."  N.Y. B. Jacket 2010 S.B. 6360, *supra* 1.

The government's suggestion that Plaintiffs should wait until LuBian's claim is adjudicated in the forfeiture proceeding underscores the problem.  Opp. 18.  Attachment in aid of execution exists precisely to allow judgment creditors to secure assets *before* competing claims are resolved, thereby preserving their ability to enforce their judgments and protect their priority. Although the Court has discretion to grant attachment, its discretion is not "unlimited." *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 220 (2d Cir. 2006).  Where, as here, "a statutory ground for attachment exists and both need and likelihood of success are established," a court's discretion "does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps even then." *Id.* at 222.

## II.    The Government Is Not Entitled To Seek Dismissal Of This Action

The government's requested pre-motion conference on its "anticipated" motion to dismiss under Rules 12(b)(1) and 12(b)(6) should be denied.  Aside from the government's contemplated arguments being meritless, such motion would be inappropriate because the government—as a non-party—has no standing to invoke Rule 12 and, even if it did, plainly has no standing to dismiss claims asserted against the Iran-China Group.  Rule 12 permits "a party" to assert certain "defenses by motion." Fed. R. Civ. P. 12(b).  But the government is not a "party" here.  "A 'party' to litigation is '[o]ne by or against whom a lawsuit is brought.'" *U.S. ex rel Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009).  And "[a]n individual may also become a 'party' to a lawsuit by intervening in the action." *Id.*  Here, the United States is not the entity "against whom [this] lawsuit

24

was brought," *id.*, as Victims explained above, *see supra* 8, and has not intervened, either.

The United States is simply the garnishee of the Bitcoin, which does not confer "party" status. A garnishee is merely "a third-party custodian," "is not substantively liable for satisfying the judgments," *Peterson*, 121 F.4th at 999, and thus is a "non-party," *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018); *accord Commodities & Minerals Enter.*, 423 F. Supp. 3d at 50 ("[T]he enforcement of money judgments in which the funds are in possession of non-party third-parties is governed by N.Y. C.P.L.R. § 5225(b)."). Those facts bar the government's attempt to move for dismissal. *Cf. MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 382 (2d Cir. 2006) ("Visa, as a non-party to the underlying action, should not have been allowed to file a motion to dismiss in the district court.").

In any event, even if the United States were a "party," it could not use Rule 12 to dismiss claims separately asserted against the Iran-China Group—not the United States. "Rule 12 does not contemplate defendants' bringing motions to dismiss claims against other co-defendants[.]" *Picaro v. Pelham 1135 LLC*, 2015 WL 1854272, at *3 (S.D.N.Y. Apr. 21, 2015); *Griffin v. City of New York*, 2025 WL 2198715, at *5 (S.D.N.Y. Aug. 1, 2025) ("well-established" that defendants lack "standing to move to dismiss the substantive claims not actually asserted against them"). Thus, the government's pre-motion conference request should be denied on that basis. But if the Court disagrees, Victims respectfully request that the Court adjudicate their emergency ex parte attachment motion—which New York law indicates should be decided at the outset of a case, *see* CPLR 6212(a)—before adjudicating any motion to dismiss, which necessarily would implicate the Iran-China Group who has not yet been served or appeared in the case.

## CONCLUSION

For the foregoing reasons, Victims' attachment motion should be granted.

25

Dated:    March 11, 2026          GIBSON, DUNN & CRUTCHER LLP
          New York, New York

          */s/Robert L. Weigel*
          Robert L. Weigel
          Jason W. Myatt
          200 Park Avenue
          New York, NY 10166
          Tel.: 212-351-4000
          rweigel@gibsondunn.com
          jmyatt@gibsondunn.com

          Jessica L. Wagner (*pro hac vice*)
          1700 M Street, N.W.
          Washington, D.C.  20036
          Tel. 202-955-8500
          jwagner@gibsondunn.com

          *Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this Reply complies with the formatting and length requirements set forth in Local Civil Rule 7.1 and this Court's February 27, 2025 Order.  The Reply contains 25 pages, excluding the caption, table of contents, table of authorities, and signature block.  The typeface, margins, and spacing comply with the Federal Rules of Civil Procedure, the Local Rules of this Court, and this Court's Individual Practice Rules.

Dated:        March 11, 2025                    */s/  Robert L. Weigel*
              New York, New York                Robert L. Weigel